ESTADO LIBRE ASOCIADO DE PUERTO RICO, peticionario, *v.* TRIBUNAL SUPERIOR DE PUERTO RICO, SALA DE EXPROPIACIONES, HON. PEDRO SANTOS BORGES, JUEZ, demandado; PLANTA DE CAL HICACO, INC., ET AL., interventores.

C-66-36

—O—

Opinión del Juez Asociado Señor Hernández Matos exponiendo los criterios en que funda su voto de no ha lugar a la moción de reconsideración, en la cual concurren el Juez Presidente Señor Negrón Fernández y el Juez Asociado Señor Santana Becerra.

San Juan, Puerto Rico, a 27 de junio de 1969

El peticionario solicitó la reconsideración de nuestra decisión que confirmó la resolución de la Sala de Expropiaciones

del Tribunal Superior que determinó que el Estado carecía de título de dominio sobre los islotes Hicacos y Ratones objeto de expropiación y que los mismos pertenecían a la fecha de instarse el procedimiento a la codemandada Best Builders, Inc.

Expone que erramos (a) al concluir que la composición tuvo lugar; (b) al determinar que la condición de cultivo fue sustancialmente cumplida y (c) al considerar terceros de buena fe a los adquirentes subsiguientes frente a la prueba de acontecimientos ocurridos fuera del Registro.

Las interventoras se han opuesto a la solicitud de reconsideración. A su vez sostienen, en síntesis, que el trámite de la composición debe estimarse concluido y que el mismo "constituye una ratificación del título que le había transferido don Leandro Fort" a don Juan Lavaggi; que el Estado no probó título alguno sobre los islotes; que los subadquirentes son terceros por haber comprado sin que constase del Registro el cumplimiento, con efectos extintivos, de la condición resolutoria y que "han adquirido por usucapión los terrenos objeto de este procedimiento", solicitando un reexamen de la actual doctrina de la usucapión contra el Estado.

Reseñaremos primeramente todos los antecedentes registrales de los islotes Hicacos y Ratones que forman la finca rústica Núm. 104 del término municipal de Fajardo. Comienzan el 28 de febrero de 1883, fecha de su primera inscripción en virtud del título de amparo concedido por la Corona de España a don Leandro Fort Torres, y terminan el 12 de diciembre de 1962, día de presentación del título de compraventa de Best Builders, Inc., cubriendo un estado registral de vigencia titular dominical ininterrumpido de 79 años y 9 meses. Luego discutiremos los efectos hipotecarios específicos de las inscripciones traslativas subsiguientes frente a la condición resolutoria constante en el asiento inmatriculador. Después los efectos de los actos extraregistrales rela-

cionados en esta opinión y, finalmente, la cuestión prescriptiva y sus efectos sobre el título envuelto.

## I

### ANTECEDENTES REGISTRALES

*Primera inscripción*, 28 de febrero de 1883. Por esta primera inscripción queda inscrito el islote Hicacos por título de amparo fechado el 12 de febrero de 1872, a favor de Leandro Fort Torres, y, según el título y el Registro:

". . . bajo la condición indispensable que se impuso el mismo de tenerla a disposición del Gobierno en cualquier tiempo que se le exija y la indispensable de cultivarla en su décima parte dentro del término de un año, en la cuarta parte dentro de cuatro años y en la mitad dentro de diez años a beneficio de la agricultura bajo la pena de la *revocación de la gracia y reversión de esta finca al Estado en el caso de incumplimiento de la referida* condición y con la obligación de que a los dos meses cuanto más de la fecha de la expedición del título ha de dar principio al cultivo de los terrenos concedidos, en cuyo caso no podrá turbársele en su posesión ni disputársele su dominio, debiendo pagar los derechos de tierra." (Énfasis suplido.)

*Segunda inscripción* de dominio, de fecha 4 de marzo de 1887. En este asiento se dice "No aparece afecta a carga alguna." Se inscribe la venta que hace Leandro Fort y Torres a Juan Lavaggi e Ignacio García del islote Hicacos, por partes iguales. Se dice, en parte, en el asiento: "En su virtud Don Juan Lavaggi y Don Ignacio García inscriben a su favor el dominio de la finca de este número que adquieren por título de compra."

*Tercera inscripción*, de fecha 30 de septiembre de 1901. Se inscribe a favor de Rita Alonso Rivera, viuda de Juan Lavaggi, y de los cuatro hermanos José Ignacio, Heriberta Nicolasa, Josefa Cirila y Aurelia Braulia García Becerril, "proindiviso y por iguales la participación que en esta finca correspondía a don Juan Lavaggi," y a título de herencia

testada de éste, fallecido el 4 de febrero de 1901. Se repite en este asiento que la finca "no aparece afecta a carga alguna."

*Cuarta inscripción*, fechada el 1ro. de octubre de 1901. Queda inscrita la venta que hace la condueña Rita Alonso Rivera de toda su participación en la finca a los cuatro hermanos García Becerril.

*Quinta inscripción*, fechada el 11 de octubre de 1901. Queda inscrita, a título de herencia testada, a favor también de los cuatro hermanos García Becerril, la mitad proindivisa del islote Hicacos perteneciente al padre de ellos Ignacio García, fallecido el 7 de marzo de 1890, habiéndose denegado la inscripción "respecto al llamado 'Ratones' por no aparecer inscrito a nombre del causante."

*Sexta inscripción* de dominio. Dice literalmente este asiento registral:

"Rústica:—Islote denominado 'Hicacos' descrito en la inscripción primera de igual modo que en el documento presentado. No aparece afecta a carga alguna. Don José Ignacio, Doña Heriberta, Doña Josefa y Doña Aurelia Braulia García Becerril son dueños de esta finca según las anteriores inscripciones y con tal título la venden en unión de tres más a su convecino Don Jorge Bird Arias por el precio todo de quinientos dollars, más cien dollars importe de un carro y una yunta de bueyes que enclavan en esta finca, cuya suma total confesaron recibida. En su virtud Don Jorge Bird Arias inscribe a su favor esta finca por título de compra. El documento comprende tres fincas más de las que se ha denegado la inscripción respecto al llamado 'Ratones' por no aparecer inscrito hallándose las demás donde dice la nota marginal. La presentación y demás circunstancias constan de la inscripción extensa número seis al folio veinte del tomo presente. Humacao, once de octubre de mil novecientos uno. Hons. No. 7 Arl. 2 pesos 70 cts. (Fdo.) Toro Ríos."

*Séptima inscripción*, de la misma fecha 11 de octubre de 1901. Este es un asiento practicado para salvar el error material cometido al verificarse la anterior inscripción Sexta

al omitirse expresar que la finca rústica Núm. 104 "está compuesta por los islotes 'Hicacos y Ratones' y, estando el título aún en el Registro, la describe el Registrador nuevamente en la siguiente forma: 'Rústica: Islotes denominados "Hicacos" y "Ratones", descrita en la inscripción primera de igual modo que en el documento presentado.' " A continuación se repite el texto de la inscripción sexta, o sean las circunstancias de la venta hecha de la finca por los cuatro hermanos García Becerril, en pleno dominio, a favor de Don Jorge Bird Arias, comprendiéndose en ella el islote Ratones, cuya trasmisión aparecía denegada erróneamente en las inscripciones Quinta y Sexta.

*Octava inscripción de dominio. Practicada el 8 de enero de 1954, luego de haber permanecido en toda su vigencia, durante más de 52 años, las inscripciones dominicales Sexta y Séptima en favor de Don Jorge Bird Arias.* Consta en esta inscripción Octava que el titular Bird Arias falleció testado el 3 de julio de 1950, dejando como sucesores a su esposa, dos hijos y una nieta; que se decretó la administración judicial de su herencia y en el curso de la misma la Sala de San Juan del Tribunal Superior ordenó la venta en pública subasta de los dos islotes con su planta de cal y sus anexos, adhesiones y maquinaria y otra finca más por un precio mínimo de $115,000.00; que la subasta se celebró el 16 de octubre de 1952, adjudicándose los islotes por $115,000.00, pagado de contado, a favor de Pilar Bird de Veve, quien pagó en dicha subasta también $54,683.10 por los bienes muebles." Se inscribió el dominio de la finca rústica, "a título de compra en subasta pública" a favor de la señora Bird de Veve, dándosele a esta finca Núm. 104 un valor de $11,000.00 en la distribución que se hizo del precio total de subasta.

*Novena inscripción de dominio.* Practicada el 12 de enero de 1954. En la descripción de la finca se dice: "que enclavan en el mismo [Hicacos] los siguientes edificios: Dos polvorines

para pólvora y dinamita y fulminantes, de concreto el primero y el otro de madera y zinc; tres casas de madera y zinc; un cuartel para obreros, cisternas de concreto; muelle de concreto con piso de madera y railes de acero; kilómetro y medio de vía fija de acero. No tiene cargas." Consta de ella que la señora Pilar Bird Cerra y su esposo Rafael A. Veve trasmiten la finca a la corporación "Planta de Cal Hicaco, Inc.", por la suma de $11,000.00 que reciben en acciones de la corporación adquirente a cuyo favor se inscribe en pleno dominio el inmueble.

*Décima y última inscripción*, según la Certificación que se relaciona, verificada el 29 de abril de 1954. Se inscribe sobre esta finca una hipoteca constituida por su dueña Planta de Cal Hicaco, Inc., en garantía del pago de una obligación al portador, pagadera a su presentación, por la suma principal de $40,000.00, con interés al 6% anual, librada por la corporación propietaria el 9 de abril de 1954, extendiéndose la garantía hipotecaria a $7,000.00 para créditos adicionales. A los fines de la ejecución hipotecaria se tasó esta finca en la suma de $31,000.00.

En el párrafo Décimo-Primero de la mencionada Certificación librada el 10 de enero de 1963, hace constar finalmente el Registrador que "en relación con esta finca se encuentra pendiente de despacho, presentado a las ocho y quince minutos de la mañana el asiento ciento veinte y ocho del Diario ciento noventa y tres, con fecha doce de diciembre de mil novecientos sesenta y dos—la expropiación se instó el 14 de enero de 1963—el siguiente documento: . . . ."

A continuación, en esa certificación, aparece transcrito el texto de la escritura pública Núm. 180, de compraventa, otorgada en San Juan, el 7 de diciembre de 1962, ante el notario R. Elfrén Bernier, mediante la cual la corporación Planta de Cal Hicaco, Inc.—titular según el Registro de la finca—la vendió a la corporación Best Builders, Inc., por la suma de $900,000.00, de la que se pagó en el acto de la

venta $25,000.00 y los restantes $875,000.00 se pagarían en cinco plazos anuales de $175,000.00 cada uno, deduciéndose de estos plazos el importe de la hipoteca de $40,000.00 a que se refiere la inscripción Décima de la finca. En esa escritura se hace constar también que la cabida de la finca "según aparece en el Registro de la Propiedad es de cuarenta y cinco cuerdas cuarenta y cuatro céntimos, pero según mensura practicada resultó tener una cabida de ciento sesenta y nueve punto treinta y cinco (169.35) cuerdas."

En la certificación relacionada constan textualmente las distintas notas marginales de esas diez inscripciones practicadas. Ninguna de tales notas marginales se refiere, en forma alguna, al cumplimiento o incumplimiento de la condición resolutoria impuesta en el título de amparo otorgado en favor de Leandro Fort y Torres el 12 de febrero de 1872 que motivó la inscripción primera.

Ni en el cuerpo de las nueve inscripciones siguientes a la primera, ni en la mencionada escritura de compraventa a favor de Best Builders, Inc., se hace constar explícita o implícitamente, o se anota o menciona o indica en forma alguna, el cumplimiento extintivo—que se dejó de cultivar— o el incumplimiento consolidador—que se cultivó del modo señalado en el Registro de la condición resolutoria inscrita. Empero, en las nueve inscripciones subsiguientes a la primera, unas veces se consigna "No aparece afecta a carga alguna.", otras veces "No tiene cargas de ninguna clase." o "No tiene cargas."

Existe por tanto, en el Registro, una serie sucesiva y continua de asientos dominicales respecto a los islotes Hicacos y Ratones, que figuran debidamente encadenados, apareciendo cada acto de disposición o gravamen derivado de la voluntad del titular o titulares inscritos. Ese eslabonamiento perfecto de titulares sucesivos del dominio no consta ni resulta interrumpido en el Registro por inscripción, anotación

o mención de acto alguno de revocación o anulación del título de amparo original o de reversión del título en favor de la Corona de España, del gobierno de los Estados Unidos o del Pueblo de Puerto Rico.

## II

### EFECTOS HIPOTECARIOS DE LA CONDICIÓN

Del mismo modo, durante esos 79 años y 9 meses, ha permanecido inalterada, según el Registro, la condición *indispensable* impuesta por la Junta Superior de Repartimiento de Terrenos Baldíos a la concesión graciosa del título de amparo de 1872 a favor de Leandro Fort Torres, relativa al cultivo de los islotes, *bajo la pena de la revocación de la gracia y reversión de esta finca al Estado en el caso de incumplimiento de la referida condición*. Del Registro no resulta ni consta cancelada, revocada, resuelta, renunciada, o anulada su eficacia; ni cumplida ni incumplida. No ha cesado o *desaparecido registralmente* el período de pendencia de tal condición resolutoria.

Dice Roca Sastre, en su obra *Derecho Hipotecario, Tomo II*, págs. 275 y 276, Editorial Bosch, Barcelona (1954):

"Los efectos hipotecarios específicos de la inscripción de un acto con condición *resolutoria,* y mientras se halle la misma pendiente de cumplimiento, son los generales de toda inscripción normal, si bien con la limitación que representa la contingencia de la condición resolutoria, la cual actúa a modo de gravamen, y afecta a los terceros adquirentes. No obstante, como también se produce una doble titularidad inscrita, podrán inscribirse en el Registro no sólo los actos dispositivos del titular sujeto a condición resolutoria (si bien con la amenaza del posible cumplimiento de la misma, con sus efectos retroactivos en general), sino también los actos dispositivos de las personas favorecidas por la condición, los cuales están asimismo supeditados a la eventualidad de que se extinga tal derecho, caso de incumplirse la condición resolutoria.

Fuera de estas particularidades, el derecho inscrito bajo condición resolutoria surte los efectos hipotecarios propios de todo derecho puro registrado.

b) Una vez cumplida la condición suspensiva o resolutoria (*existente condicione*), o incumplida la condición suspensiva o resolutoria (*deficiente condicione*), cesa el período de pendencia (*pendente condicione*) desapareciendo el estado de incertidumbre y, con ella, queda firme o consolidada una de las dos titularidades, y extinguida o sin efecto la otra.

Los efectos que en estos supuestos se producen, interesan al Derecho civil, si bien repercuten en el orden hipotecario, por cuanto debe traducirse en los libros del Registro la nueva situación creada, o sea el resultado consolidador o extintivo que dicho cumplimiento o incumplimiento de ambas clases de condiciones provoca."

## III

### Prescripción de la Acción Resolutoria

En su octava conclusión de derecho la Sala de Expropiaciones determinó que dicha condición resolutoria había prescrito en el año 1886, fundándose en que "la acción resolutoria prescribe a los cuatro años." El Pueblo alega que tal determinación es errónea. En ello tiene razón. Nuestro Código Civil no señala término de prescripción alguno para las acciones resolutorias. Es cierto que en su Art. 1251 dispone que la acción para pedir la rescisión autorizada por ley dura 4 años. Pero tal término no es aplicable para el ejercicio de las acciones resolutorias, sino el general de 15 años que señala el Art. 1864 cuando se trata de acciones resolutorias de carácter personal. ([1])

En términos generales, la doctrina española se inclina a creer que toda vez que el derecho de resolución implica una verdadera causa de extinción contractual, debe ser incluido

---

([1]) Véanse sentencias del Tribunal Supremo de España, de 14 de octubre de 1914, 14 de noviembre de 1927 y 24 de setiembre de 1930. Manresa, *Comentarios al Código Civil Español*, tomo 8, vol. II, pág. 596, 5ta. Ed. 1950; Scaevola, *Código Civil*, tomo XX, pág. 946.

en consecuencia dentro de los derechos de modificación o de formación no sujetos a prescripción, si bien la jurisprudencia española no admite en su integridad ese principio, estimando que la acción resolutoria de tipo personal está sujeta al plazo general de prescripción de quince años señalado por el Art. 1964 del Código Civil español, Núm. 1864 del nuestro.

Pero en este caso no se trata de una acción resolutoria que obre *in personam* o meramente obligacional. Se trata de una acción resolutoria inscrita que obra *in rem*, con juego semejante a la *rei vindicatio*, que en su caso puede aniquilar o resolver el derecho o acto adquisitivo afectado por la misma. ([2])

Toda vez que la condición resolutoria inscrita, respecto a las partes y terceros adquirentes interesados en el negocio jurídico condicionado, constituye una amenaza constante de posible pérdida, extinción y caducidad definitiva del dominio y demás derechos reales adquiridos, y produce una doble titularidad e incertidumbre para el tráfico inmobiliario durante su período de pendencia y después de su cumplimiento la posibilidad de estados litigiosos, no debe estimarse perpetua e imprescriptible la acción resolutoria real que genera ese cumplimiento extintivo.

---

([2]) Varias acciones reivindicatorias ha instado El Pueblo de Puerto Rico originadas por la extinción, caducidad o ineficacia de primitivas concesiones de terrenos realengos hechas por el gobierno español. Véanse: *Pueblo* v. *Dimas*, 18 D.P.R. 1061 (1912); *Pueblo* v. *Riera*, 27 D.P.R. 1 (1919); *Trigo* v. *Pueblo*, 51 D.P.R. 222 (1937); *Pueblo* v. *Rojas*, 53 D.P.R. 121 (1938); *People of Porto Rico* v. *Livingston*, 47 F.2d 712 (1931).

En el citado tomo II de su obra, a la pág. 284, comenta Roca Sastre: "Cumplida una condición resolutoria, la persona favorecida por ella deviene titular de una acción resolutoria, mediante la cual puede exigir la efectividad de la resolución con la consiguiente restauración o tránsito del derecho afectado; e incluso puede proceder contra terceros o posteriores adquirentes del derecho sujeto a resolución, puesto que la acción resolutoria obra *in rem*, ya que el cumplimiento de la condición resolutoria produce efectos retroactivos o *ex tunc*, según se ha examinado en otra parte de la presente obra. Esta actuación de la acción resolutoria afecta a terceros hipotecarios, siempre que la condición correspondiente conste registrada."

Bajo el juego de los Arts. 1830, 1832, 1836, 1861, 1863 y 1869 (³) de nuestro Código Civil la acción resolutoria de índole real prescribe a los 30 años contados desde el día en que pueda ejercitarse.

Tratándose de una condición resolutoria a término, si no se había cumplido en cada plazo de cultivo, la acción resolutoria prescribía el 12 de abril de 1903; el 12 de abril de 1906 y el 12 de abril de 1912, en la hipótesis de no haberse extinguido por la reversión al Estado del título de 1891.

## IV

### VALIDEZ DE LA COMPOSICIÓN

¿Tuvo lugar la composición en favor de los señores Lavaggi y García y de sus herederos? Expusimos en nuestra opinión que como consecuencia de una investigación practicada en 1890 por el Estado español sobre el cultivo de los islotes, el 29 de agosto de ese año se resolvió la concesión graciosa del original título de amparo hecha en 1872, se decretó la reversión del dominio de los islotes a la Corona

---

(³) "Art. 1830.—Por la prescripción se adquieren, de la manera y con las condiciones determinadas en la ley, el dominio y demás derechos reales.

"También se extinguen del propio modo por la prescripción los derechos y las acciones, de cualquier clase que sean."

"Art. 1832.—Los derechos y acciones se extinguen por la prescripción en perjuicio de toda clase de personas, inclusas las jurídicas, en los términos prevenidos por la ley."

"Art. 1836.—Son susceptibles de prescripción todas las cosas que están en el comercio de los hombres."

"Art. 1861.—Las acciones prescriben por el mero lapso del tiempo fijado por la ley."

"Art. 1863.—Las acciones reales sobre bienes inmuebles prescriben a los 30 años.

"Entiéndese esta disposición sin perjuicio de lo establecido para la adquisición del dominio o derechos reales por prescripción."

"Art. 1869.—El tiempo para la prescripción de toda clase de acciones, cuando no haya disposición especial que otra cosa determine, se contará desde el día en que pudieron ejercitarse."

Española, otorgándose posteriormente la composición final a favor de los sucesores de Lavaggi.

Relacionamos todos los trámites que, en ese sentido, entonces se observaron al nivel administrativo hasta llegar al momento en que se le requiere al interesado para que finalmente deposite la suma de cien pesos en la Alcaldía de Fajardo para sufragar los gastos de mensura y tasa de los islotes. No existe en la prueba documental presentada por el Estado resolución, decreto, auto o comunicación oficial al cual pueda atribuírsele autenticidad y obligatoriedad, como acto o disposición de funcionarios competentes y debidamente autorizados entonces para intervenir en el asunto de aquella composición, y que pueda demostrar legalmente que no se completó el trámite de la composición. Parte de la documentación procedente de los antiguos archivos públicos es ilegible.

Como única evidencia de que la misma no se efectuó el Estado nos hace referencia a cierta nota manuscrita puesta en la carátula del antiguo expediente Núm. 108 del Negociado de Bienes del Estado de la Administración Central de Contribuciones y Rentas, que lee así:

"REVERTIDA.—Se concede a los entonces ocupantes Sociedad García Lavaggi el derecho de composición, pero no se efectuó ésta. P.R.R."

Esa nota no está fechada. No se sabe a qué o a quién hacen relación esas letras mayúsculas "P.R.R." En toda la parte presentada del expediente no hay nombre de funcionario o autoridad a quien propiamente se puedan atribuir tales letras como las iniciales de su nombre y apellidos. En la carátula aparecen otras observaciones manuscritas con letras distintas.

El no haber recobrado el gobierno español la posesión material de los islotes, y, por el contrario, el haber continuado públicamente en la posesión material y explotación de esos islotes los sucesores de Lavaggi y García por más de

una década y hasta que los venden a Jorge Bird Arias; el haberlos inscrito a nombre de ellos, en pleno dominio, como tales sucesores; el no haber solicitado en forma alguna el Estado la cancelación en el Registro de la inscripción de dominio a favor de Lavaggi y García por resolución de la antigua concesión del título de amparo de 1872 y que se extendiera a su favor, a título de reversión, una nueva inscripción de los islotes a tenor con el Art. 16 de la Ley Hipotecaria; el que apareciera en distintos sitios del viejo expediente manifestaciones de varios funcionarios en el sentido de que Jorge Bird Arias poseía y era el dueño de ellos y "los adquirió de buena fe", y, finalmente, el que jamás El Pueblo de Puerto Rico, a partir del 1 de mayo de 1900 en que empieza a regir el Acta Foraker, y hasta el 14 de enero de 1963, reclamara derechos de propiedad alguno sobre los islotes, constituyen circunstancias adversas a la teoría de la no conclusión del trámite de la composición. Todo ello, a falta de evidencia legítima en contrario, nos inclina a estimar que en el trámite de composición se siguió completamente el curso ordinario de los negocios, que la ley y reglamentos aplicables a ella se acataron y que en tal trámite se actuó con celo ordinario. En definitiva, a la luz de esas circunstancias, concluimos que por la virtud jurídica de esa composición los herederos de Lavaggi y García también adquirieron sobre los islotes un derecho de propiedad puro, no sujeto a condición alguna, del cual podían disponer libremente.

Al desprenderse de nuevo, en forma incondicional, la Corona de España de la propiedad de ambos islotes, y al convertirse los mismos definitivamente en propiedad privada de Lavaggi y los herederos de García, ningún derecho real sobre ellos pudo trasmitir la Corona de España al Gobierno de los Estados Unidos por medio del Tratado de París del 10 de diciembre de 1898, ni éstos a Puerto Rico por la Carta Orgánica de 1900, ni por la de 1917.

Nuestra aseveración de que hubo un cumplimiento sustancial de la condición de cultivo impuesta de parte de Lavaggi encuentra amplio apoyo en los testimonios obrantes en el antiguo expediente presentado por el demandante y a los cuales hicimos referencia en nuestra opinión. No tenemos que esforzarnos para demostrar que tratándose de unos islotes rocosos y de poquísima fertilidad "empotrados en la soledad del mar como esos despeñaderos de costa donde se descuernan los cabros alzados", el lograr un cultivo de 20 cuerdas del máximo de 22.72 exigido por la concesión de 1872, constituyó un cumplimiento sustancial de la condición. (⁴)

La condición no señaló la clase de cultivo a que deberían someterse las 45.44 cuerdas concedidas. Si de ellas sólo 15.15 podían cultivarse "a beneficio de la agricultura", aunque

(⁴) Dice, en parte, el informe de Manuel Martínez Mora, Inspector de Terrenos Públicos, obrante en el tantas veces citado expediente ofrecido como prueba de El Pueblo:

"En el islote [se refiere a 'Hicacos'] hay próximamente una tercera parte de su área que puede dedicarse al cultivo de frutos menores, y con preferencia a la siembra de palmas de coco. Esta parte del suelo está constituída por arena gris con subsuelo de roca caliza. Su fuerza vegetativa es bastante en atención a que los arrastres [de] las aguas pluviales acumulan en ella los detritus producidos por la descomposición de las hojas de los arbustos que cubren las tierras más altas.

"Las dos terceras partes de área del islote es de naturaleza accidentada, pero de poca elevación. Lo constituye una ligera capa de tierra vegetal formada de detritus orgánicos, como lo indica su color oscuro; tierra que es retenida entre las asperezas de la superficie del subsuelo, que se compone de compacta roca caliza de cristalización cúbica y consistencia que se presta a ser labrada en sillares aplicables a construcción. Roca que calcinándola se obtiene de ella una cal de superior calidad para cortar los guarapos en la elaboración del azúcar de caña, y para cualquier clase de fabricación de mampostería."

También del expediente aparece lo que sobre este aspecto decimos a la página 343 de nuestra opinión: ". . . presentando ante la Intendencia General de Hacienda, . . . bajo testimonio público el hecho jurídico de haber intentado tanto él [Lavaggi] como su socio don Ignacio García 'hacer siembras en dichos islotes sin haber obtenido frutos por ser el terreno seco y demasiado estéril, sintiéndose en dicho sitio fuertes sequías que lo hacen improductivo, pudiéndose únicamente sembrar una muy pequeña parte de pastos en ciertas épocas del año . . . .' "

fuera con palmas de coco, la prueba aducida a los fines de la composición acreditó que se cultivaron 20 cuerdas de pasto de yerba de guinea y malojillo que alimentaba una bueyada de una hacienda de cañas y que en el resto del islote Hicacos se operaba un horno de cal, es correcto concluir que hubo un cumplimiento sustancial de la condición de cultivo.

Es obvio que ante esa realidad, las autoridades coloniales encargadas de determinar administrativamente si la condición de cultivo había sido cumplida, utilizaron un criterio matemático en la resolución del asunto. Parece que al mismo resultado hubieran llegado aun cuando se hubiera demostrado que se cultivaron 22.71 cuerdas y no 22.72 cuerdas como exigía el título de amparo.

La condición de cultivo, pensamos, se ideó para imponerse en general a los agricultores que recibían graciosamente terrenos fértiles, productivos, labrantíos y demás tierras de campo laborables; no para pescadores y demás habitantes de arrecifes, cayos, islotes, atolones, bancos de arenas y tierras de secano. Los nombres geográficos de los islotes son "Cayo Icacos" y "Cayo Ratones". Así aparece hasta en varios de los recibos de contribuciones presentados.

La condición impuesta era casi de naturaleza imposible; el evento del cual se hizo depender lindaba en lo irrealizable. Podría estimarse en este caso como una "condición fallida", de deficiencia en la condición, que produce efectos inversos a la condición cumplida, y que, cuando se trata de condiciones resolutorias, el negocio jurídico gravado con ella se considera puro y producirá los efectos que le sean propios, considerándose definitivos los ya causados, al desaparecer respecto de ellos la amenaza de su resolución. [5]

---

[5] Véase la Monografía sobre las Condiciones, escrita por el jurista español Alberto de Rovira Mola, en el Tomo IV, pág. 876, de la *Nueva Enciclopedia Jurídica*, Ed. Seix, Barcelona, 1952.

# VI

## CONDICIÓN DE TERCEROS

Sostiene el Estado que en nuestra opinión le dimos la razón respecto de su contención de que la Sala de Expropiaciones había cometido error al determinar que Planta de Cal Hicacos, Inc., y Best Builders, Inc., eran terceros registrales, condición que invocaron específicamente en la cuarta defensa de su contestación.

Se funda en que en nuestra opinión hicimos referencia sobre prueba extraregistral relativa a la investigación practicada en 1890 por el Estado español en la que se descubrió que ni Leandro Fort Torres ni sus inmediatos sucesores Lavaggi y García, "habían cumplido los requisitos de la segunda condición" y que, por ello, el Estado decretó la reversión. [6]

(a) Leandro Fort Torres fue parte en la concesión del título de amparo sujeto al gravamen de la condición resolutoria. Se puede afirmar, por la prueba obrante en autos, que él no cumplió durante los once años en que los poseyó con la condición de cultivo, aunque en el propio título de amparo se dice que había cultivado unas cuatro cuerdas. No podía, desde luego, considerarse tercero a la luz del Art. 27 de la Ley Hipotecaria que empezó a regir el 1 de mayo de 1880.

(b) Don Juan Lavaggi y don Ignacio García, representados por don José de Celis Aguilera por escritura pública

---

[6] Resulta del Exhibit 3 de El Pueblo que la Junta Superior de Composición y Venta de Realengos, con la asistencia de sus cuatro miembros españoles, decretó la reversión al Estado de los islotes el 26 de agosto de 1891, estando ausentes los miembros puertorriqueños de la misma don Pablo Ubarri, don Francisco de P. Acuña y don José de Celis Aguilera, quienes tampoco concurrieron a la siguiente sesión. En esas reuniones de la Junta de Celis Aguilera no podía actuar porque él había actuado como mandatario verbal de Lavaggi y García en el contrato de compra por ellos de los islotes a Leandro Fort Torres.— Exh. 4, Dte., foto 83.

del 18 de mayo de 1883, compraron los islotes. En esa escritura en su cláusula segunda se hizo constar en parte:

"Segundo: Que vende los tres islotes reseñados con todas sus entradas y salidas, usos, derechos y servidumbres a los referidos D. Ignacio García y D. Juan Lavaggi representados por D. José de Celis Aguilera *bajo las mismas bases y condiciones que* le fueron concedidas [a Leandro Fort y Torres] por el convenido precio de . . . ."

Para la fecha de esa escritura estaba inscrito el título de amparo de 1872 a favor de Fort Torres y constaba inscrita la condición resolutoria. Si ellos adquirieron "bajo las mismas bases y condiciones que le fueron concedidas" a aquél, están reconociendo implícitamente que su vendedor no había cumplido la condición de cultivo y que ellos se hacían cargo de su cumplimiento. Tampoco ellos la cumplieron y ello motivó la revocación de la concesión y la reversión del título en 29 de agosto de 1891. Estos sucesos los eliminan como terceros registrales.

Al inscribirse el título de compra de Lavaggi y García el 4 de marzo de 1887, en ninguna forma se hizo constar en la inscripción que ellos adquirían "bajo las mismas bases y condiciones que les fueron concedidas." Desde luego, ya ellos, por la primera inscripción tenían conocimiento claro y preciso de la naturaleza y posibles efectos resolutorios de la condición de cultivo en caso de cumplirse.

Ellos y sus herederos fueron partes en los trámites de la investigación del cumplimiento de la condición y de la revocación que produjo la reversión al Estado. Estos gozaron de una protección registral que no tuvieron sus causantes.

Es cierto que adquieren después un título de dominio puro por virtud de la composición que posteriormente se efectuó, según concluimos correctamente en nuestra opinión original. Pero el título de composición no fue llevado al Registro, así como jamás figuró en el Registro noticia de índole alguna

de la investigación, revocación y reversión, como hemos consignado en otro lugar.

(c) Jorge Bird Arias compra a los cuatro hermanos García Becerril, mediante escritura pública otorgada el 5 de octubre de 1901, los dos islotes. Los inscribe, en pleno dominio el 11 de octubre de 1901 por las inscripciones sexta y sétima. Véase a la pág. 647 el texto completo de la sexta inscripción. Adquiere de buena fe, por título justo y oneroso, de personas que en el Registro resultan titulares dominicales de los mismos, y con facultades para trasmitirlos, según las inscripciones tercera, cuarta y quinta, en las que se dice que la finca "No aparece afecta a carga alguna.", o "No tiene cargas de ninguna clase."

A la fecha de la venta la realidad extraregistral demuestra que los hermanos vendedores desde las respectivas muertes de sus causantes disfrutan de la posesión material de ambos islotes. En ese día el Registro revela que se ha mantenido, por lo menos registralmente, durante los anteriores 29 años un tracto sucesivo de titulaciones: De la Corona Española a Leandro Fort Torres; de éste a Juan Lavaggi e Ignacio García; de éstos a sus herederos mencionados. Como hemos dicho y repetido, del Registro no constaba en forma alguna que esos anteriores titulares, o alguno de ellos, hubiese incumplido la obligación de cultivar, ni mucho menos constaba que el título había revertido al Estado español.

Sin embargo, en aquella fecha del 5 de octubre de 1901, por la virtud informadora de la primera inscripción se anunciaba *erga omnes*, de manera precisa, clara y expresa, que Leandro Fort Torres inscribía el derecho pleno actual sobre los islotes afecto su derecho dominical a la contingencia de la condición resolutoria, y que, asimismo, quedaba registrado a favor del Estado español el derecho condicional o expectativa resultante, es decir, ese asiento inmatriculador publicaba la existencia de dos titularidades, una, la del adquirente, que venía a ser propietario de la cosa, si bien con

la amenaza resolutoria derivada de la condición resolutoria si se cumplía, y otra, a favor del transferente, caso de cumplirse la condición, y cuya titularidad tenía, por tanto, el carácter de condicionada o preventiva.

Esta *conditio iuris*, especie de gravamen que formaba parte de la causa o elemento integrante del contrato inscrito, que se denominó requisito indispensable del título de amparo registrado, era determinante del derecho real concedido, y afectaba directamente a subsiguientes adquirentes en la misma extensión que a Leandro Fort Torres. En la realidad jurídica extraregistral había quedado destruida en 1891, por efectos de la reversión y de la posterior composición, pero al no cancelarse entonces y al figurar todavía en 1901 como pendiente aún de cumplimiento o incumplimiento tal condición resolutoria de cultivo, por lo menos registralmente, aparecía el comprador Jorge Bird Arias, en su condición de nuevo titular de los islotes, sometido a los efectos extintivos o consolidadores de ella. (7)

¿Pero respecto a la condición resolutoria en el momento de adquirir Bird Arias, existía concordancia entre el contenido del Registro y la realidad jurídica? No existía. Al declarar la Junta Superior de Composición y Venta de Terrenos Realengos el 29 de agosto de 1891—casi diez años antes de comprar Bird Arias—revocada o resuelta la concesión de los islotes y decretar la reversión del dominio sobre ellos a favor del Estado español, se extinguió *ipso jure* la condición resolutoria. Tomó cuerpo de realidad la amenaza de caducidad del título de amparo que había surgido a la vida registral el 28 de febrero de 1883. La titularidad preventiva de la Corona de España se transformó en pleno derecho de propiedad a su favor. Poco tiempo después los trasmite por composición a Lavaggi y a los herederos de

---

(7) Véase lo que dijimos en nuestra decisión del caso de *Trigo* v. *Pueblo*, 51 D.P.R. 222 (1937), cita precisa a la pág. 234 respecto a este punto.

Ignacio García, en forma pura, sin quedar su título sujeto a condición resolutoria alguna. En esa nueva situación de derecho y en el curso de una nueva soberanía política, se venden los islotes a Bird Arias y éste los adquiere de quienes, según el Registro, tenían facultades para enajenarlos.

No podía Bird Arias, en octubre de 1901, resultar jurídicamente obligado a cumplir un requisito del antiguo título de amparo que había arrastrado consigo la reversión titular de agosto de 1891, aun cuando figurase registralmente subsistente. Como dijimos en *Fajardo Sugar Growers Ass'n* v. *Kramer*, 45 D.P.R. 348, 378 (1933):

". . . inscribió pero no poseía lo inscrito, y con que habiendo la demandante adquirido el título que invoca desde 1909, esto es, desde hace más de 20 años, tampoco entró en la posesión de los manglares. El Registro de la Propiedad no se ha hecho para llevar a él derechos que no existen. Es cierto que protege a los terceros, pero parte siempre de la base que existe algo real."

En *El Pueblo* v. *Riera*, 27 D.P.R. 1 (1919), el Estado demandó en reivindicación a Juan D. Riera alegando que éste se hallaba poseyendo sin título legal cierta parcela de terreno radicada en el barrio de Puerta de Tierra de San Juan, que pertenecía en propiedad a El Pueblo por cesión que le hizo el gobierno de los Estados Unidos de Norte América, quien la adquirió de España en virtud del Tratado de París del 10 de diciembre de 1898. Contestó Riera alegando que el gobierno español por escritura pública de 27 de setiembre de 1897 había vendido la finca a Manuel J. Gestera, que se habían hecho posteriormente sucesivas trasmisiones de la parcela hasta adquirirla del demandado; que tanto el comprador original como los subsiguientes habían inscrito sus títulos, que él era un tercero protegido por la ley que había adquirido el dominio de persona que según el Registro aparecía como dueña de dicho inmueble sin condición ni defecto alguno. El pleito se terminó por sentencia que

declaró con lugar la demanda en cuanto a la devolución de la finca y de ella apeló Riera.

Allí resolvimos que el título del primer adquirente Manuel J. Gestera se había otorgado por funcionarios del gobierno sin facultades para ello, resultando por tanto nulo, y también nulo porque al solicitarse por Gestera la adquisición de la parcela él no era un poseedor que la hubiera cultivado por lo menos dos años antes del 17 de abril de 1892, requisito indispensable exigido por el Decreto Real de primero de febrero de 1894.

Por no constar tales causas de nulidad en el Registro, consideramos a Riera tercero amparado por el Art. 34 de la Ley Hipotecaria, no obstante la nulidad del título inscrito del primer adquirente. Entre otras cosas, a las páginas 11, 12 y 16 del citado tomo, dijimos:

"Pero se sostiene que al que adquiere de quien en el registro aparece como dueño no le basta con examinar los libros de esa oficina para ver si de ellos resulta claramente vicio alguno de nulidad sino que si no quiere verse privado de los beneficios que a los terceros concede el artículo 34 de la Ley Hipotecaria deberá por los datos que el registro arroje, acudir a otras oficinas a examinar los documentos que menciona el registro para conocer por ellos si existe vicio de nulidad.

Entendemos que el artículo 34 que consideramos es claro y terminante en el sentido de que es en el registro donde debe aparecer el vicio de nulidad, siendo necesario que de él aparezca claramente el mismo para que perjudique a tercero. La ley lo dice así expresamente y, por tanto, so pena de violentarla y de destruir el fin que persiguió el legislador al consignar ese precepto, no puede sostenerse que el vicio de nulidad que no consta en el registro perjudique a tercero, porque él pudo conocerlo si hubiera ido a examinar en otras oficinas los documentos mencionados en el registro. Sería también agregar a la ley mandatos que no tiene. El legislador quiso que sólo la nulidad que apareciese del registro fuera la que perjudicara a tercero, y si hubiera querido que tuviera igual efecto la que apareciese fuera del registro pero en documentos en él mencionados, lo hubiera dicho.

Pero es que la ley no quiso esto último, y se comprende fácilmente su razón recordando el fin primordial perseguido por el legislador al decretar la Ley Hipotecaria, que fue el de facilitar el crédito territorial, y a cuyo fin garantizó a los terceros que no serían perjudicados por los vicios de nulidad que no constasen claramente en el registro. Si, contra lo que dice la ley, no basta a los terceros lo que aparezca del registro, entonces se habrá destruído el crédito territorial pues las personas que quieran contratar con propiedad inmueble, si quieren estar garantidas contra vicios de nulidad de los títulos inscritos del dueño y sus antecesores en derecho, estarán obligados a hacer una peregrinación de oficina en oficina, y de pueblo en pueblo, por lejanos y extraños que sean, en busca y examen de los documentos, expedientes y actuaciones de cualquier clase que estén mencionados en el registro. Si la ley hubiera tenido este propósito, entonces le hubiera bastado con no haber escrito el artículo 34 que comentamos.

· · · · · · · ·

En resumen, pues, como es en el registro de la propiedad, y no en otras oficinas, donde deben constar claramente las causas de nulidad o de rescisión de los actos o contratos para que perjudiquen a un tercer adquirente con título inscrito, y como en este caso el vicio de nulidad del título de Gestera no consta del mismo registro, el apelante Riera está protegido por el artículo 34 de Ley Hipotecaria contra ese vicio de nulidad."

Desde entonces ese criterio respecto al tercero hipotecario ha prevalecido en nuestras decisiones.([8]) En los casos de *Kramer*, supra, y *Trigo* v. *Pueblo*, 51 D.P.R. 222 (1937), en los que las circunstancias fundamentales son muy distintas al de Riera, no lo abandonamos como parece creer El Pueblo.

Asumiendo que para el 1901 estuviera vigente la condición resolutoria inscrita, esa circunstancia, por sí sola, no constituía causa efectiva de nulidad del título de sus antecesores

---

([8])*Annoni* v. *Sucn. Nadal*, 59 D.P.R. 640, 645 (1941); *Lizardi* v. *Caballero*, 65 D.P.R. 83, 90–93 (1945); *Cruz* v. *Sucesión González*, 72 D.P.R. 308, 316 (1951); *Rubio Sacarello* v. *Roig*, 84 D.P.R. 344, 354–356 (1962); *Mundo* v. *Fúster*, 87 D.P.R. 363, 375 (1963).

en derecho. En adición a ella nada constaba en el Registro que pudiera legalmente impedir la legítima adquisición de los islotes.

Resumiendo, Jorge Bird Arias al adquirir e inscribir su título en octubre de 1901 se situó en una posición jurídica semejante a la del demandado Riera, aunque sujeto, tan sólo en apariencia registral, a una amenaza de resolución de su título, imposible de realizarse desde el 29 de agosto de 1891. Lo consideramos un tercero hipotecario, condición que, desde luego favoreció a sus herederos 49 años después.

(d) Pilar Bird y su esposo Rafael Veve adquieren en pública subasta celebrada el 16 de octubre de 1952, ordenada por el Tribunal Superior, la propiedad de los islotes Hicacos y Ratones y sus edificaciones. Para esa fecha había transcurrido más de medio siglo de ininterrumpida vigencia registral del dominio de ellos en favor del anterior dueño Jorge Bird Arias y de posesión material del inmueble por parte de éste y sus herederos, sin que constara del Registro vicio o causa de nulidad titular alguna. La sociedad conyugal de ambos fue un tercer adquirente protegido por la ley.

(e) Planta de Cal Hicaco, Inc., y Best Builders, Inc., corporaciones demandadas, a base de esos antecedentes registrales (reforzados por la exactitud o concordancia entre el Registro y la realidad jurídica existente respecto al título y al hecho posesorio material) también son terceros hipotecarios cuyas respectivas y legítimas condiciones titulares deben mantenerse y protegerse. (9)

---

(9) El actual Art. 34 de la Ley Hipotecaria española aunque no lo define, otorga al tercero registral la siguiente protección:

"Art. 34—El tercero que de buena fe adquiera título oneroso algún derecho de persona que en el Registro aparezca con facultades para transmitirlo, será mantenido en su adquisición, una vez que haya inscrito su derecho, aunque después se anule o resuelva el del otorgante por virtud de causas que no consten en el Registro."

En sus comentarios sobre ese Art. 34, en el tomo I, págs. 440 y 441 de su citada obra *Derecho Hipotecario*, dice Roca Sastre:

"II. Alcance del art. 34 de la Ley Hipotecaria.—

# VII

## De la Prescripción contra el Estado

En la quinta defensa especial de su contestación a la demanda las corporaciones demandadas alegaron:

"La posesión pacífica, quieta, pública, en concepto de dueño, sin interrupción y continuadamente, con justo título y buena fe por los dueños de las propiedades por más de 80 años, excluye a cualquier persona natural o jurídica, inclusive el Estado Libre Asociado, como titular de derecho alguno sobre ambas islas, . . . habiendo las demandadas adquirido o consolidado por usucapión o prescripción adquisitiva su título de dominio."

Contra esta defensa expuso el Estado:

"Las demandadas están además impedidas de alegar haber adquirido la propiedad por prescripción adquisitiva o usucapión. Es innegable que por disposición expresa del Artículo 9 del Código Político de P.R. no puede adquirirse por prescripción título de propiedad sobre bienes inmuebles pertenecientes al Estado a partir del cambio de soberanía."

---

"El alcance de este precepto es *mantener* a todo trance, en beneficio del tercer adquirente que reúna los cuatro requisitos que el mismo establece, la *adquisición* efectuada por este tercero, frente al peligro y consecuencias aniquiladoras que se produzcan cuando el título de adquisición del titular registral que le transmitió, resulte ineficaz por efecto de una acción de nulidad, de resolución o de tipo análogo, cuya causa originadora no conste claramente del Registro, o frente a una inexactitud registral.

".  .  .  .  .  .  .  .

"El art. 34 viene a disponer lo siguiente: el tercer adquirente que reúna las cuatro circunstancias que el mismo precepto señala *será mantenido en su adquisición* aunque el contenido del Registro sea *inexacto*, o el acto adquisitivo o derecho del transferente sea *nulo* o quede *resuelto*, *revocado* o ineficaz, total o parcialmente, por causas que no consten *explícitamente* del Registro."

En el Art. 192 del Proyecto de Código Hipotecario presentado bajo el Núm. 782 ante la Cámara de Representantes de Puerto Rico, sesión ordinaria de 1967, se define y protege al tercero hipotecario así:

"Es tercero quien, de buena fe y a título oneroso, adquiera algún derecho de persona que en el Registro aparezca con facultad para trasmitirlo y será mantenido en su adquisición, una vez haya inscrito su derecho, aunque después se resuelva o anule el del otorgante en virtud de causas que no consten del Registro."

La Sala sentenciadora, entre otras cosas, determinó:

"Desde 1872 hasta la fecha de la expropiación—14 de enero de 1963—don Leandro Fort y Torres y sus sucesores en título poseyeron los islotes pública, quieta y pacíficamente, en concepto de dueños y sin interrupción alguna; habiendo estado protegidos en esa posesión por el Estado, a quien en diversas ocasiones pagaron contribuciones territoriales."

¿Es correcta la tesis de que a partir del cambio de soberanía no pueden adquirirse por usucapión los bienes inmuebles pertenecientes al Estado? Resolvemos que respecto a ciertos bienes lo es; pero que respecto a otros, no lo es. Veamos.

En los Arts. 252 a 257 del Libro Segundo, nuestro Código Civil, luego de declarar que "la palabra *bienes* es aplicable en general a cualquier cosa que puede constituir riqueza o fortuna", pasa a clasificar los bienes por razón del sujeto de ellas, del fin o carácter de los mismos, así: en cosas comunes,([10]) "que son aquellas cuya propiedad no pertenece a nadie y en las cuales todos los hombres tienen un libre uso, en conformidad con su propia naturaleza: tales son el aire, las aguas pluviales, el mar y sus riberas"; bienes de dominio público, los destinados al uso público, como los caminos, canales, ríos, torrentes y otros análogos: son bienes de uso público en Puerto Rico y sus pueblos, los caminos estaduales y los vecinales, las plazas, calles, fuentes y aguas públicas, los paseos y las obras públicas de servicio general, costeadas por los mismos pueblos o con fondos del tesoro de Puerto Rico. Sobre los otros bienes dispone el Art. 256:

*"Todos los demás bienes* que el Pueblo de Puerto Rico o los municipios posean, *son patrimoniales y se regirán por las disposiciones de este Código."* (Énfasis suplido.)

---

([10]) Sobre el concepto de cosas comunes, véase la interesante obra del profesor Pedro Luis Perea Roselló, *Res Communes Ommnium*, Burgos, 1964.

Considera el Código bienes de *propiedad privada* a los patrimoniales del Pueblo de Puerto Rico y de los municipios y los pertenecientes a particulares individual o colectivamente. Art. 257. Véase Art. 24, Reglamento Hipotecario.

Los bienes de dominio público, comprendiendo los de uso público, están sometidos, principalmente, al régimen jurídico provisto en el Código Político Administrativo de Puerto Rico. Véanse sus Arts. 5–9 y 393–426. Véanse Arts. 25 y 26, Reglamento Hipotecario.

En *Gobierno de la Capital* v. *Consejo Ejecutivo*, 63 D.P.R. 434, 459 (1944) dijimos que los bienes de uso público se usan libremente por el público en general, mientras que a los bienes patrimoniales el público no tiene constante y general acceso, a pesar de que nada impide que se les puede dar un uso público ocasionalmente. Estos bienes, como toda propiedad particular, pueden constituir fuente de ingresos para el erario público o son susceptibles de producir ingresos, para cubrir atenciones del Estado; están o pueden estar en el comercio jurídico humano porque pueden ser vendidos o arrendados, generalmente, por el Secretario de Obras Públicas, en las formas legalmente dispuestas. Art. 135, Código Político.

Como resolvimos en *Autoridad sobre Hogares* v. *Sagastivelza*, 72 D.P.R. 276, 282 (1951) a tenor de lo provisto por el citado Art. 256, en los casos de expropiación, como el presente, una vez que se dicte la orden de incautación, los bienes o derechos expropiados son patrimoniales. También lo son todos los adquiridos por el Estado por herencia intestada—bienes mostrencos—por el procedimiento de apremio para el cobro de contribuciones territoriales o de contribuciones de ingresos, por confiscación de bienes y cobro de toda clase de créditos pertenecientes al Estado.

Si todos los bienes patrimoniales o de propiedad privada del Estado "se regirán", según lo ordena el transcrito Art. 256, "por las disposiciones de este Código", es obvio que tales

bienes del Estado están sujetos a las que en dicho Código regulan el instituto de la prescripción. [11]

Como regla general dispone nuestro Código Civil que por la prescripción se adquieren, de la manera y con las condiciones determinadas en la ley, el dominio y demás derechos reales y también se extinguen del propio modo los derechos y las acciones, de cualquier clase que sean. Pero limita el ámbito objetivo de ese modo de adquirir a todas las cosas que están en el comercio de los hombres, que equivale a prevenir que no son susceptibles de prescripción las cosas que están fuera del comercio. [12] De suerte que para el Código ciertas cosas tienen la aptitud o cualidad de prescriptibles y otras no la tienen. En su Art. 1865 encontramos ejemplos de acciones declaradas imprescriptibles.

Así como éstas se encuentran irradiadas del comercio de los hombres por explícita disposición de ley, también por diversas razones hay cosas no prescriptibles como son, entre otras, las de dominio público, las de uso público general y las cosas y derechos no susceptibles de apropiación individual. Las cosas cuya enajenación esté prohibida por la

[11] Ya lo hemos resuelto respecto a bienes patrimoniales de los municipios, en *Gobierno de la Capital* v. *Casino Español,* 56 D.P.R. 790, 806 (1940) y *Jiménez* v. *Municipio,* 70 D.P.R. 517, 521 (1949). En éste en parte dijimos:

". . . considerando entonces cuáles son los bienes de dominio público y cuáles los patrimoniales, esto es, bienes de propiedad privada de los municipios, se llegó a la conclusión de que éstos se rigen por las disposiciones del Código Civil, entre los cuales se encuentran las relativas a la prescripción, estableciendo que en cuanto a los bienes patrimoniales de los municipios, la prescripción corre contra ellos y que no siendo el cuadro envuelto en el pleito, uno de los bienes entre los especificados por la ley como de uso público, ni siendo tampoco análogo a ellos, la prescripción le era aplicable al municipio. Véanse los artículos 255, 256 y 257 del Código Civil, edición de 1930.

"En el presente caso no hay discusión en cuanto a que el solar objeto del dominio era un bien patrimonial del municipio, y siéndolo, la prescripción corre en su contra bajo la doctrina anteriormente expuesta, y erró la corte inferior al no resolverlo así."

[12] Véanse los Arts. 1830, 1832 y 1836 del Código, cuyos textos insertamos en el escolio (3).

ley también se hallan fuera del comercio humano, y, por tanto, no pueden prescribirse. (¹³)

Por la prescripción, señala el Art. 1832, los derechos y acciones se extinguen "en perjuicio de todas las personas, inclusas las jurídicas." Así ha de entenderse "sin perjuicio de lo que en este Código o en leyes especiales se establezca respecto a determinados casos de prescripción", conforme al Art. 1838.

Sólo conocemos dos disposiciones legales que prohiben la adquisición por usucapión de ciertos y determinados terrenos del Estado. Se establecen por los Arts. 9 y 405 del Código Político de 1902. Dispone el primero según el texto español de la Compilación de 1941:

"Artículo 9.—Usurpadores de terrenos, cómo se expulsarán. —Posesión adversa.—Si alguna persona so pretexto de algún derecho incompatible con la jurisdicción del Gobierno de Puerto Rico, usurpare *terrenos baldíos o no concedidos,* pertenecientes a Puerto Rico, el Fiscal del distrito judicial en que radican dichos terrenos informará de ello en el acto al Gobernador, quien dispondrá que el Attorney General adopte las medidas necesarias para expulsar al usurpador. *No podrán adquirirse títulos a terrenos baldíos insulares por posesión adversa,* o contraria al título de otra u otras personas." (Énfasis suplido.)

El Art. 405 citado dispone, en lo pertinente, que "La posesión u ocupación, cualquiera que fuere el período de tiempo, *de terrenos pertenecientes a las carreteras insulares,* por parte de algún dueño u ocupante de terrenos adyacentes, no constituirá derecho alguno sobre el terreno así ocupado a

---

(¹³) Manresa, *Código Civil Español,* Tomo XII, pág. 799, 5ta. Ed. Reus, 1951; Scaevola, *Código Civil,* Tomo XXXII (Vol. 1), págs. 359, 361 y 364, Ed. Reus, 1965; Castán, *Derecho Civil Español, Común y Foral,* Tomo I (Vol. 2), pág. 839, 10ma. Ed. Reus, 1962; Borrell, *Derecho Civil Español,* Tomo I, págs. 294–300, Barcelona, 1955; Puig Peña, *Compendio de Derecho Civil Español,* Tomo I, págs. 502–505, Ediciones Nauta, Barcelona, 1966; Sánchez Román, *Estudios de Derecho Civil,* Tomo 2, pág. 484, 2da. Ed. y Tomo 3, pág. 258, Madrid, 1900; *Diccionario de Derecho Privado,* De Casso y Cervera, Tomo II, pág. 3084.

favor del citado dueño u ocupante de la persona que pretenda tenerlo por virtud del que aquél alega, . . . ." (Énfasis suplido.)

El transcrito Art. 9 del Código Político, en su última oración, en términos claros y precisos, limita la prohibición de adquirir títulos contra el Estado por posesión adversa, a terrenos baldíos insulares solamente.

Sin duda alguna, tal prohibición fue establecida en ese artículo para evitar que el usurpador de terrenos baldíos alegara como defensa la prescripción. Al reducir su ámbito objetivo a terrenos baldíos tal prohibición restringida jamás podría entenderse como una de general aplicación respecto a los bienes patrimoniales del Estado. ([14])

---

([14]) Entre los textos inglés y castellano del Art. 9 del Código Político existe una fundamental discrepancia respecto al alcance o ámbito objetivo de la prohibición. Mientras que en el texto castellano se circunscribe a "terrenos baldíos insulares", en el inglés se extiende en general a todos los terrenos insulares, al decir: "Title to insular lands shall not be acquired by adverse possession."

Si literalmente se tomara en consideración esta última oración del texto inglés, con entera independencia de lo demás dispuesto en el Art. 9, la prohibición de adquirir título por usucapión sería aplicable a toda clase de terrenos insulares, no sólo a los "terrenos baldíos insulares" como señala el texto castellano.

Pero en la resolución del problema prescriptivo en este caso, estamos obligados a preferir y atender sólo al texto castellano, aplicando las reglas que para estos casos provee el Art. 13 de nuestro Código Civil, en los siguientes términos:

"Artículo 13. Discrepancia entre los textos inglés y castellano de un estatuto, cómo se resolverá.

En caso de existir discrepancia entre los textos inglés y castellano de un estatuto de la Asamblea Legislativa de Puerto Rico, prevalecerá en la interpretación del mismo el texto en que se hubiere originado en cualquiera de las Cámaras, salvo en los casos siguientes: (a) si el estatuto fuere una traducción o adaptación de un estatuto de los Estados Unidos o de algún Estado o Territorio de los Estados Unidos, se dará preferencia al texto inglés sobre el texto castellano; (b) si el estatuto fuere de origen español se atenderá al texto castellano con preferencia al texto inglés; (c) si la cuestión de preferencia no pudiera resolverse por las reglas precedentes, se atenderá al texto castellano."—Código Civil, 1930, Art. 13.

El Art. 9 de nuestro Código Político se tomó, en parte, del Art. 42 del Código Político de 1872, del estado de California que dice así:

Nuestro Código Civil nada dispone sobre terrenos baldíos. Baldío es el terreno que pertenece al Estado pero que no está adehesado ni se labra, pertenece al dominio público para su común disfrute o aprovechamiento, no produce más frutos que los espontáneos y naturales ofrecidos por la tierra. Véase

---

"§ 42. INTRUDERS ON PUBLIC LANDS OF THE STATE.

If any person, under any pretense of any claim inconsistent with the sovereignty and jurisdiction of the state, intrudes upon any of the waste or ungranted lands of the state, the district attorney of the county must immediately report the same to the governor, who must thereupon, by a written order, direct the sheriff of the county to remove the intruder; and if resistance to the execution of the order is made or threatened, the sheriff may call to his aid the power of the county, as in cases of resistance to the writs of the people."

Decimos que se tomó en parte porque, según se observará, del Art. 42 de California no formaba parte la oración final del Art. 9 nuestro.

Por disposición del Art. 40 del Acta Foraker que autorizó la creación de la Comisión Codificadora de 1901, y, por la Ley Núm. 13 de 31 de enero de 1901, se le confirió facultad a dicha comisión para compilar, revisar y codificar un sistema de leyes para Puerto Rico, que incluiría un Código Civil, un Código Político, un Código de Procedimiento Civil y un Código Penal, que serían sometidos a la Asamblea Legislativa *en los idiomas inglés y español.*

Dicha comisión preparó los códigos, con excepción del Código de Procedimiento Civil, y los sometió a la Asamblea Legislativa en 1902. Se sometió un proyecto de Código Político redactado en el idioma inglés y otro proyecto del mismo código en castellano. Se le asignó a ambos el Núm. CB-24.

Al preparar en ambos idiomas el proyecto del Código Político la Comisión Codificadora de 1901, por su propia iniciativa, adicionó (con los mismos textos que respectivamente tienen hoy, y que se han conservado inalterados) las últimas oraciones de los textos inglés y castellano del Art. 9.

No hemos encontrado precedente legal alguno respecto a esas últimas oraciones. Ni aparece tomado de California, el texto inglés, ni mucho menos el texto castellano de alguna ley de España, donde los bienes patrimoniales del Estado pueden ser adquiridos por la usucapión. No sabemos cuál de ellas se redactó primero o si una es traducción errónea de la otra. Sin embargo, se nota que hay mayor armonía y correlación entre el sentido de cada oración del Art. 9 en el texto español, ya que ambos tienen el mismo y determinado ámbito objetivo: "los terrenos baldíos insulares", lo que no se observa en el texto inglés, donde la primera oración se refiere a *"waste and ungranted lands"* y la segunda en términos generales a *"insular lands."*

Habiéndose originado el Código Político en las cámaras de aquella época en ambos idiomas, la regla general del Art. 13 del Código Civil

*Enciclopedia Jurídica Española,* Tomo IV, sobre la voz "Baldíos."

Los islotes Hicacos y Ratones envueltos en este litigio, no son "terrenos baldíos", ni tampoco "terrenos no concedidos." Desde 1872, en que fueron trasmitidos a título de amparo, se dedicaron a pastos cultivados y a la explotación de una industria de cal para la elaboración de azúcar, fertilizantes y construcciones. Si alguna vez, antes del año 1872, pudieron clasificarse como baldíos, hace muchos decenios que perdieron esa condición.

A la luz de todo lo expuesto, no puede válidamente sostenerse que, en todos los casos y como norma jurídica de aplicación general, la prescripción no corre contra el Estado Libre Asociado de Puerto Rico. Como hemos dicho en otro lugar, no correrá respecto a aquellos bienes suyos no susceptibles de dominio por particulares, que son inalienables y que estarán fuera del comercio de los hombres mientras se encuentren afectos al uso o servicio público general. Pero los restantes bienes que integren su propiedad privada, sujeto a las excepciones establecidas por ley, son prescriptibles conforme a las normas de nuestra legislación civil.

Como apuntamos en el escolio (11), reiteradamente hemos decidido que los bienes patrimoniales de los gobiernos municipales son prescriptibles.[15] Si, como dispone el artículo citado 256 todos los bienes patrimoniales "que el Estado Libre Aso-

---

no es aplicable para resolver la discrepancia; ni la regla (a) porque esas últimas oraciones no son una traducción o adaptación de estatuto alguno de Estados Unidos o de alguno de sus Estados; ni la regla (b) porque no son de origen español.

La regla (c) que dispone que "si la cuestión de preferencia no pudiera resolverse por las reglas precedentes, se atenderá al castellano", es de perfecta aplicación a nuestro caso, por lo que la última oración del texto castellano del Art. 9 es la que debe aplicarse.

[15] Véanse, *El Pueblo* v. *Municipio de San Juan,* 19 D.P.R. 656 (1913); *Miranda* v. *Municipio de Aguadilla,* 39 D.P.R. 467 (1929); *Gobierno de la Capital* v. *Casino Español,* 56 D.P.R. 790 (1940); *Jiménez* v. *Municipio,* 70 D.P.R. 517 (1949).

ciado de Puerto Rico o los municipios posean . . . se regirán por las disposiciones de este Código", entre las cuales, como dijimos en *Jiménez* v. *Municipio*, supra, "se encuentran las relativas a la prescripción", no hay ni hubo buena razón para resolver, o para haber resuelto, que los bienes patrimoniales del Estado no pueden ser adquiridos por usucapión. Nuestro Código Civil en esto obliga tanto al soberano como a sus divisiones de gobierno local. [16]

Ahora, examinemos el problema de la adquisición por usucapión planteado en este recurso, tomando como punto de partida la adquisición de Jorge Bird Arias en octubre de 1901. No existe controversia alguna respecto a los siguientes hechos y circunstancias:

1. Por escritura pública otorgada el 5 de octubre de 1901, Jorge Bird Arias compró los islotes Hicacos y Ratones a los cuatro hermanos García Becerril, sus titulares, según constaba en el Registro.

2. Ese título de compra fue inscrito en el Registro de la Propiedad de Humacao el 11 de octubre de 1901, sin defecto alguno.

3. El 5 de octubre de 1901 tomó posesión material de ellos el comprador Bird Arias, y de hecho disfrutó y gozó de tal posesión física, en concepto de dueño, con justo título, de buena fe, en forma pública, pacífica, constante e ininterrumpida, hasta la fecha de su muerte ocurrida el 3 de julio de 1950, es decir, por más de 48 años.

4. Desde el 5 de octubre de 1901 hasta el 3 de julio de 1950 El Pueblo de Puerto Rico conoció o tuvo medios racio-

---

[16] Nuestras decisiones en sentido contrario y, en particular, *Jiménez* v. *Municipio*, 70 D.P.R. 517, 521 (1949), *Gobierno de la Capital* v. *Casino Español*, 56 D.P.R. 790, 801 (1940), *Pueblo* v. *Rojas*, 53 D.P.R. 121, 136 (1938), *Miranda* v. *Municipio de Aguadilla*, 39 D.P.R. 467, 470 (1929) y *Pueblo* v. *Municipio de San Juan*, 19 D.P.R. 656, 667 (1913) no deben tener, en modo alguno, el reconocimiento ni autoridad de precedentes obligatorios en cuanto en ellas se resuelva, explícita o implícitamente, que respecto a sus bienes patrimoniales—excepto terrenos baldíos—no puede alegarse la prescripción adquisitiva en contra de El Pueblo de Puerto Rico.

nales y motivos suficientes para conocer, que tales islotes estaban poseídos de hecho, y a título de dueño, por Bird Arias, y nunca realizó acto o gestión alguna que pudiera interrumpir, suspender o extinguir tal posesión física, no obstante tener en su poder el informe sometido por el Inspector de Terrenos Públicos el 26 de noviembre de 1904, mencionado en el escolio (4), en que ese funcionario comunicaba al gobierno insular, en términos claros y precisos, que Bird los había adquirido en 1901 por compra y los ocupaba y poseía. En dicho informe, presentado en evidencia por el Estado, y marcado Exh. 4, en lo pertinente, se hace constar:

"El *actual poseedor* del islote lo es Dn. Jorge Bird Arias que lo adquirió en octubre 5 de 1901 *por compra* a los hermanos García Lavagi. [*sic*] ([17])" Pág. 9.

"Consideraciones. En *estos predios que poseen* los indicados Sres. Bird y Noble, ([18]) se ha de dilucidar como proceda el mejor derecho a la propiedad, *porque ellos los adquirieron de buena fe,* y los títulos que recibieron han sido *debidamente anotados en el Registro de la Propiedad de Humacao.*" Pág. 33.

"En cuanto a los predios *que ocupan* el Sr. Noble y el Sr. Bird, esta inspección entiende que se les debe comunicar oficialmente el resultado de la investigación practicada, para que ellos demuestren con los primitivos documentos el derecho que les asiste sobre tales terrenos." Pág. 36. (Énfasis suplido.)

Ante la Sala sentenciadora no se ofreció evidencia alguna por la parte demandante de la acción tomada, si alguna se tomó, por el gobierno, como resultado de las recomendaciones del Inspector de Terrenos Públicos.

5. A Bird Arias y a sus herederos, suceden en la posesión física de los islotes los subadquirentes Pilar Bird de

---

([17]) Un tercer islote llamado "Lobos" fue comprado en 24 de enero de 1903 por Bird Arias a Quintín Rodríguez.

([18]) William Noble era poseedor como dueño de 230 cuerdas de terreno situado en la misma zona.

Veve en 1952, la corporación Planta de Cal Hicaco, Inc., en 1954, y, finalmente, la corporación Best Builders, Inc., en 1962.

6. Se pagaron al Estado contribuciones territoriales sobre los islotes por sus titulares registrales y poseedores de hecho; la Compañía de Fomento Industrial, para cuyo beneficio se han expropiado los islotes, le prestó a "Planta de Cal Hicaco, Inc.", la suma de $40,000.00 con garantía hipotecaria sobre los islotes, y "mientras se estudiaba la posibilidad de instar este procedimiento," la Compañía de Fomento Industrial llevó a cabo valoraciones de los islotes y hasta llegó a expedir un cheque (por $500,000.00) a favor del Secretario del Tribunal para ser depositado como valor de los inmuebles en favor de los titulares registrales de los mismos.

7. El 14 de enero de 1963, transcurridos ya 61 años y 3 meses de constante posesión de hecho ejercida, en la forma relatada, por los propios titulares registrales de los islotes, se inicia por el Estado Libre Asociado de Puerto Rico "a requerimiento de la Compañía de Fomento Industrial de Puerto Rico" la expropiación de los islotes y sus establecimientos industriales por una simbólica compensación de $2.00, alegando que todos esos bienes le pertenecían.

Por consecuencia jurídica inevitable de esa prolongada posesión de hecho, partiendo del 11 de octubre de 1901, fecha de la inscripción del título a favor de Bird Arias, en el día 11 de octubre de 1911 se consolidó la usucapión ordinaria *secundum tabulas*, ratificándose por el estado de hecho posesorio la paralela situación registral.

Por si ello fuera insuficiente, y en los supuestos de que El Pueblo de Puerto Rico hubiera sido el verdadero dueño de los islotes con arreglo a lo acordado en los Arts. II y VIII del Tratado de París y lo dispuesto en el Art. 13 de nuestra Carta Orgánica de 1900, y que Bird Arias jamás hubiera tenido un título justo sobre ellos, ni buena fe en su posesión

como dueño, el 11 de octubre de 1931, se consolidó también la usucapión extraordinaria *secundum tabulas* a su favor.

Desde esta última fecha, por la virtud adquisitiva-extintiva de la conjunción del tiempo con la posesión, quedaron plena y definitivamente aseguradas la certidumbre, firmeza y perfección de aquella adquisición dominical "en perjuicio de toda clase de personas, inclusas las jurídicas", como reza el Art. 1832 del Código Civil; quedaron convalidados, curados y purgados todos sus posibles vicios, defectos e imperfecciones y quedaron *ipso facto*, perdidas, destruidas y extinguidas para siempre cuantas acciones reales se hubieran podido ejercitar respecto a esos inmuebles por el Pueblo de Puerto Rico.

Así, purificado por el correr del tiempo, el derecho de propiedad plena sobre los islotes pasó a la señora Bird de Veve, después a la corporación "Planta de Cal Hicaco, Inc.", y finalmente a Best Builders, Inc., quienes agregaron otro decenio posesorio al medio siglo de Jorge Bird Arias.

En este incidente de reconsideración de nuestro fallo las corporaciones interventoras dieron énfasis a sus defensas de prescripción de la acción y de adquisición por usucapión ordinaria y extraordinaria, hasta el punto de pedirnos el reexamen de la doctrina relativa a la usucapión contra propiedades del Estado, cosa que estimamos haber hecho.

Procede ampliar un poco esta ponencia a fin de precisar la eficacia jurídica de la usucapión en relación a cada islote de los dos que componen la finca rústica Núm. 104 del Municipio de Fajardo.

A—Respecto a Hicacos, con su cabida original de 45.44 cuerdas, la usucapión tuvo eficacia jurídica convalidante de los títulos·de Bird Arias y sus causantes en derecho. Los tradicionales cinco requisitos de la usucapión ordinaria: justo título, buena fe, posesión continuada, transcurso del tiempo tasado por la Ley y prescriptibilidad de la cosa, habían quedado cumplidos antes de adquirir Bird Arias en octubre de

1901, y con arreglo al Art. 1957 del Código Civil que nos rigió desde el 1 de enero de 1890 hasta el 1 de julio de 1902, según quedó enmendado ese artículo por la Orden Militar de 7 de abril de 1899, la cual, con efecto retroactivo, redujo a 6 años el término de prescripción adquisitiva ordinaria señalado por aquel artículo. El justo título lo constituyó la adquisición por composición del año 1892. Vuelve a consolidarse en 1911 la usucapión ordinaria, a la luz del Art. 1857 de nuestro Código Civil de 1902 que restituyó el plazo de 10 años, en el supuesto de que fuese aplicable al caso este Art. 1857, no obstante lo dispuesto en el Art. 1839, a virtud del cual la ley sobre prescripción vigente al comenzar ésta es la aplicable.

La usucapión extraordinaria, tomando en consideración exclusivamente la posesión de Bird Arias, y a partir de la compra que hace el 5 de octubre de 1901—antes de entrar en vigor el Art. 9 del Código Político—se consolida en el mismo día y mes del año 1931. Ella también tuvo eficacia, consecuencia y efecto adquisitivo sobre el exceso de cabida de Hicacos ascendente, según mensura reciente practicada por el demandante, a 94.56 cuerdas sobre la cabida original 45.44 cuerdas del título de amparo. No parece que tan gran exceso pueda comprenderse como una accesión con arreglo al Art. 303 de nuestro Código Civil. Para inscribirse tal exceso de cabida es necesario acudir al procedimiento especial apropiado.

B—Si bien el islote Ratones aparece haber estado unido a Hicacos a los fines de la explotación agrícola e industrial a que han sido por mucho tiempo sometidos ambos, y no obstante haber concluido la Sala sentenciadora que desde el 1872 ambos islotes habían sido poseídos por Fort Torres y sus posteriores adquirentes, lo cierto es que este islote Ratones no figuró como objeto de concesión en el título de amparo de 1872. Este se limita al islote Hicacos, entonces compuesto de 45.44 cuerdas. En el texto del título de amparo sólo se menciona el islote Ratones como un punto de referencia al

describirse a Hicacos, y al decirse que éste está situado entre las Cabezas de San Juan y el islote Ratones.

En las primeras cuatro inscripciones de la finca rústica Núm. 104 del Municipio de Fajardo aparece que la misma está formada solamente por el islote Hicacos.

Al practicarse la quinta inscripción se hizo constar que la misma se denegaba "respecto al llamado Ratones por no aparecer inscrito a nombre del causante." Cuando Bird Arias pide inscripción de su título, también se deniega en relación con el islote Ratones. Sin embargo, por la séptima se hace constar:

"Omitida en la inscripción que precede—6ta.—hacer constar que esta finca está compuesta por los islotes denominados 'Hicacos y Ratones' y estando el título aún en el Registro la describo nuevamente en la siguiente forma: Rústica: Islotes denominados 'Hicacos y Ratones', descrita en la inscripción primera de igual modo que en el documento presentado. No aparece afecta a carga alguna."

Empero en la inscripción primera del año 1883 la finca 104 sólo se describe así:

"Rustica: Islote denominado Hicacos destinado a pastos, *sito entre la Cabeza de San Juan y otro islote llamado Ratones,* a tres millas del puerto de Fajardo frente al barrio de las Cabezas término municipal de dicho pueblo. Linda por los cuatro puntos cardinales con el Mar. Tiene de cabida cuarenta y cinco cuerdas cuarenta y cuatro céntimos de otra."

Se nos hace difícil aceptar que a la luz de tal descripción pudieran rectificarse las inscripciones quinta y sexta a los fines de hacer constar que la finca 104 estaba integrada por ambos islotes.

La usucapión extraordinaria resulta ser el verdadero modo de adquirir la propiedad del islote Ratones. Faltó el ingrediente del justo título para que respecto al mismo se produjera la ordinaria. Y tanto Hicacos como Ratones, de aceptarse que al cambio de soberanía pasaron a pertenecer, por

cesión de la Corona Española, al pueblo de los Estados Unidos y luego al pueblo de Puerto Rico, como bienes patrimoniales del Estado estuvieron puestos, desde marzo de 1902 y bajo ciertas condiciones, en el comercio de los hombres, a tenor del Art. 135 del propio Código Político nuestro, que hasta el 1949 dispuso:

"Artículo 135. El Comisionado de lo Interior podrá, previa aprobación del Consejo Ejecutivo, disponer el arrendamiento, por un período que no exceda de quince años, y con el consentimiento de la Asamblea Legislativa, *la venta de todos los terrenos cedidos a la Isla de Puerto Rico por los Estados Unidos* o que en adelante le cedieren, o de otro modo adquiridos." (Énfasis suplido.)

Véase Ley Núm. 182 de 5 de mayo de 1949.

En una contienda sobre el título de una cosa, en que la parte actora alega que ésta le pertenece por cesión que se le hizo, mientras que la otra aduce que ella es su verdadera dueña y que la adquirió por distintos modos autorizados por ley, no concebimos impedimento serio para resolver, de ello proceder, que la parte demandada es la dueña real de la cosa por las distintas formas, razones, modos y títulos, independientes entre sí, que mediaron o intervinieron en su adquisición. Si para decidir una cuestión en determinado sentido existen razones diferentes, pero igualmente válidas, es preferible que la firmeza y solidez jurídica del fallo se apoyen en todas. Una conciencia judicial, libre de prejuicios, con ánimo de medir a todos con la misma vara, tiene derecho a sentirse satisfecha y convencida de que ha dado a cada uno lo suyo, con mayor razón cuando cada uno de los fundamentos de derecho de que se ha valido, de por sí, constituye un sostén inconmovible de su decisión. Con ello se facilita extensivamente la aplicación del principio de cosa juzgada.

Hemos aplicado un cuadro de disposiciones de nuestro cuerpo de derecho positivo, reconocidas como de orden pú-

blico, para arribar a la conclusión de que la resolución dictada por la Sala sentenciadora y nuestra decisión que la sostiene no deben alterarse en reconsideración. Hace tiempo que la doctrina de que la prescripción en Puerto Rico nunca corre contra el Estado debió derrumbarse, tanto en relación con los gobiernos municipales, como ya ha acontecido, como también en relación con el insular. No existen verdaderas razones para que subsista la distinción, que constituye un irritante reto al recto sentido y filosofía de ese cuadro de disposiciones.

Si en verdad existe una necesidad seria que imperiosamente clame por otro estado de derecho que efectivamente y a plenitud imponga esa doctrina de privilegio, favoreciendo con una inmunidad prescriptiva absoluta al Estado que puede invadir las actividades privativas, comerciales, industriales, agrícolas, de servicios a la comunidad, y hasta enfrascarse en negocios de compra y reventa de bienes inmuebles, debe establecerse tal estado de derecho por los organismos legislativos. Creemos que nada hay que se oponga a ello. Muchos *estados continentales* lo han hecho.([19]) Bastaría para ello un simple cambio al Art. 9 del Código Político.

En *El Pueblo* v. *Dimas*, 18 D.P.R. 1061 (Del Toro) (1912), el Estado reivindicaba una parcela de terrenos desecados, antiguos manglares que "formaban parte de un monte del Estado declarado reservable." Haciendo una indeterminada alusión al año 1898 (en vez de hacerla al 1 de julio de 1902, en que realmente comenzó la prohibición, según el Art. 9 del Código Político, de adquirir terrenos baldíos del Estado por posesión adversa) dijimos en la opinión:

---

([19]) Para la jurisprudencia americana sobre la materia véase 55 A.L.R.2d 554–638. Para jurisprudencia respecto a que la doctrina *nulla tempus ocurrit regi* no es de aplicación a bienes inmuebles y derechos reales de los Estados Unidos sitos en Puerto Rico y de que nuestras disposiciones prescriptivas benefician o perjudican a Estados Unidos, véanse: *Baldrich* v. *Barbour*, 90 F.2d 867 (1937) y *People of Puerto Rico* v. *Fortuna Estates*, 279 Fed. 500 (1922). Véase el apéndice o anexo unido.

"A partir de esa fecha, no era posible adquirir por prescripción *los terrenos de que se trata en este pleito.*" (Énfasis suplido) Pág. 1081.

Después transcribimos unos ocho párrafos de la opinión del tribunal de instancia, emitida por el entonces Juez de Distrito, Córdova Dávila. Es en el primero de ellos donde se inserta la máxima *Nullum tempus ocurrit regi,* y, en el tercero se dice, refiriéndose a ella:

"Aunque la Legislatura del país hubiese permanecido en silencio, el dominio del pueblo sobre los terrenos de su propiedad no podría prescribir hoy *aplicando la misma regla* que a los Estados se aplica. La Asamblea Legislativa, *sin embargo, ha consignado este precepto* en el Código Político, cuyo artículo 9 dice *de modo claro y terminante,* que no puede adquirirse título a terrenos baldíos insulares por la posesión adversa de los mismos." (Énfasis suplido.) Pág. 1082.

Se observará que en la primera oración, el juez sentenciador, partiendo del supuesto de que la máxima hubiera sido de aplicación a Puerto Rico, manifestó que "el dominio del pueblo sobre los terrenos de su propiedad no podía prescribir."

Pero, en su segunda oración, obviamente indica el Juez Córdova Dávila lo único que respecto a esa materia de prescripción de bienes del Estado había hecho el supremo órgano legislativo local, en las siguientes palabras:

". . . La Asamblea Legislativa, *sin embargo,* ha consignado este precepto en el Código Político, cuyo artículo 9 dice *de modo claro y terminante,* que no puede adquirirse título *a terrenos baldíos insulares* por la posesión adversa de los mismos." (Énfasis suplido.)

Con ello claramente indicaba que la máxima, en su más amplio sentido, no había sido adoptada como derecho legislado en Puerto Rico.

Habiendo concluido este Tribunal que se trataba de una acción para reivindicar terrenos baldíos, resolvió que al apro-

barse el Art. 9 del Código Político, decretando la no adquisición por posesión adversa de terrenos baldíos insulares, había quedado interrumpida la prescripción y que por este motivo no era posible usucapir *"los terrenos de que se trata en este pleito."*

No resolvimos en ese caso que la mencionada máxima rigiera o fuera aplicable en Puerto Rico, ni que, en términos generales y absolutos, todos los bienes del Estado estaban fuera del alcance del instituto prescriptivo establecido en nuestro Código Civil. No obstante, en varias decisiones posteriores, luego de hacer una mera alusión a *El Pueblo* v. *Dimas*, le atribuimos un alcance y autoridad como precedente, que jamás tuvo, en el sentido de establecer una doctrina o regla reconociendo tal prohibición prescriptiva general y absoluta en favor del Estado. A la luz del derecho aplicable y de los hechos y eventos peculiares envueltos en ese caso, no podíamos, ni podemos en casos semejantes, resolver tal cosa. La aplicación del único precepto que gobierna la materia— Art. 9, última oración, Código Político—debió mantenerse dentro de su excepcional limitación objetiva: sólo respecto a propiedades del Estado comprendidas exclusivamente dentro del término "terrenos baldíos insulares." Nuestro ministerio, como reza el Art. 26 de la Ley de Evidencia, en la interpretación de una ley, es simplemente averiguar y declarar lo que textualmente y en sustancia contiene, sin insertar lo que se hubiese omitido, ni omitir lo que se hubiese insertado.

Por las razones anteriores y, además, por las complementarias respecto al punto de la usucapión fiscal, que expreso en el apéndice o anexo que se une a esta opinión, como parte de la misma, quedan expuestos los criterios en que fundo mi voto de "no ha lugar" sobre los méritos de la moción de reconsideración presentada el 30 de obtubre de 1968.

—O—

## ÍNDICE DEL APÉNDICE

## COMPLEMENTARIO

*Materias*                                                       *Página*

I—*Advertencia Preliminar*

Tres razones jurídicas fundamentales, no cuestionadas, para desestimar imperiosamente la Moción de Reconsideración ...............................................   687

II—*Ámbito de la Prescriptibilidad Señalada*

Bienes del Estado que no pueden adquirirse por usucapión; los patrimoniales pueden prescribir, con la única excepción, *clara y terminante,* de los terrenos baldíos, manglares, terrenos realengos y montes del Estado .........   689

III—*Motivos en Contrario*

1ro. Que el Comisionado Mr. Rowe pudo haber escrito, o pudo ser el autor de la última oración del Art. 9 del Código Político de 1902; ...............................   690

2do. Que el caso de *El Pueblo* v. *Dimas,* 18:1061, resuelve el problema de prescripción general aquí planteado   690

IV—*Del Argumento Respecto al Texto de la Última Oración del Art. 9*

(a) Escolio (14) ...................................   691

(b) Precepto de factura puertorriqueña ..............   692

(c) Circunstancias y hechos históricos en torno a los Códigos de 1902 ............................   693

V—*Del Argumento sobre No Prescripción Contra el Estado*

A. La usucapión en el Derecho Romano ..............   698

B. Según los principales Códigos Antiguos ............   705

C. Según el Código Civil Español de 1889 ............   708

D. Extensión a Puerto Rico del anterior Código Civil ..   714

E. El Gobierno Militar y el Congreso Federal, enmiendan y adaptan el instituto prescriptivo contra el Estado ........................................   716

(a) La Orden General Núm. 1 y la Judicial Núm. 82 ................................   716

(b) La Sec. 8 del Acta Foraker ..............   718

(c) Autorizada la prescripción contra el Estado por la Comisión Codificadora, creada por el Congreso en 1900 ......................   722

F. Análisis e Inaplicación del Art. 9 del Código Político

(a) Análisis ...............................   726

(b) Su no aplicación al presente caso ........   729

686

G. Nuestra Legislación Prescriptiva es de Criterio Anti-
privilegista .................................... 732
    1. Código Civil vigente desde 1890 ............ 732
    2. Ley Hipotecaria de 1893 ................... 732
    3. Código Civil revisado de 1902 .............. 733
    4. Código Político de 1902 ................... 733
    5. Código de Enjuiciamiento Civil de 1904 ...... 734
    6. Ley Núm. 76 de 1916 ..................... 735
    7. La Ley Núm. 104 de 1955 ................. 736
    8. Art. II, Sec. 7 de nuestra Constitución de 1952 739

H. Prescripción contra el Estado en la Jurisprudencia
Americana .................................... 740
    (a) Regla general negativa respecto al gobierno
federal de los Estados Unidos; *su única ex-
cepción respecto a inmuebles sitos en Puerto
Rico* .................................... 740
    (b) Jurisprudencia de los Estados citada por la
oposición, y su análisis demostrativo de su
inaplicación a Puerto Rico ................ 744
        (1) Disposiciones adversas a la prescripción
contra el Estado en las tres últimas
Constituciones de Luisiana ............ 744
        (2) Los Estatutos Revisados de Tejas expre-
samente la prohíben ................. 746
        (3) Pero Alabama, California, Kentucky,
Missouri, New York, West Virginia y
otros Estados la admiten respecto a sus
bienes patrimoniales no usados para
fines públicos específicos .............. 746
    El Proyecto del Senado Núm. 755, para eliminar
la exención prescriptiva de los terrenos baldíos
hubiera constituido una legislación igualitaria,
extintiva de una situación irritante y antijurídica
y de privilegio antisocial ...................... 779
Posición Actual del Estado ................................. 780
Advertencia Histórica ..................................... 781

APÉNDICE COMPLEMENTARIO

SOBRE LA USUCAPIÓN FISCAL

## I

## *ADVERTENCIA PRELIMINAR*

Este anexo sólo complementa el *punto de prescripción* tratado en mi anterior opinión expositiva de los criterios en que fundo mi voto de no ha lugar a la moción de reconsideración.

*RECUÉRDESE:* que estoy conforme con la desestimación de la moción de reconsideración de El Pueblo dejándose en pie la opinión del Juez Belaval y nuestra sentencia confirmatoria del 10 de octubre de 1967,[*] que declara a la interventora Best Builders, Inc., única y legítima titular de los islotes Hicaco y Ratones, por las siguientes razones:

*Primera:* Porque el demandante Estado Libre Asociado de Puerto Rico jamás ha tenido—ni lo tuvo El Pueblo de Puerto Rico—título alguno de dominio o cualquier otro derecho real, sobre los islotes que en vano alegó le pertenecían y que por muchos años reconoció como bienes de los demandados.

*Segunda:* Porque adquirió su pleno dominio y posesión a virtud del contrato de compraventa celebrado el 7 de diciembre de 1962, entre ella y la corporación "Planta de Cal Hicaco, Inc.", mediante escritura pública otorgada ese día, por el convenido precio de $900,000.00, parte del cual fue satisfecho entonces.—Véanse págs. 649–651, anterior opinión.—

*Tercera:* Porque esa codemandada auténticamente ostenta, tiene y disfruta del estado, condición o categoría jurídica superior de tercero hipotecario, encontrándose sus dere-

---

[*] NOTA DEL COMPILADOR: *E.L.A.* v. *Tribunal Superior*, 95 D.P.R. 339 (1967).

chos dominicales desde la presentación de su título de compraventa en el Registro de la Propiedad—12 de diciembre de 1962—legalmente protegidos, fortalecidos y garantizados, contra todo el mundo.

En la misma forma privilegiada en derecho, o sea como terceros hipotecarios, por títulos respectivos de compraventa, inscritos sin defectos algunos, desde octubre de 1901 (antes de empezar a regir el Art. 9 del Código Político) se encontraron sus anteriores dueños Jorge Bird Arias, Rafael Veve, Pilar Bird y la corporación Planta de Cal Hicaco, Inc.— véanse págs. 659–666, anterior opinión.

*Cuarta:* Por imperio de las siguientes usucapiones:

a) La *ordinaria de seis años,* con justo título y buena fe, establecida por el Art. 1957 del Código Civil Español que rigió en Puerto Rico desde el 1ro. de enero de 1890 hasta el 1 de julio de 1902, tal como dicho artículo quedó enmendado por Orden General, o Judicial, de 4 de abril de 1899, en concordancia con los Arts. 344, 1932 y 1939 del mismo antiguo Código.

b) La *ordinaria de diez años* entre presentes, y veinte entre ausentes, con justo título y buena fe, autorizado por el Art. 1857 de nuestro Código Civil vigente, que curó cualquier vicio o defecto que pudiera afectar el título de compraventa indicado.

c) La *extraordinaria de 30 años,* sin necesidad de título ni buena fe, fijada en el Art. 1859 del mismo cuerpo legal. Según la realidad jurídica y los asientos del Registro de la Propiedad, el período posesorio continuo hasta el momento del pleito es de *sesenta y un (61) años,* contando desde la adquisición e inscripción de los islotes en octubre de 1901, por y a favor de Jorge Bird Arias, y

*Quinta:* Por imperio de la prescripción extintiva de la acción reivindicatoria (es la que en verdad se instó) ejerci-

tada el 14 de enero de 1963 por el Estado contra Best Builders, Inc., y Planta de Cal Hicaco, Inc., establecida en el Art. 1861 del actual Código Civil.

A virtud *de cualquiera de las anteriores cinco razones jurídicas fundamentales,* necesariamente debía desestimarse la moción de reconsideración.

## II

### *ÁMBITO DE LA PRESCRIPTIBILIDAD SEÑALADA*

*Pregunto* en la página 668 de mi opinión:

"¿Es correcta la tesis de que a partir del cambio de soberanía no pueden adquirirse por usucapión los *bienes* . . . pertenecientes al Estado? (Énfasis nuestro.)

*Contesto* en la misma página:

". . . respecto a *ciertos* bienes *lo es;* pero *respecto a otros, no lo es."* (Énfasis nuestro.)

En ella seguidamente procedo a exponer que, de toda la masa de bienes del Estado, *sólo aquella parte declarada o clasificada "bienes patrimoniales"* con arreglo al Art. 256 de nuestro Código Civil—o sea la propiedad, fortuna o *riqueza privada* del Estado—sí puede adquirirse o perderse por usucapión, *con la especial excepción,* respecto a esos bienes patrimoniales, *(a partir del 1 de julio de 1902)* de los terrenos clasificados "baldíos" del Estado, según lo dispuso, *con efecto prospectivo,* nuestro Código Político de 1902, en la última oración de su Art. 9, texto castellano, en los siguientes términos:

"No podrá adquirirse títulos *a terrenos baldíos* insulares por posesión adversa, o contraria al título de otra u otras personas." (Énfasis nuestro.)

Para enfatizar y aclarar más nuestra posición, reproducimos el segundo párrafo de la página 674 de nuestra opinión:

"A la luz de todo lo expuesto, no puede válidamente sostenerse que, en todos los casos y como norma jurídica de aplicación general, la prescripción no corre contra el Estado Libre Asociado de Puerto Rico. Como hemos dicho en otro lugar, no *correrá* respecto a aquellos bienes suyos no susceptibles de dominio por particulares, que son inalienables y que estarán fuera del comercio de los hombres mientras se encuentren afectos al uso o servicio público general. Pero los restantes bienes que integren su propiedad privada, sujeto a las excepciones establecidas por ley, son prescriptibles conformes a las normas de nuestra legislación civil." (Énfasis nuestro.)

## III

*MOTIVOS DE OPOSICIÓN QUE PODRÍAN ADUCIRSE*

Las razones que podrían aducirse contra mi opinión serían las siguientes:

1ra. Respecto al texto que debe prevalecer en la interpretación y aplicación del Art. 9 del Código Político de 1902, es el inglés, debido a que, el Sr. Rowe, miembro de la primitiva Comisión Codificadora que preparó los proyectos de códigos de 1902, utilizó para su labor el Código Político de California y utilizó el idioma inglés y el Art. 13 del Código Civil nuestro dispone que si el estatuto fuera una traducción o adaptación de un estatuto de algún Estado se dará preferencia al texto inglés.

2da. Que los tribunales han resuelto a favor del Estado este problema específico de la prescripción o no prescripción de los terrenos públicos y que el caso determinante de tal solución en nuestra isla es *Pueblo* v. *Dimas*, 18 D.P.R. 1061 (1912).

Ambas razones son erróneas. Veamos por qué:

# IV

## *ARGUMENTO RESPECTO AL TEXTO*

### (a)

En el escolio 14 de nuestra opinión consideramos, con alguna amplitud, el problema de la irreconciliable discrepancia entre los textos inglés y castellano *de la última oración* del Art. 9 del Código Político de 1902, a la luz del Art. 13 de nuestro Código Civil. Concluimos que el castellano era el que debía prevalecer con arreglo a las normas de hermenéutica fijadas por dicho Art. 13.

Repetimos, que la *última o segunda oración* del texto inglés original del Art. 9 del Código Político de 1902, que dice: "Title to insular lands shall not be acquired by adverse possession.", ni ninguna otra relativa a la adquisición por posesión adversa de terrenos públicos, baldíos o no baldíos, *jamás formó parte del Art. 42 del Código Político de 1872* del Estado de California que aparece transcrito en el escolio 14. Tampoco integraba dicho Art. 42 de ese Estado, ninguna otra expresión o disposición análoga, respecto a la no adquisición por usucapión de terrenos públicos del Estado.

Como ello es correcto, necesariamente tenemos que aceptar que la idea, noción o pensamiento de dotar de tal oración al Art. 9 del proyecto de Código Político de 1902—que el Congreso y nuestra Legislatura mandaron se hiciera y se aprobara en los idiomas inglés y castellano—se concibió, por primera vez, en Puerto Rico y aquí se añadió a la parte del Art. 42 de California que se tomó y adaptó por la Comisión Codificadora de 1901.

Ante esa realidad, forzosamente debe concluirse, como se dice en nuestro escolio, que "los textos inglés y castellano *de esa última oración* no son una traducción o adaptación de estatuto alguno de Estados Unidos o de alguno de sus Estados . . . ." (Énfasis nuestro.) Lo que no se dice,

ni se escribe, en idioma alguno, es intraducible, es inadaptable. Considerando con toda serenidad el problema, no se puede afirmar, con acierto, que ha sido traducida, mal traducida o adaptada, de o a tal texto, una oración que nunca se escribió o expresó en fuente original alguna.

Adaptación significa ordenación ajustada, acoplamiento de medios afines, de las actividades a sus objetos, de la vida en general a las circunstancias del medio. Es avenir, acomodar o modificar condiciones en armonía con un medio distinto al suyo habitual. Existe en los casos en que un objeto, inútil originalmente para ciertos usos, por medio de alteraciones, se ha convertido en un objeto utilizable o apto para tales usos.

En aquella parte del Art. 42 del Código Político de California que se tomó para formar *la primera oración* del texto inglés del Art. 9 de nuestro Código Político de 1902, la adaptación que se hizo para acomodarla a las condiciones y circunstancias de esta Isla de Puerto Rico, consistió en cambiar las frases o expresiones *"lands of the state"*, por *"lands of Puerto Rico"*; *"the district attorney of the county"*, por *"the Fiscal (District Attorney) of the judicial district"*; *"sheriff of the county"*, por *"the Attorney General"*, y, además, en eliminar la parte del texto californiano que disponía:

*". . . ; and if resistance to the execution of the order is made or threatened, the sheriff may call to his aid the power of the county, as in cases of resistance to the writs of the people."* (Énfasis nuestro.)

La segunda y última oración del Art. 9 de nuestro Código Político, cuyos textos inglés y castellano discrepan esencialmente entre sí, *no tiene concordancia alguna con el Código Político de California; ni fue tomada del mismo, ni es una traducción, ni una adaptación de estatuto alguno de un estado o territorio americano de habla inglesa.* Fue una autóctona y original aportación, o bien de toda una Comisión Codificadora que por ley—Acta Foraker—tenía que

preparar dos proyectos originales, *uno en inglés y otro en castellano*, de cada Código, o de los hombres de nuestra primera Asamblea Legislativa, en la que figuraban notables juristas, hombres de ilustración y profesionales de la talla de Rosendo Matienzo Cintrón, José Guzmán Benítez, Francisco M. Quiñones, José Gómez Brioso, Santiago Veve, Cayetano Coll y Toste y Ulpiano R. Colón. La preparación de esos Códigos fue carga de muchos camellos.

Como ya expusimos, la segunda y última oración del Art. 9 del Código Político, regula, en parte, una institución jurídica, la prescripción, en sentido prohibitivo, materia independiente y extraña a la finalidad de la primera oración, referente a la invasión, por intrusos, de *"waste or ungranted lands of Puerto Rico"*, según su texto inglés y a "terrenos baldíos o no concedidos pertenecientes a Puerto Rico", según su texto castellano.

Jamás—y no nos cansamos de afirmarlo, aunque parezcamos machacones—esta última oración pasó por proceso alguno de traducción o adaptación. ¿Cuál texto se redactó primero? No hemos encontrado información que nos ayude a contestar con absoluta precisión la pregunta. No queremos correr el riesgo de adivinar o de hacer afirmaciones categóricas a ciegas.

Las circunstancias de que al Comisionado Rowe, se le asignara la dirección de la preparación de un proyecto de Código Político, aunque tiene su peso o valor, no es evidencia concluyente de que él fuera el inspirador, autor o coautor de la oración segunda. La posibilidad de que lo fuera de su versión inglesa no la negamos, desde luego.

Pero apuntaremos otros hechos y circunstancias acaecidos en torno a la redacción y aprobación de los códigos de 1902.

Recordemos que el propio Congreso de Estados Unidos, autorizó la creación de una comisión para revisar los códigos y leyes de Puerto Rico y el nombramiento de "los em-

pleados y demás auxiliares" de la misma, ordenándose, en parte, textualmente por la Sec. 40 del Acta Foraker:

"Y dicha Comisión presentará al Congreso un informe minucioso y definitivo, *en los idiomas inglés y español*, de sus revisiones, compilaciones y recomendaciones, con notas explicativas en cuanto a los cambios y justificación de éstos, dentro de un año de la adopción de la presente Ley." (Énfasis nuestro.)

Recordemos también, que la primera legislatura insular, a fin de prorrogar el plazo concedido a la anterior comisión, aprobó una ley (C.B.13), el 31 de enero de 1901—véase leyes de 1901, pág. 145—estableciendo otra comisión para compilar, revisar y codificar el sistema de leyes nuestro, incluyendo un Código Civil, un Código Político, un Código de Procedimiento Civil y un Código Penal. Se dispuso en esa ley, según su texto inglés:

"The *said proposed codes shall be in English and in Spanish.*" (Énfasis nuestro.)

Por su Sec. 3, en ella también se dispuso:

"The said commission is hereby authorized to employ *such necessary translators and assistants* as may be deemed necessary and proper for the performance of its work." (Énfasis nuestro.)

En el Tomo I del Informe de dicha comisión, redactado *en inglés y castellano*, impreso en 1901, por la imprenta del gobierno federal, encontramos un detallado relato de sus labores preliminares en su parte I, titulada "Historia de la Comisión."

La comisión dio participación en la obra de revisión y codificación a toda la ciudadanía ilustrada del país. Celebró audiencias y conferencias públicas y privadas en muchos municipios de la Isla y "recibió gran número de comunicaciones escritas de magistrados, funcionarios y comerciantes de la Isla; todas las cuales fueron compendiadas y tomadas

en consideración por los comisionados al redactar su informe definitivo." Ver pág. 19.

De esa "Historia de la Comisión", pág. 17, tomamos los siguientes párrafos:

"Se pasaron invitaciones para la primera serie de audiencias públicas y privadas, al tenor de las enviadas en Septiembre 3, 1900, á las siguientes conspicuas personas:  Dr. José Esteban Saldaña, Dr. Cayetano Coll y Toste, Sr. Manuel F. Rossy, Sr. Luis Muñoz Rivera, Sr. Fidel Guillermety, Sr. Tulio Larrínaga, Sr. Manuel C. Román, Sr. Herminio Díaz, Sr. Santiago Veve, Dr. Rafael del Valle, Sr. Manuel Egozcue, Dr. José Marxuach, Sr. Carlos M. Soler, Sr. Rafael Palacios, Sr. Gerardo Soler.

Cada miembro tomó a su cargo también la cuestión de forma de gobierno insular y organización del sistema de enseñanza.

A fin de familiarizarse con el funcionamiento del gobierno local en toda la isla, *el Comisionado* Rowe empleó todo el mes de Octubre y parte de Noviembre *en una extensa excursión de estudio, visitando la mayor parte de las poblaciones y celebrando conferencias públicas y privadas en las cuales oyó la opinión de los representantes de dichos gobiernos locales y de los principales vecinos.*" (Énfasis nuestro.)

Según el plan para la distribución del trabajo adoptado por la Comisión, se asignó al Comisionado Joseph F. Daly, entre otros, la preparación de los proyectos correspondientes a la organización de los tribunales y al Comisionado Rowe, entre otros, el correspondiente a tributación y rentas.  No obstante ser el inglés el idioma propio de ellos, los proyectos preparados respecto a tales materias asignadas a estos comisionados norteamericanos, *fueron redactados originalmente en español* y ello se hace constar en esa Historia de la Comisión, pág. 29, del siguiente modo:

"Conviene indicar acerca de lo expuesto que la ley sobre reorganización de los tribunales, la relativa a derechos sobre trasmisión de herencias y la de derechos judiciales, *fueron redactadas originalmente en español*; de aquí el que se hallan conservado en la traducción muchos términos latinos y espa-

ñoles. En muchos casos fué del todo imposible hallar equivalentes en inglés para los términos empleados por las leyes españolas, considerándose mejor, por tanto, conservar estas voces y evitar así la confusión e incertidumbre que resultaría del uso de expresiones inglesas que no corresponden exactamente a las españolas.

Exceptuando la revisión de la ley orgánica (Ley Foraker), todos los asuntos confiados a la comisión son de la competencia de la asamblea legislativa local y a menos que el Congreso esté en aptitud de promulgar un código completo de las leyes para Puerto Rico, la revisión del sistema *legal tendrá que ser llevada a cabo por la asamblea insular.*"

El proyecto de Código Político, preparado bajo la dirección del Comisionado Rowe, por sus asesores y auxiliares puertorriqueños, con el consejo y sugerencias de tantos distinguidos juristas puertorriqueños, de formación jurídica española, contenía 778 artículos, divididos en 15 títulos y un título adicional. Cuando se sometió a la Legislatura Insular de 1902—Compuesta por un Consejo Ejecutivo, integrado por once miembros, 5 de ellos puertorriqueños, y por una Cámara de Delegados, integrada por 33 puertorriqueños y sólo un norteamericano, Mr. Frederick Cornwell—*se eliminaron de tal proyecto original 351 artículos*, quedando reducido su articulado primitivo a 427. Sobre ello dice el Maestro Muñoz Morales, a la pág. 210 de su obra *Compendio sobre Legislación Puertorriqueña,* ed. 1948, U.P.R.:

"Ese proyecto adaptándose en su estructura al Código Político de California de 1872 contiene *778 artículos* divididos en 15 títulos y un título adicional con 40 artículos dedicado al servicio civil insular y local.

(b) Texto aprobado por la Legislatura Insular de 1902:— *Al someterse a la Legislatura Insular* el mencionado proyecto se aceptó sustancialmente pero fue enmendado según la Ley aprobada en 1 de marzo de 1902 titulada 'Ley para establecer un Código Político para Puerto Rico' que consta de 392 artículos divididos en 10 títulos, y un apéndice aprobado en la misma fecha que contiene el título XI y que comprende los artículos 392 al 427." (Énfasis nuestro.)

*Entre los artículos eliminados del proyecto de Código Político por aquella legislatura de 1902 figuraba el número 778, último del proyecto, cuyo texto español disponía:*

"*Art. 778. El texto de este Código según consta redactado en inglés será considerado como el texto oficial.*" (Énfasis nuestro.)

Demasiado significativa es esta circunstancia para ignorarse o no citarse. Fue un cuerpo legislativo de puertorriqueños y norteamericanos *que rechazó en absoluto tal propuesta* y ocasionó o prefirió la no prevalencia del texto inglés sobre el castellano.

Todas estas circunstancias nos indican obviamente lo inseguro, desconfiable y arriesgado que sería afirmar, en términos absolutos y sin reservas, que el texto castellano *de la última oración del Art. 9* del Código Político de 1902, es una traducción, y, mucho más, una "mala traducción" de su texto inglés, cuando, por al Acta Foraker y nuestra ley de 1901 (C.B. 13), se autorizó y ordenó la preparación de todos los proyectos de códigos *en ambos idiomas.* ([1])

A pesar de nuestras intensas investigaciones—varias veces hemos examinado los textos español e inglés del Código Político en las oficinas de Secretaría Ejecutiva—no estamos

---

([1]) En varias ocasiones hemos resuelto problemas de discrepancia entre el texto inglés y el castellano de otros artículos del mismo Código Político de 1902, tomados original y literalmente del Código Político de California de 1872. Conforme a la regla (a) del Art. 13 del Código Civil, decidimos que prevalecía la versión original inglesa *del artículo concernido.* Así ocurrió en: *Coll* v. *Picó,* 82 D.P.R. 27, 32 (1960) respecto al Art. 291 (i); *Sucn. Giusti* v. *Tribunal de Contribuciones,* 70 D.P.R. 117, 121 (1949), respecto al Art. 291(d); *New Córsica Cent.* v. *Gallardo,* 41 D.P.R. 669 (1931) respecto al Art. 290. Idéntica solución dimos al tratarse de artículos, tomados totalmente de otros códigos americanos. Véanse: *Mestres* v. *Díaz Román,* 50 D.P.R. 370 (1936); *Pueblo* v. *Zayas,* 72 D.P.R. 18 (1951).

Pero desconocemos precedente alguno nuestro en que estuviera envuelto un artículo estructurado con oraciones traducidas o adaptadas de estatutos americanos y, además, con oraciones de puro origen puertorriqueño, como la segunda y última oración del Art. 9 del Código Político.

en condiciones, repetimos, de ofrecer una positiva y absoluta contestación o solución al problema de quién, cómo, cuándo y dónde fueron preparados los textos castellano e inglés *de la última oración* del Art. 9, cuya sede apropiada debió ser el Código Civil y no el Código Político.

Por constituir un precepto de excepción, limitadísimo en su ámbito objetivo, de la aplicación de nuestro histórico instituto de prescripción, que, por otro lado constituye una afirmación de la supervivencia plena de ese instituto, en cuanto afecta a los terrenos patrimoniales pertenecientes al Estado que se encuentran en el comercio de los hombres, cuando se interpreta y aplica a *contrario sensu,* esa última oración, debemos decidirnos a concluir que su texto castellano fue concebido y redactado, bien por un legislador, bien por un jurista, o bien por un asistente o auxiliar de la comisión codificadora, puertorriqueño.

Ante ello, es de estricta aplicación el mandato del Art. 13 del Código Civil, en el sentido de que, cuando no se trata de una traducción o adaptación del estatuto de algún Estado, o de un estatuto de origen español, como ocurre en este caso, *SE ATENDERÁ AL TEXTO CASTELLANO.*

## V

### SOBRE LA PRESCRIPCIÓN CONTRA EL ESTADO

—A—

#### La Prescripción en el Derecho Romano

Pueden encontrarse citas del Digesto y las Institutas en demostración de que en el Derecho Romano no se adquirían, por usucapión, las cosas públicas del pueblo romano y de las ciudades. (²) Por su valor histórico y porque en el Derecho Romano existieron otras instituciones prescriptivas que

---

(²) Sobre este punto hemos consultado tratados clásicos de profesores de renombre sobre la materia, como *Derecho Público Romano,* Teodoro

también deben considerarse, haremos alguna glosa en torno a los orígenes y evolución en Roma de ese modo de adquirir.

Generalmente se acepta que los bienes del Estado romano no podían ser adquiridos por usucapión. Pero los más destacados romanistas demuestran que esto no fue siempre así, especialmente después de Constantino I y el Código Teodosiano.

En cuanto a la propiedad, el derecho privado romano comenzó por la de los animales y los esclavos, y, en general por la de los bienes muebles; la propiedad de la comunidad partió, por el contrario, del derecho al suelo.

La trasmisión privada de propiedad se verificaba principalmente por medio de un cambio material de posesión, concurriendo el propietario saliente y el entrante, en el lugar donde la cosa se encontraba. En el derecho de la comunidad el cambio ocurría por un simple acto de la voluntad de ésta o de su mandatario, esto es, por medio de asignación. El título de adquisición por ocupación era exclusivo del derecho de la comunidad; *el título por posesión prescriptiva, exclusivo del derecho privado.*

*La toma de posesión del suelo público por los particulares dio origen para la comunidad a un crédito análogo, por su duración,* a los arrendamientos de tiempos posteriores, crédito a los que no correspondía nada semejante en el derecho privado.

En el derecho público dominaron, desde tiempo inmemorial, las relaciones jurídicas reales, efectivas, apoyadas en la costumbre y la buena fe; compraventa, arrendamiento, etc.

---

Mommsen, traducción de P. Dorado, Madrid; *Elementos de Derecho Privado Romano,* Alvaro d'Ors, Pamplona, 1960; *Instituciones de Derecho Romano,* Pedro Bonfante, 8va. Ed., traducción de Luis Bacci y Andrés Larrosa, Reus, 1965; *Curso de Derecho Romano,* Tomo I, Ursicino Álvarez, Ed. Revista de Derecho Privado, Madrid, 1955; *El Derecho Privado Romano,* Guillermo Floris Margadant, México, 1960; *Derecho Romano,* Juan Iglesias, 4ta. Ed., Barcelona, 1962.

El derecho patrimonial romano no conoció *la demanda propiamente dicha*; por regla general, la comunidad ni demandaba ni era demandada. En la esfera del derecho privado, la comunidad ocupaba el puesto de juez que resolvía las contiendas entre particulares, *y cuando ella misma fuese parte, su derecho no se equiparaba al de los particulares, sino que ella se hacía justicia por sí propia; si el particular se consideraba perjudicado en su derecho por la comunidad, no tenía otro recurso que confiar en su propio auxilio.*

El *censor* estaba a cargo del orden patrimonial, y tenía o ejercía su reglamentación central, su conservación y explotación, sujeto a ciertas restricciones tendientes a conservar el derecho de propiedad del Estado. Disponía lo tocante al aprovechamiento del suelo común. Todo pedazo de tierra comprendido dentro del campo de la comunidad era, de derecho, de la propiedad de ésta, siempre que no estuviera acotado. Los gastos ordinarios de la nación se cubrían no con la contribución romana (*tributus*), sino con los productos de los bienes comunes. Estos, por esa y otras razones públicas, no podían perderse por la usucapión para el Estado.

La propiedad del suelo no se vendía. Sólo se donaba a la familia (*datio asignatio*), el aprovechamiento del suelo de la comunidad. Ello podía hacerlo únicamente la propia comunidad por acuerdo especial de los comicios.

La primera época del Derecho Romano fue el fruto de una sociedad restringida, de vida sencilla y rústica. Las XII Tablas, codificadas en el año 451 A.C., son la expresión de esa época. Estas reconocieron que la propiedad privada podía adquirirse por quien no fuese titular de ella, mediante la usucapión, siempre que se comportara como dueño y bajo condiciones que los tratadistas resumen así: (1) *Res habilis*; (2) *titulus*; (3) *fides*; (4) *possessio* y (5) *tempus*. El término posesorio se fijaba en 1 año para los bienes muebles

y 2 años para los inmuebles. Pero esta usucapio no podía invocarse por un extranjero contra los intereses de un romano. Este modo de adquirir convertía al poseedor bonitario —el que poseía desprovisto de título legal o válido—en propietario quiritario o legítimo.

Según Bonfante—pág. 290 *ob cit.*—estaban excluidas de la usucapión, además de las cosas absolutamente *extra commercium*, las siguientes:

"1ro. las cosas furtivas (*res furtivae*) y las cosas sustraídas violentamente al propietario (*res vi possessae*). El vicio de furtividad, que afecta a la cosa que se halle en manos de cualquiera, se purga a base de la ley Atinia con el retorno de aquélla a la potestad de su propietario, y análogamente el vicio de la violenta adquisición; 2do. las cosas recibidas por el Magistrado en virtud de donación contra la prohibición de la *lex Iulia repetundarum:* no obstante, también aquí se admitía la purgación; 3rd. por la Novela 119, según la opinión dominante, los inmuebles adquiridos por un poseedor de mala fe; 4to. las cosas del Estado, *res fiscales*, del Príncipe, de los pupilos y de los menores (2), los bienes inmuebles de las iglesias y de las fundaciones pías; 5to. las cosas dotales (no solamente el fundo) ; 6to. las cosas respecto de las cuales está prohibida la enajenación."

La usucapión sólo era aplicable a los fundos itálicos. En las provincias el verdadero propietario de todos los inmuebles era el Estado romano. Los individuos particulares no podían tener más que un *possessio provincialis*, transmisible, pero revocable y restringido por Roma si el interés social lo exigía. En principio no podían usucapirse los fundos provinciales. La comunidad romana por lo general, no se desprendía del derecho de propiedad de sus bienes, aunque traspasara al ciudadano su posesión, uso y disfrute.

Sin embargo, los emperadores Constantino, Teodosio II y Justiniano simplificaron y unificaron la usucapión y la prescripción en tal grado y extensión que hasta los bienes del Estado—el *aerarium sacrum* o *fiscus regis*—no se escapaban de ser adquiridos o perdidos por este modo.

A las págs. 132 y 133 de su citada obra *Elementos de Derecho Privado Romano*, el sabio profesor compostelano Alvaro d'Ors, nos dice respecto a la materia.

"§ 105. En la época post-clásica, la extensión de la ciudadanía romana produjo también una equiparación entre los fundos itálicos, susceptibles de usucapión bienal y los provinciales, a los que se aplicaba la prescripción decenal o vicenal; era inevitable que ambas instituciones se confundieran. *La prescripción se convirtió en un modo adquisitivo, no meramente negativo, y precisamente el general para todos los inmuebles*; al mismo tiempo, la usucapión se redujo a los muebles. Esta situación fue reconocida por Justiniano, el cual distingue:

a) una *usucapio*, con plazo de tres años, para adquirir la propiedad de los muebles;

b) una *praescriptio longi temporis*, de diez o veinte años como antes, pero referidos ahora a la presencia o ausencia del propietario en la misma provincia (reducida en su extensión desde Diocleciano), para la adquisición de la propiedad sobre toda clase de inmuebles; ambos tipos, con los requisitos de buena fe y justo título; ambos con posibilidad de *successio y accessio possessionis*; ambos interrumpibles por la demanda procesal (una vez que había desaparecido el régimen de la *litis contestatio clasica*); pero además, Justiniano recogió otro tipo:

c) *una longissimi temporis praescriptio*, prescripción extraordinaria sin el requisito de la justa causa, establecida por Constantino con el plazo de cuarenta años, reducido por Teodosio II a treinta, cuyo fin era el de defender, mediante la extinción de las acciones del propietario, a los que poseían una finca sin título ninguno, y, al mismo tiempo, facilitar así un sujeto pasivo a los derechos del Fisco; Justiniano la mantuvo, pero con carácter de prescripción adquisitiva del dominio cuando el poseedor era de buena fe aunque sin título, con el plazo Teodosiano de treinta años, y, *cuando perjudicaba a la Iglesia o al Fisco, de cuarenta.*" (Énfasis nuestro.)

Al mismo efecto el acatado romanista italiano Pedro Bonfante, a la pág. 287, de su obra ya mencionada, afirma:

"Pero en la Edad imperial, esta institución de la usucapión, juntamente con otros defectos, que la jurisprudencia pretoria podía remediar en los casos extremos, como era el breve trans-

curso de tiempo no adecuado a una vasta sociedad, manifestaba una grave laguna, consistente en ser un modo de adquisición del dominio, que sólo era aplicable a los fundos itálicos. Probablemente, para aportar un remedio a esta laguna se fundó en la Edad imperial, por obra de los Emperadores o de los Gobernadores de las provincias, la institución de la *exceptio* o *praescriptio longi temporis* o *longuae possessionis,* derivada del Derecho griego. Esta Institución consistía en una excepción concedida al poseedor *contra quien intenta reivindicar la cosa,* cuando él la haya poseído por espacio de diez años entre presentes, o sea entre personas residentes en la misma ciudad (o en la misma provincia, después de la admisión de los súbditos provinciales en la ciudadanía), y por espacio de veinte años entre ausentes. Esta institución tenía su base no tanto en la posesión del demandado como en la inacción y en el largo silencio del actor, que hacían presumir su carencia de derecho. Conforme a las normas del Derecho pretorio, se requirió en principio, como condición de la *exceptio,* solamente la *possessio iusta* (conseguida *nec vi nec clam nec precario*).

En la práctica, si bien las dos instituciones tuvieron diverso carácter y diversos requisitos, derivados de la base diferente en que se apoyaban, acabaron por cumplir la misma función y aun parece que al poseedor, después de transcurridos los diez o veinte años, se le concedió más tarde, a más de la excepción, una acción para la recuperación de la cosa eventualmente perdida. No quedaba más que una diferencia, ahora injustificable, entre fundos itálicos y fundos provinciales, sobre todo en lo que se refiere al tiempo necesario para la adquisición. Por otra parte, en el Oriente no existían en general más que fundos provinciales, por lo que la usucapión, en este nuevo territorio del Derecho romano, no tenía aplicación en lo referente a las cosas inmuebles. Los tiempos eran maduros para la reforma, y Justiniano la llevó a efecto. Hizo claramente de la *longi temporis praescriptio* un modo de adquisición del dominio y la fundió después con la usucapión, ampliando también el transcurso del tiempo con respecto a las cosas muebles de uno a tres años y allanando las diferencias existentes entre las dos instituciones. Sin embargo, conforme al estado de las cosas en la última época, el nombre de *usucapio* se empleó con preferencia respecto a las cosas muebles, y el nombre de *longi temporis praescriptio* con respecto a las cosas inmuebles."

Juan Iglesias, en su obra *Derecho Romano,* pág. 274 comenta:

"Un rescripto de Constantino[324] introduce la *praescriptio longissimi temporis* o excepción que puede oponerse a cualquier acción reivindicatoria por parte de quien ha poseído la cosa durante cuarenta años, aunque sea sin título ni buena fe. Tal prescripción tiene fuerza adquisitiva, y no simplemente defensiva, en el Derecho justinianeo. En efecto, Justiniano dispone que el que ha poseído la cosa—incluso la furtiva, pero no la sustraída violentamente—durante treinta años,[325] o durante cuarenta, *si pertenecía al fisco, a la Iglesia,*[326] *a una obra pía, al emperador o a la emperatriz, adquiere la propiedad sobre ella.*

Para esta prescripción adquisitiva no se exige el título, sino únicamente la buena fe inicial. El tiempo comienza a correr desde la toma de posesión, que es el momento a partir del cual puede intentarse contra el poseedor la acción reivindicatoria, cuyo ejercicio caduca a los treinta o cuarenta años. En lo demás, rigen los requisitos de la antigua *longi temporis praescriptio.* Todavía es de advertir que esta prescripción extraordinaria—tal es el nombre que hoy suele dársele—funciona con eficacia extintiva cuando se dan las condiciones necesarias para ello, y faltan, en cambio, las que se requieren para que entrañe adquisición."

De todo lo dicho se deduce que después de Constantino el Grande, emperador desde el año 306 d.c. a 337 d.c., los fundos del Estado podían ser adquiridos por la prescripción extraordinaria o sea la *praescriptio longi temporis,* y que después de Justiniano, la usucapión sólo regía respecto a los bienes muebles.

---

"[324] Véase C. 7, 39, 2, que hace mención de la lex Constantiniana. Un extracto del rescripto de Constantino ha sido conservado en el Pap. Columbia Inv. 181 (Riccobono, Fontes, n. 464). *Cf.* Arangio-Ruiz, Negotia, n. 101; Parerga, pág. 79 y ss."

"[325] Tal tiempo es el que señaló Teodosio II para la prescripción de todas las *actiones perpetuae.* Véase C. Th., 4, 14, I-C. 7, 39, 3."

"[326] Así algunos autores, pero en C. I, 2, 23 se señalan cien años para las cosas pertenecientes a la Iglesia."

Desde la edad media al renacimiento el Derecho romano-justinianeo se convirtió poco a poco, por obra de los jurisconsultos de la escuela de Bolonia y por efecto de un conjunto de causas históricas y sociales, según observa Bonfante, en ley común para todos los pueblos latinos y germánicos. Pero desde la mitad del siglo XVIII empezó a ceder el puesto a los Códigos civiles, no obstante haber constituido parte esencial en la formación de los mismos.

Hoy, según el mismo jurista italiano, la verdadera fama imperecedera del Derecho romano se debe: a la importancia que conserva *para la interpretación* de los nuevos Códigos, al arte perfecto de sus jurisconsultos y a ser el único Derecho que se puede seguir a través de un desenvolvimiento más que milenario, ofreciendo, por consiguiente, el mejor terreno para el estudio de las leyes orgánicas de la evolución jurídica.

—B—

*La Prescripción Según los Principales Códigos*
*Antiguos Españoles*

En el Código de las Siete Partidas, aprobado en el siglo XIII, se regula la prescripción como en el Derecho romano-justinianeo. En el título XXIX, "De los Tiempos Por Que Ome Pierde Sus Cosas, También Muebles como Rayzes", de la Tercera Partida, y en su Ley VII, se dispone que se prescriben por cuarenta años las *cosas patrimoniales* de las ciudades y villas y los inmuebles de las Iglesias. Dice esta ley:

"Ley VII.—Como las placas, nin los caminos, nin las defesas, nin los exidos, nin los otros lugares semejantes, que son del comun del Pueblo, non se pierden por tiempo, e de las otras cosas (a).

Plaza. (1), nin calle (2), nin camino (3), nin defensa, nin exido, nin otro lugar qualquier semejante destos (4), que sea en vso comunalmente del Pueblo de alguna Cibdad, o Villa, o Castillo, o de otro Lugar, non lo puede ningund ome ganar

por tiempo. Mas las otras cosas (5) que sean de otra natura, assí como sieruos (b), o ganados, o pegujar, o nauios, o otras cosas qualesquier semejantes destas, maguer sean comunalmente del Concejo de alguna Cibdad, o Villa, bien se podrían ganar por tiempo de quarenta años (6). E esto es, porque maguer que sean de todos comunalmente, non vsan comunalmente dellas todos, assi como de las otras cosas sobredichas. Empero si la Cibdad, o Villa, o otro Lugar, que perdiese alguna destas cosas por tiempo de quarenta años, pidiese despues deste tiempo fasta quatro años (7) al Rey, o al Adelantado, o al Judgador del logar (c), que aquel tiempo passado non le empeciesse, e que le otorgasse, que la cosa non se perdiese por el, deuegelo otorgar (8); e estonce non le empescera ninguna cosa el tiempo de los quarenta años. Mas si los quatro años passasen de mas de los quarenta, que lo non pidiessen assi, dende adelante non lo podrían pedir (9) ; e el que la cosa tuuiese, ganarla y a por tiempo de los quarenta años.''

Según la Ley VI, de ''Como la Cosa sagrada, ni ome libre, non se gana por tiempo'', del mismo Título y Partida, estaban excluidas de la prescripción:

1. Las cosas sagradas, santas o religiosas
2. El hombre libre
3. El ''senorío para fazer justicia''
4. Los ''tributos, pechos o rentas o otros derechos qualesquier que pertenezcan al Rey, e que ayan costumbrado, o usado de darle.''

La Corte Suprema de España, por sentencia del 16 de abril de 1880, interpretando la transcrita Ley VII, resolvió que entre las cosas que esta Ley declara imprescriptibles, *no se encuentran* los bienes del Estado que, como persona jurídica, está sujeta a las prescripciones de la ley común, *sin que sea lícito atribuirle excepciones y privilegios que la ley no le concede.*

Por imperio de la Ley IV, Título VIII—''De las Prescripciones'', del Libro XI de la Novísima Recopilación, se prescriben por la posesión inmemorial, probada conforme se requiere en la ley de Toro, el señorío de las ciudades y villas

y *las cosas patrimoniales de la Corona.*—El texto de esta ley, tomado de la obra *Los Códigos Españoles,* Madrid, 1850, Tomo 9, pág. 458, es como sigue:

"LEY IV.—Tiempo necesario para prescribir el Señorío de los pueblos, y su Jurisdicción civil y criminal, a excepción de la Suprema, y de los pechos y tributos pertenecientes al Rey (a).

Ley 2. tit. 27. del Ordenam. de Alcalá; y D. Felipe II. año de 1566.

Porque algunos en nuestros reynos tienen y poseen algunas ciudades, villas y lugares, y Jurisdicciones civiles y criminales, sin tener para ello título nuestro, ni de los Reyes nuestros antecesores, y se ha dudado, si lo suso dicho se puede adquirir contra Nos y nuestra Corona por algun tiempo; ordenamos y mandamos, que la posesion inmemorial, probándose segun y como y con las calidades que la ley de Toro requiere, que es la ley 1. tit. 17. lib. 10., baste para adquirir contra Nos y nuestros sucesores qualesquier ciudades, villas y lugares, y Jurisdicciones civiles y criminales, y qualquiera cosa y parte dello, con las cosas al Señorío y Jurisdiccion anexas y pertenecientes; con tanto que el dicho tiempo de la dicha prescripción no sea interrumpido, ni destajado por Nos, ó por nuestro mandado, ó otros en nuestro nombre, natural ó civilmente; pero la Jurisdicción civil ó criminal Suprema, que los Reyes han por mayoría y poderío Real, que es la de facer y cumplir donde los otros Señores y Jueces la menguaren, declaramos, que esta no se pueda ganar ni prescribir por el dicho tiempo, ni por otro alguno: y asimismo lo que las leyes dicen, que las cosas del Reyno no se puedan ganar por tiempo, se entienda de los pechos y tributos á Nos debidos. (Ley 1. tit. 15 lib. 5. R.)"

Sería demasiada prolija la enumeración de las diversas disposiciones legales que desde las Siete Partidas hasta la aprobación del Código Civil de España en 1889, regularon el modo de "ganar lo ajeno y perder lo suyo", por la acción del tiempo. En resumen, nos basta decir, que en el curso de la evolución del instituto prescriptivo, se fijaron como plazos de la posesión prescriptiva, 1, 3, 4, 10, 20, 30, 40 y 100 años, y el tiempo inmemorial.

El término de 100 años se fijó tomando en consideración que era el término mayor de vida de "los hombres de vida larga."

El de 4 años se fijaba en la Recopilación de las Leyes de Indias, título III, Libro V, por las cuales se disponía que los nuevos pobladores de las Indias se convertían en dueños de tierras repartidas por la Real Corona

". . . labrándolas y poblándolas de ganado, árboles, etc. . . . *adquirirían dominio sobre los terrenos a los cuatro años de morada y labor . . . .*" (Énfasis nuestro.)

Esta cita la hacemos del alegato—pág. 7—de la parte demandante ante el tribunal de instancia.

—C—

*La Prescripción de Bienes del Estado en el Código Civil Español de 1889*

Desde su aprobación original el Código Civil Español, en el primer párrafo de su Art. 1932, ha dispuesto y dispone aún:

"Los derechos y acciones se extinguen por la prescripción *en perjuicio de toda clase de personas, inclusas las jurídicas,* en los términos prevenidos por la ley." (Énfasis nuestro.)

Manresa, en su clásica obra sobre el Código Civil español, Tomo XII, págs. 786, 787, 789 y 790, comenta el alcance y orígenes de ese primer párrafo así:

"Nuestras antiguas leyes atendían para dar o no eficacia a la misma a las condiciones de la cosa objeto de la prescripción y a las circunstancias de las personas a quienes pertenecieran las mismas. Así, por ejemplo, la ley 8a. del tít. XXIX de la Partida 3a., excluyó de ella los bienes de los menores de edad y de las mujeres casadas, si bien al declararlo así reconoció que si después de llegar aquéllos a la mayor edad ganase alguno el dominio por prescripción, fuera ésta eficaz, y también lo sería en el caso de que la mujer casada no reclamara su dote al

marido malgastador. Del mismo modo podríamos citar otras varias excepciones sancionadas por el derecho anterior en consideración a dichas causas.

Por el contrario, el Código no admite ninguna de las excepciones que, por razón de la naturaleza y condiciones de las cosas o por las circunstancias de las personas, eran admitidas antes, y entre ellas, las correspondientes a los bienes patrimoniales del Estado, susceptibles de peculiar apropiación de los menores, de las mujeres casadas por razón de su dote inestimada y de las cosas hurtadas y robadas. Todos esos bienes eran antes imprescriptibles por el término ordinario, aunque algunos podían serlo por el extraordinario; pero desde la publicación del nuevo Cuerpo legal están sujetos a la prescripción como todos los demás, sin otra condición que la de ser poseídos con las condiciones legales. Y no podía menos de ser así habiendo aceptado sus autores el principio, elevado a precepto positivo en el art. 1.936, de ser susceptibles de ella todas las cosas que estén en el comercio de los hombres.

Por eso en el párrafo primero de este artículo se consigna en términos absolutos, la declaración de que los derechos y acciones se extinguen por la prescripción en los términos prevenidos por la ley *en perjuicio de toda clase de personas, incluso las jurídicas.* Este principio es aplicable sin distinción a todos los que fueren dueños de los bienes objeto de prescripción, cualesquiera que sean sus circunstancias, habiendo venido a borrar todas las excepciones antes admitidas por razón de la persona sujeto pasivo de la prescripción, pues al no establecer disposición especial respecto de ellos, las sometió a las reglas generales del derecho. En su virtud, es aplicable lo mismo a los mayores que a los menores de edad, a la mujer casada que a la soltera, al incapacitado que al que posea íntegra su capacidad.

La redacción dada al primero de dichos preceptos ha hecho incurrir a algunos en error suponiendo que sólo se refiere a los derechos y acciones, y que, por tanto, su disposición no alcanza a las cosas materiales, ya de los particulares, ya de las Corporaciones, Sociedades u otras entidades; pero el error en que se incurre al estimarla así es bien notorio y patente, porque semejante inteligencia está en pugna con la regla consignada en el art. 1.936, según la que son susceptibles de prescripción todas las cosas que están en el comercio de los hombres.

Al fijar el Código el principio antes indicado lo ha hecho en términos absolutos, apartándose de todo privilegio puramente personal o independiente de la condición de las personas, pues no admite ninguna de las excepciones que las antiguas leyes reconocían, y ni aun siquiera se eximen de los efectos de la prescripción los impedidos física o legalmente para administrar sus propios bienes.

Los términos en que se halla redactado dicho precepto no pueden ser más claros y precisos. Según ellos, no sólo se da la prescripción contra los particulares sino también contra las personas jurídicas, pues rompiendo los antiguos moldes y separándose de algunos Códigos que aun conservan vestigios del privilegio concedido al Estado, a las Corporaciones y a otras entidades, morales o jurídicas, para seguir el amplio criterio adoptado en el Código francés, en el de Holanda, en el de Vaud y algunos otros, se da lugar a la prescripción contra dichas instituciones y contra los establecimientos públicos y las demás personas jurídicas, sin otra limitación que la impuesta también a los particulares de haber de estar en el comercio de los hombres las cosas o los derechos y acciones objeto de la misma. En su virtud, sólo dejará de surtir efecto la prescripción contra el sujeto pasivo de ella cuando fuere imprescriptible, con arreglo a la ley, la cosa sobre que recaiga." (Énfasis nuestro.)

Glosando Scaevola este Art. 1932 español, a las págs. 315–317, del volumen Primero, Tomo XXXII, Ed. Reus, 1965, de su obra *Código Civil*, nos dice también:

"Alguna otra disposición, como la Ley 2a., título V, del libro V del Espéculo, establece un plazo de cien años para la prescripción de las cosas del Rey y de la Iglesia romana, y otro de cuarenta para los pertenecientes a las demás iglesias.

Nuestro Proyecto de Código de 1851, en su artículo 1.946 determinaba que 'El Estado y las personas morales, comprendidas en el artículo 33, están sujetos a la prescripción en cuanto a sus bienes o derechos susceptibles de propiedad privada'. *Siguiendo este criterio, ya antiprivilegista*, llega nuestro actual artículo 1.932, que, igualmente se aparta de la mayoría de las

legislaciones extranjeras, que aún contienen, con una o más variantes, el sistema tradicional, y proclama, como vemos, la prescriptibilidad de derechos y acciones en contra de toda clase de personas, cualquiera que sea su condición o estado de naturaleza física o jurídica.

. . . . . . . .

El sistema de nuestro Código es rigurosamente lógico y responde a la sistemática y armonía que ha de tener este artículo con su precedente 1.931, en cuanto hay una razón de lógica para deducir legalmente que si la prescripción favorece a toda clase de personas y puede aplicarse, como vimos, en beneficio de los menores e incapacitados y en las personas jurídicas de toda clase, también, en obligada correlación, todos ellos deben soportar los efectos de aquélla." (Énfasis nuestro.)

Otro precepto del Código Civil Español, que llega a la máxima amplitud o comprensión objetiva, abarcando todas las cosas de todas las personas naturales y jurídicas, sin límite alguno, con tal que formen parte del comercio de los hombres, es su Art. 1.936, que también, desde su origen, dispone:

"Art. 1.936. Son susceptibles de prescripción *todas las cosas* que están en el comercio de los hombres." (Énfasis nuestro.)

Manresa, sobre la aplicación de este Art. 1.936, que es otra pieza de efectos expansivos del cuadro de disposiciones prescriptivas, de carácter reparador y de utilidad práctica para el bien y el orden sociales, a las págs. 799, 800 y 801 del mismo tomo XII, nos dice:

"No hemos de detenernos en la crítica ni aun en el examen de dichas teorías, pues hoy, después de las modificaciones introducidas por el Código en nuestro antiguo derecho relativas a esta materia, resultaría ocioso dicho trabajo, toda vez que partimos en estos comentarios del derecho positivo vigente; pero no está de más indicar que nuestras antiguas leyes limitaban considerablemente el alcance o la extensión de la prescripción en cuanto a las cosas que podían ser objeto de ella, estableciendo numerosas excepciones, ya absolutas, ya relativas, pues unas

cosas no podían prescribirse por término alguno y otras requerían un lapso de tiempo mayor que el ordinario para que pudieran ser ganadas o perdidas por prescripción.

Así, por ejemplo, las leyes 6a., 7a. y 29 del tít. XXIX de la Partida 3a., declaraban imprescriptibles las cosas llamadas sagradas, la jurisdicción, las contribuciones, los bienes de aprovechamiento común de los pueblos y algunos otros; pero no todas esas excepciones eran absolutas, sino que se referían a la prescripción ordinaria, constituyendo la especialidad de las mismas la necesidad del transcurso de mayor término para que se causase la prescripción, por lo que era conocida con el nombre de extraordinaria. Conforme con dicho sistema prescribían por treinta años las cosas de los menores de edad, por cuarenta las de las ciudades y villas, y los inmuebles de las iglesias, y los inmuebles de ellas a los tres, excepción hecha de aquellos pertenecientes a la Iglesia romana, los cuales sólo podían perderse por prescripción a los cien años cumplidos, y en cuanto a los bienes patrimoniales no podían tampoco prescribirse, sino por tiempo inmemorial.

Hoy todo este estado de derecho ha desaparecido por virtud de la amplitud dada por el Código al precepto consignado en el presente artículo, según el que pueden ser prescritas todas las cosas que estén *en el comercio* de los hombres.

. . . . . . . .

Réstanos indicar para dejar perfectamente definido el alcance o la extensión del precepto consignado en dicho artículo, que aun aquellos bienes excluidos de la prescripción por la ley en consideración a determinadas condiciones de las personas a quienes pertenezcan, por privilegiadas que éstas sean, pueden llegar a ser prescriptibles siempre que vengan a colocarse por intervención de ellas o por cualquiera otra causa dentro de las condiciones que las hagan susceptibles del comercio de los hombres.

. . . . . . . .

No creemos que en adelante pueda haber cuestión ni dificultad alguna sobre ello, dada la precisión y la claridad de los términos en que la ley ha establecido la regla que sirve de norma para dilucidar cuáles sean las cosas que pueden ser materia u objeto de la prescripción, y por eso no insistimos más en este punto,

pues creemos ociosa toda nueva consideración respecto de ello." (Énfasis nuestro.)

En su Art. 1938 el Código español consigna una salvedad de todo punto necesaria, que, según el mismo comentarista, tiene su fundamento en las especiales razones que en algunos casos impone un régimen distinto para la prescripción. Previene este artículo:

"Art. 1938. Las disposiciones del presente título se entienden sin perjuicio de lo que en *este Código o en leyes especiales* se establezca respecto a determinados casos de prescripción." (Énfasis nuestro.)

En la misma trayectoria jurídica—de afectar a todas las personas y de comprender y abarcar todas las cosas—se encuentra la siguiente, y primera disposición general, del Código Civil Español, respecto a la materia de prescripción, que adrede, en último término mencionamos:

"Art. 1930. Por la prescripción se adquieren, de la manera y con las condiciones determinadas en la ley, el dominio y demás derechos reales.

También se extinguen del propio modo por la prescripción los derechos y las acciones, de cualquier clase que sean."

Sobre este artículo, dice la sentencia de 31 de enero de 1902, del Tribunal Supremo de España que la prescripción no puede hacerse extensiva a casos distintos, ni para ampliarla ni para restringirla.

Manresa, quien actuó como vocal de las secciones 1ra. y 4ta. de la Comisión General de Codificación que preparó y redactó el Código Civil Español de 1889, dice, a la pág. 785 del tomo XII de su obra, que en "consideraciones a la importancia de la materia objeto del presente título—el Código—ha puesto especial cuidado en la expresión de las disposiciones del mismo, procurando la mayor claridad en sus términos y la conformidad más completa en sus preceptos con los principios generales del derecho . . . ."

En los Arts. 338–345 españoles se definían y aún se definen, los bienes de dominio público o de propiedad privada; se disponía que los bienes del Patrimonio Real "se rigen por su ley especial." En los Arts. 342 y 344 (hoy el 256 nuestro) se prevenía, como sigue previniéndose, que los bienes patrimoniales o de propiedad privada se rigen "por las disposiciones de este Código, salvo lo dispuesto en leyes especiales." En España el antiguo Patrimonio de la Corona vino a denominarse "Patrimonio Nacional" y se gobierna por la Ley de 7 de marzo de 1940 y el Reglamento de 1942. Su propiedad corresponde al Estado y el Art. 5 de esa ley declara que tales bienes "son inalienables e imprescriptibles, y no podrán sujetarse a ningún gravamen real ni a ninguna otra responsabilidad."

—D—

### Extensión a Puerto Rico del Código Civil Español de 1889

Por real decreto de 31 de julio de 1889 se hace extensivo a Puerto Rico el Código Civil Español vigente en la península ibérica. Empezó a regir el 1 de enero de 1890, según declaraciones en *Torres et al.* v. *Rubianes, et al.,* 20 D.P.R. 337, 345 (1914).

Con las enmiendas y adiciones que, a juicio de la sección de lo civil de la Comisión General de Codificación, fueron necesarias y convenientes, se puso aquí en vigor el Código Civil Español de 1889, como una nueva edición del original conteniendo, respecto a la materia de prescripción, el mismo texto y la misma numeración del articulado original.

Así los transcritos Arts. 1930, 1932, 1936 y 1938 del Código Civil Español de 1889 figuran en su edición, ligeramente enmendada, que se pusieron aquí en vigor el 1 de enero de 1890, sin modificación o alteración alguna.

Al amparo de las disposiciones de ese Código Civil Español hecho extensivo a Puerto Rico, adquirieron, inscribieron y poseyeron sus respectivos derechos dominicales sobre ambos islotes:

1ro. Los cuatro hermanos García Becerril, a título de herencia testada de Ignacio García, fallecido el 7 de marzo de 1890. Inscripción 5ta., pág. 647, opinión.

2do. La señora Rita Rivera Alonso, y esos cuatro hermanos, por herencia testada de Juan Lavaggi, fallecido el 4 de febrero de 1901. Inscripción 2da.

3ro. Don Jorge Bird Arias, por título de compraventa, mediante *escritura pública de fecha 5 de octubre de 1901*, que quedó debidamente inscrita, en pleno dominio, en el Registro de la Propiedad de Humacao, por sus inscripciones sexta y séptima, ambas de *fecha 11 de octubre de 1901*.

Nuestro antiguo Código Civil de 1890 continuó en vigor en nuestra Isla hasta el 1ro. de julio de 1902. Rigió, sin interrupción alguna, y según fue enmendado por el Gobierno Militar y el Congreso de los Estados Unidos (Sec. 8, Acta Foraker, 1900) durante once años y medio, o sea hasta que por la Disposición Final del Código Civil revisado de 1902, se dispuso:

"Quedan derogados y sin fuerza ni vigor el Código Civil y todas las demás leyes o cuerpos legales . . . así en su concepto de leyes directamente obligatorias, como en el de derecho supletorio."

Empero, en parte de las Disposiciones Transitorias del Código Civil revisado de 1ro. de julio de 1902, se previno así:

"DISPOSICIONES TRANSITORIAS

Las variaciones introducidas por las reformas hechas en el Código Civil que perjudican derechos adquiridos según la legislación civil anterior no tendrán efecto retroactivo.

Para aplicar la legislación que corresponda en los casos que no están expresamente determinados en el Código revisado, se observarán las reglas siguientes:

1ra. Se regirán por la legislación anterior al Código revisado los derechos nacidos, según ella, de hechos realizados bajo su régimen, aunque dicho Código los regule de otro modo o no los reconozca. Pero si el derecho apareciere declarado por primera vez en el Código Civil revisado, tendrá efecto desde luego, aunque el hecho que lo origine se verificare bajo la legislación anterior, siempre que no se oponga o perjudique a otro derecho nacido o adquirido al amparo de dicha legislación anterior.

2da. Los actos y contratos celebrados bajo el régimen de la legislación anterior, y que sean válidos con arreglo a ella, surtirán todos sus efectos según la misma, sin limitación de ningún género."

—E—

*El Gobierno Militar y el Congreso Federal Enmiendan el*
*Antiguo Código Civil y Ordenan la*
*Continuación de su Vigencia*

(a)

Nos refiere el Maestro Muñoz Morales, en su citada obra *Legislación Puertorriqueña*, pág. 24, que al establecerse el Gobierno Militar en Puerto Rico el 18 de octubre de 1898, y asumir el mando del Departamento de Puerto Rico el mayor general John R. Brooke, éste, *cumpliendo instrucciones del Presidente de los Estados Unidos*, dictó la Orden General Núm. 1, en cuyo apartado IX se dispuso:

"IX. Las leyes provinciales y municipales, hasta donde afectan la determinación de derechos privados correspondientes a individuos o propiedades, serán mantenidas en todo su vigor, a menos que no resulten incompatibles con el cambio de condiciones realizado en Puerto Rico, en el cual caso podrán ser suspendidos por el Jefe del Departamento. Dichas leyes serán administradas materialmente tales como existían antes de la cesión a los Estados Unidos. (Véase órdenes generales del De-

partamento de Puerto Rico para 1898 O. N. I.) Véase Boletín Histórico de Puerto Rico, tomo VI, pág. 86."

Y continúa diciendo el Maestro,

"Por virtud de esa formal declaración *continuaron vigentes en Puerto Rico las leyes anteriores y entre ellas el Código Civil* de que ahora nos ocupamos, y sobre ese texto se verificaron todas las enmiendas decretadas por subsiguientes órdenes generales del gobierno militar hasta enero de 1900." (Énfasis nuestro.)

Entre esas órdenes, se encuentra la Núm. 82, de fecha 4 de abril de 1899, decretada por recomendación del entonces Secretario de Justicia, Herminio Díaz Navarro, cuyo texto inglés, en cuanto enmendaba el Art. 1957 del Código Civil antiguo, vigente entonces, con efecto retroactivo dice así:

"Office of the Secretary of Justice

Judicial Order

The mayor general, on recommendation of the Department of Justice, has been pleased to order as follows:

1. Article 1957 of the civil code is amended to read as follows:

Ownership and other property rights in real property shall prescribe by possession *for six years,* as to persons present and absent, with good faith and with a proper title.

.        .        .        .        .        .        .        .

7—This order *shall have retroactive effect."* (Énfasis nuestro.)

Por los apartados 2, 3, 4, 5 y 6 de esa orden quedaron también enmendados los Arts. 391, 393 y 394 de la Ley Hipotecaria.

En la compilación de esas órdenes hecha por la oficina de imprenta del gobierno federal en 1909, a la pág. 2477, se consignó la siguiente nota:

"Compiler's Note. This order was formally approved by General Henry in both languages, the two versions being pub-

lished in the Gazette. *The English version being an evident translation of the Spanish,* the latter was selected for this volume." (Énfasis nuestro.)

Reproducimos esta nota por lo que afirmamos a la pág. 698, respecto a que en muchos casos los proyectos de ley eran preparados en español, aunque bajo la supervisión de funcionarios americanos.

La enmienda del Art. 1957 antiguo la interpretamos y aplicamos en distintas ocasiones. Véanse *Teillard* v. *Teillard,* 18 D.P.R. 562 (1912); *García* v. *De los Angeles,* 13 D.P.R. 76 (1907); *Cobián* v. *Registrador,* 11 D.P.R. 91 (1906); *Ex Parte Tapia,* 6 D.P.R. 247 (1904). Decidimos en *Teillard* que la enmienda había sido sustituida por el Art. 1858 del Código Civil revisado que reprodujo el original término de 10 años entre presentes y 20 entre ausentes.

Igualmente quedó enmendado, pero por la Orden Militar Núm. 162 de 1899, el Art. 688 del antiguo Código Civil, eliminando el requisito del papel sellado en el otorgamiento del testamento ológrafo.

### (b)

El Congreso de los Estados Unidos el 12 de abril de 1900 aprueba el Acta Foraker, para proveer de un gobierno civil a Puerto Rico. En su Sec. 8 se dispuso en esa primera ley orgánica:

"Sección 8.—Que las leyes y ordenanzas de Puerto Rico actualmente en vigor, continuarán vigentes, excepto en los casos en que sean alteradas, enmendadas ó modificadas por la presente; ó hayan sido alteradas ó modificadas por órdenes militares y decretos vigentes cuando esta Ley entre á regir, y en todo aquello en que las mismas no resulten incompatibles ó en conflicto con las leyes estatutarias de los Estados Unidos no inaplicables localmente ó con las presentes disposiciones, hasta que sean alteradas, enmendadas ó revocadas por la autoridad legislativa creada por la presente para Puerto Rico, ó por una ley del Congreso de los Estados Unidos. *Disponiéndose:* Que

la parte de la ley vigente cuando se efectuó la cesión en abril once de mil ochocientos noventa y nueve, prohibiendo el matrimonio de los curas, ministros ó secuaces de cualquiera religión, ó sea el párrafo cuarto, artículo ochenta y tres, capítulo tres del Código Civil, y que continuara en vigor por orden del Secretario de Justicia de Puerto Rico, fechada en marzo diez y siete de mil ochocientos noventa y nueve, y promulgada por el Mayor General Guy V. Henry, Voluntarios de los Estados Unidos, queda revocada y anulada por la presente, y todas las personas legalmente casadas en Puerto Rico tendrán todos los derechos y recursos conferidos por la ley á los contrayentes de matrimonios civiles ó religiosos. *Disponiéndose, además:* Que el párrafo uno, artículo ciento cinco, sección cuarta, sobre divorcio, en el Código Civil, y el párrafo dos sección diez y nueve, de la Orden del Secretario de Justicia de Puerto Rico, fechada marzo diez y siete de mil ochocientos noventa y nueve, y promulgada por el Mayor General Guy V. Henry, Voluntarios de los Estados Unidos, queden por la presente redactados en los términos siguientes: 'Adulterio por parte del marido ó de la mujer.' "

Se autoriza, *en términos generales, la continuación* de las leyes entonces vigentes en Puerto Rico, con las alteraciones o modificaciones que en esa ley orgánica de 1900 se hacen, o como hayan sido alteradas o modificadas *por órdenes militares* y decretos vigentes, y en todo aquello en que la misma legislación no resultara incompatible *con las leyes estatutarias de los Estados Unidos* no inaplicables localmente, o con las disposiciones propias de esa carta orgánica.

En términos específicos se enmiendan, por el *Congreso de los Estados Unidos*—téngase ello en mucha cuenta para cuando nos refiramos al caso de *Pueblo* v. *Dimas*—por medio de esa Sec. 8, los Arts. 83 (4) y 105 (1) del Código Civil antiguo, entonces en vigor.

*Es el Congreso,* y no cuerpo legislativo alguno de Puerto Rico, que *ordena la continuación de nuestra legislación sustantiva fundamental,* entre ella el Código Civil español, hecho extensivo a Puerto Rico en el año 1899, que contiene, entre su articulado, el instituto de la prescripción, *al cual somete*

*la propiedad patrimonial o privada* del Estado y de sus pueblos o municipios. Ejercitó, en esa ocasión, el Congreso de los Estados Unidos, el poder que le concede en el Art. IV, Sec. 3, la Constitución de Estados Unidos así:

"El Congreso podrá disponer de, o promulgar todas las reglas y reglamentos necesarios en relación con el territorio o cualquier propiedad perteneciente a los Estados Unidos."

Pero el Congreso, no sólo ordena, en términos generales y específicos la continuación de la vigencia en Puerto Rico del Código Civil, sino que, va más lejos en esa acta orgánica de 1900. Por su Sec. 40, crea una comisión codificadora "para *revisar las leyes de Puerto Rico, como también los varios códigos* . . . y para formular y proponer las leyes que fueren necesarias para formar un gobierno sencillo, armónico y económico; establecer justicia . . . . (Énfasis nuestro) con la encomienda específica siguiente:

"Y dicha Comisión presentará al Congreso un informe minucioso y definitivo, *en los idiomas inglés y español,* de sus revisiones, compilaciones y recomendaciones con notas explicativas en cuanto a los cambios y justificación de éstos, . . . . (Énfasis nuestro.)

Después de disponerse en esa Sec. 40 del Acta Foraker que la legislación puertorriqueña continuaría en vigor cuando no estuviere en conflicto con esa ley orgánica y en todo aquello en que las mismas no resulten incompatibles o en conflicto *con las leyes estatutarias de Estados Unidos* no inaplicables localmente, señala las únicas fuentes u organismos con exclusiva autoridad o poder para enmendar, alterar, revocar o derogar toda o parte de esa legislación aprobada durante la Soberanía Española para Puerto Rico, es decir

". . . *la autoridad legislativa creada por la presente para Puerto Rico, o por una ley del Congreso de los Estados Unidos.*" (Énfasis nuestro.)

No se podía, ni aún se puede, alterar, modificar o derogar los códigos y leyes que continuaron rigiendo nuestro destino de pueblo y nuestros conflictos públicos y privados, por meras máximas de la ley común, por la llamada lógica, ni por el sentido común, que ahora se invocan tratando de tirar por la borda nada menos que la institución de la prescripción en cuanto afecta a los bienes patrimoniales o de propiedad privada del Estado. Hasta que no se demuestre racionalmente, no por caprichosas ocurrencias y argucias, que todos o parte de los preceptos sobre prescripción de nuestro Código Civil *"resultan incompatibles o en conflicto con las leyes estatutarias de los Estados Unidos* "no inaplicables localmente, estamos obligados a respetar de verdad, consciente y responsablemente, ese instituto jurídico que promueve, conserva, protege, asegura y garantiza la paz pública y privada, la riqueza pública del propio Estado, la propiedad privada de sus ciudadanos y todas las demás cosas que están en el comercio de los hombres.

Frente a la madurez jurídica que nuestro cuerpo de Derecho positivo o privado ha alcanzado, no sería posible convertirnos en una tercera Cámara Legislativa para hacer un tajante cambio en nuestra fundamental legislación sustantiva ni permutar nuestro justo y humano sistema de derecho legislativo, lo estatuido en nuestro código sobre la prescripción de bienes del Estado, por otras doctrinas; cambiar un sistema de igualdad prescriptiva, por uno de inmunidades, privilegios, desigualdad, discrimen, prerrogativas y monopolio irritantes en favor del Estado.

Como dice Scaevola, nuestro Código *"sigue un criterio antiprivilegista"* y proclama la prescripción contra toda clase de personas, cualquiera que sea su condición o estado de naturaleza física o jurídica. Si, conforme al Art. 7 del Código Político el Estado puede adquirir bienes por la prescripción, ¿por qué, ante el Derecho, en "obligada correlación" (frase

de ese comentarista de tanto renombre) no puede soportar los efectos adversos de esa misma prescripción?

Si hace mucho tiempo que de nuestra legislación ha desaparecido en absoluto la histórica o tradicional inmunidad substantiva o adjetiva, de que gozaban los menores de edad, los incapacitados mentales o dementes, las personas encarceladas, las mujeres casadas, los bienes hurtados y eclesiásticos, las fundaciones pías y, hasta los municipios de Puerto Rico con arreglo a repetidas decisiones nuestras, cuando se trata de la prescripción de acciones reivindicatorias de propiedad inmueble, *y, si, con excepción de terrenos baldíos, en Puerto Rico no existe, en absoluto, ley, estatuto o disposición legal alguno que directa, o hasta indirectamente, disponga que los bienes patrimoniales o de propiedad privada del Estado no pueden usucapirse, y,* por el contrario, existen claras y precisas disposiciones legales como los Arts. 21, 256, 1830, 1832, 1836 y 1859 (y esas *leyes especiales de prescripción contra el Estado* que más adelante indicaremos) no concebimos fundamento sólido, racional, justo, de índole moral, social o legal, para resucitar el odioso privilegio de la inmunidad prescriptiva de que gozaron, en el curso de la historia, los bienes del Rey, del Príncipe, del Emperador, de la Iglesia y de la nobleza feudal.

(c)

*La Comisión Codificadora de 1901 Autorizó la Prescripción Contra el Estado*

No obstante estar integrada aquella Comisión Codificadora creada por el Congreso por una mayoría de miembros norteamericanos, la misma recomendó la aprobación de un proyecto de Código Civil preparado por el Comisionado Hernández López. Un comité conjunto de la Cámara y el Consejo Ejecutivo rindió informe proponiendo numerosas enmiendas a dicho proyecto. Aprobado éste por dichos cuerpos en unión

a los proyectos de Códigos Político, Penal y Enjuiciamiento Criminal, el 1 de marzo de 1902, quedaron aprobados definitivamente esos cuatro códigos.

Hace Muñoz Morales, a la pág. 213 de su citada obra, el siguiente elogio del proyecto del Código Político, *redactado originalmente en castellano e inglés por mandato congresional;*

". . . cuyo proyecto, aunque adaptado en su forma general al del Código Político de California, *no es copia servil de aquél y se ajusta en detalle a nuestra legislación insular en todo aquello que no fue necesariamente modificado por el cambio de régimen.* Y podemos decir en justicia que ese proyecto *fue el mejor* y más concienzudo trabajo presentado por aquélla Comisión . . . ." (Énfasis nuestro.)

En su informe la Comisión se expresó, en parte, que "la mente del Congreso fue poner las instituciones de la Isla en más estrecha armonía con el sistema americano, pero sin efectuar cambios repentinos y que debía tenerse presente que "la base de los códigos españoles es el derecho civil romano" y que éste podría considerarse también como padre del Common Law; que "el sistema de derecho de los Estados Unidos es del todo *compatible con la conservación de aquellas instituciones que han resistido la prueba de los tiempos y de la experiencia* en algunos de los pueblos más adelantados de Europa y Sud América." (Énfasis nuestro.)

Dice además, la Comisión en parte de ese informe al Congreso:

"La comisión *no fue nombrada para barrer con el sistema de derecho de la Isla, sino más bien para conservar las instituciones del país que han dado prueba de vigor y desarrollo* y adaptarlas a los principios fundamentales del derecho americano." (Énfasis nuestro.)

Pero como se verá, respecto a la prescripción, lo que hizo fue una perfecta labor de conservación o subsistencia textual del articulado sobre la materia del Código Civil

español que nos regía desde el 1 de enero de 1890, con la sola limitación o excepción, de ámbito objetivo, de hacer inaplicable la usucapión, exclusiva y únicamente a los "terrenos baldíos insulares" y a "terrenos pertenecientes a las carreteras insulares", por virtud de los Arts. 9 y 405 del Código Político. Ya hemos demostrado ampliamente que la oración sobre "terrenos baldíos insulares", no es copia o adaptación de estatuto alguno continental.

Además, en sus tantas veces citado informe se expresa así la Comisión Codificadora de 1901, a la pág. 25 del citado tomo I, Partes I, II y III de sus comentarios sobre la revisión propuesta.

"Hay que notar, por otra parte, que los códigos civil y de comercio de Puerto Rico han sido cuidadosamente revisados por sucesivas comisiones codificadoras españolas y constituyen un sistema de derecho mucho más avanzado que los que existen en cualquiera de los países de Sud América. El período de liberalismo que prevaleció en España después de la revolución de 1869 fue testigo de una transformación profunda en su legislación. Un gran número de juristas educados en países extranjeros, principalmente Alemania y Francia, empezó la revisión del sistema anticuado basado sobre las leyes de las 'Siete Partidas,' Nueva y Novísima Recopilación y demás antiguos códigos. La serie de compilaciones de las cuales los códigos civil y de comercio y la ley hipotecaria son los más importantes, proporcionaron una nueva base para el sistema legal de la madre patria. Tanto Cuba como Puerto Rico recibieron el beneficio de estos cambios, por cuya razón *tenemos aquí un sistema de derecho civil que en muchos conceptos puede ser considerado superior al de los otros códigos latinos.*" (Énfasis nuestro.)

Inspirada en esos principios la Comisión Codificadora de 1901 no propuso alteración fundamental alguna al instituto prescriptivo codificado, ni mucho menos conceder inmunidad prescriptiva al Estado. Sólo propuso crear las excepciones prescriptivas en relación con terrenos baldíos por el Art. 9 y terrenos de carreteras por el 405 del Código Político.

Se incluyeron en el proyecto del Código Civil revisado, aprobado por la Legislatura del 1902 (Compuesto uno de sus cuerpos también por otra mayoría norteamericana) los siguientes artículos ·tomados textualmente del antiguo Código Civil de 1890:

"Art. 328.—Son bienes de uso público en Puerto Rico y en sus pueblos, los caminos insulares y los vecinales, las plazas, calles, fuentes y aguas públicas, los paseos y las obras públicas de servicio general, costeados por los mismos pueblos ó con fondos del Tesoro de Puerto Rico.

Todos los demás bienes que el Pueblo de Puerto Rico ó los municipios posean, son patrimoniales y se regirán por las disposiciones de este Código.

Art. 329.—Son bienes de propiedad privada, además de los patrimoniales del Pueblo de los Estados Unidos, del Pueblo de Puerto Rico y de los municipios, los pertenecientes á particulares individual ó colectivamente.

Art. 1831.—Por la prescripción se adquieren, de la manera y con las condiciones determinadas en la ley, el dominio y demás derechos reales.

También se extinguen del propio modo por la prescripción los derechos y las acciones, de cualquier clase que sean.

Art. 1833.—Los derechos y acciones se extinguen por la prescripción en perjuicio de toda clase de personas, inclusas las jurídicas, en los términos prevenidos por la ley.

Art. 1837.—Son susceptibles de prescripción todas las cosas que están en el comercio de los hombres.

Art. 1839.—Las disposiciones del presente Título se entienden sin perjuicio de lo que en este Código ó en leyes especiales se establezca respecto á determinados casos de prescripción.

Art. 1858.—El dominio y demás derechos reales sobre bienes inmuebles se prescriben por la posesión durante diez años entre presentes y veinte entre ausentes, con buena fe y justo título.

Art. 1860.—Se prescriben también el dominio y demás derechos reales sobre los bienes inmuebles por su posesión no interrumpida durante treinta años, sin necesidad de título ni de buena fe, y sin distinción entre presentes y ausentes, salvo la excepción determinada en el art. 546 de la segunda Sección del Capítulo I, Título VII del Libro Segundo de este Código.

Art. 1862.—Las acciones prescriben por el mero lapso del tiempo fijado por la ley.

Art. 1864.—Las acciones reales sobre bienes inmuebles prescriben á los treinta años.

Entiéndese esta disposición sin perjuicio de lo establecido para la adquisición del dominio ó derechos reales por prescripción. ''

Del Art. 1833 antiguo la Comisión eliminó su segundo párrafo en que se hacía cierta salvedad o reserva, en favor de las personas impedidas de administrar sus bienes, del derecho a reclamar contra sus representantes legítimos cuya negligencia hubiese sido causa de la prescripción.

Hemos insertado el texto de esos artículos para que se tenga a la vista y se tomen en consideración como parte del derecho positivo o legislado en Puerto Rico sobre prescripción existente al cambio de soberanía y al decidirse el citado caso de *El Pueblo* v. *Dimas* en el año 1912, cuyo análisis, adredemente, hemos dejado para último lugar.

—F—

*Análisis y Aplicación del Art. 9*
*del Código Político*

(a)

*Análisis*

En su última oración el Art. 9 del Código Político previene:

"No podrá adquirirse títulos *a terrenos baldíos* estaduales por posesión adversa, o contraria al título de otra u otras personas." (Énfasis nuestro.)

Los Códigos Civil y Político se aprobaron en la misma fecha, 1 de marzo de 1902. Ambos entraron en vigor el 1 de julio siguiente. El segundo de ellos, con el cambio de soberanía, respondió a la necesidad de una *reorganización del sistema público administrativo*, ajustada al criterio e ideales americanos.

Como esa oración del Art. 9 se refiere a la usurpación de *terrenos baldíos* y designa las personas que deben adoptar y ejecutar "las medidas necesarias para expulsar al usurpador", afirmamos a la pág. 672 del proyecto de opinión circulada:

"Sin duda alguna, tal prohibición [la de que no se podrá adquirir títulos *a terrenos baldíos* por posesión adversa] fue establecida en ese artículo para evitar que el usurpador de *terrenos baldíos* alegara como defensa la prescripción. Al reducir *su ámbito objetivo a terrenos baldíos insulares* tal prohibición restringida jamás podría entenderse como una de general aplicación respecto a los [otros] bienes patrimoniales del Estado." (Énfasis nuestro.)

Al restringirse objetivamente esa norma estatutaria por su aplicación, efectos y consecuencias jurídicas única y exclusivamente a una especie o tipo de terrenos patrimoniales del Estado, implícitamente, o a *contrario sensu*, declaró que el título sobre todos los demás bienes patrimoniales del Estado podía adquirirse por posesión adversa.

Sólo es aplicable, por los términos claros y precisos en que se concibió tal prohibición, a los terrenos baldíos insulares, hoy estaduales. Los islotes reclamados aquí por el Estado dejaron de ser terrenos baldíos hace cerca de un siglo. Hacía más de 30 años que al empezar a regir el Art. 9 del Código Político había dejado de serlo. Tal Art. 9 es una disposición especial, operante exclusivamente respecto a terrenos baldíos. Como precepto prohibitivo, constitutivo de una excepción a la regla general de que son susceptibles de prescripción todas las cosas que están en el comercio de los hombres—Art. 1836—que rige respecto a los bienes patrimoniales del Estado—Art. 256—no debe aplicarse a casos que no estén claramente comprendidos dentro de sus disposiciones, ni ampliarse mediante interpretación, ni extenderlo más allá de sus claros términos. *Dávila* v. *Torres*, 58 D.P.R.

881 (1941); *Barros* v. *Padial,* 35 D.P.R. 258 (1926); *Fuentes* v. *Tribl. de Distrito,* 73 D.P.R. 959, 978 (1952). Ya dispone el Art. 26 de la Ley de Evidencia que en la interpretación de un estatuto, nuestro ministerio es simplemente averiguar y declarar lo que textualmente y en sustancia contiene, *no insertar lo que se hubiere omitido, ni omitir lo que se hubiere insertado;* y cuando contuviere varias disposiciones o extremos, *se adoptará la interpretación que, de ser posible, diere efecto a todos. Pueblo* v. *Abréu,* 67 D.P.R. 887 (1947); *Pueblo* v. *González,* 20 D.P.R. 591 (1914); *Matson* v. *Goyco,* 18 D.P.R. 702 (1912).

Hace tiempo dijimos que es un principio de interpretación que dos preceptos legislativos, uno de carácter general y otro particular, pueden subsistir al mismo tiempo, aunque al parecer estén en contradicción, ya sean partes de la misma o *de leyes distantas,* cualquiera que sea la fecha de su aprobación, entendiéndose que los preceptos de carácter particular califican y constituyen excepciones a preceptos de carácter general. *Coll* v. *Leake,* 17 D.P.R. 857 (1911); *Wood* v. *Tribunal de Contribuciones,* 71 D.P.R. 233 (1950).

Como dijimos, aquí se trata de preceptos correspondientes a códigos distintos, *pero aprobados y puestos* en vigor conjuntamente. Uno de ellos, el civil, que es la ley general, en su Art. 1838 previene:

"Las disposiciones de la presente parte se entienden sin perjuicio de lo que en este título *o en leyes especiales*—en este caso la última oración del art. 9 del Código Político—se establezca respecto a determinados casos de prescripción—en este caso la imprescriptibilidad de los terrenos baldíos del Estado Libre Asociado de Puerto Rico.—(Énfasis nuestro.)

El precepto prohibitivo del Art. 9 del Código Político, como hemos dicho, al limitar la no adquisición por posesión adversa, pone o sujeta al alcance jurídico de la precripción, adquisitiva o extintiva, todos los demás *bienes patrimoniales* del Estado, que no sean terrenos baldíos como:

Los terrenos cultivados o cultivables, los dedicados a fines agrícolas, industriales, residenciales, comerciales; los explotados con toda clase de negocios y actividades; toda clase de propiedad inmueble que no consista en terrenos, como edificios e instalaciones; toda clase de bienes muebles o semovientes; las propiedades adquiridas en cobro o pago de contribuciones, procedimientos de expropiación y confiscación de bienes, en fin, cuanta cosa que, con arreglo al Art. 256 del Código Civil, pueda clasificarse como patrimonial y se encuentre en el comercio de los hombres.

La prohibición prescriptiva tampoco la extiende esa última oración a los derechos reales. El día, no lejano, en que la fuerza expansiva poblacional, comercial e industrial de nuestro pueblo materialmente acabe con los poquísimos terrenos baldíos que el Estado aún conserva, desde luego, por los medios propios y legales establecidos, será letra muerta esa última oración.

### (b)

#### Su no aplicación al presente caso.

La especial y limitada prohibición de adquisición por posesión adversa del Art. 9, es un precepto substantivo de derecho. Crea, define y regula derechos a favor del Estado, concediéndole un privilegio e inmunidad especialísima contra la usucapión. Declara imprescriptibles únicamente sus terrenos baldíos. No se trata, ni remotamente, de una norma adjetiva, de trámite, procesal o de enjuiciamiento.

El propio *Código Político, en su Art. 384* dispone, y siempre ha dispuesto:

"Art. 384. Ninguna parte de este Código tendrá efecto retroactivo, a menos que expresamente estuviere así consignado."

Nuestro Código Civil en su Art. 3, también dispone:

"Art. 3. Las leyes no tendrán efecto retroactivo, si no dispusieren expresamente lo contrario.

En ningún caso podrá el efecto retroactivo de una ley perjudicar los derechos adquiridos al amparo de una legislación anterior."

Hemos visto—pág. 715—que entre sus Disposiciones Transitorias nuestro Código Civil (que es nuestro Derecho general o común) provee la siguiente:

"Las variaciones introducidas por las reformas hechas en el Código Civil que perjudican derechos adquiridos según la legislación civil anterior, *no tendrán efecto retroactivo*." (Énfasis nuestro.)

Ya decidimos que la no retroactividad es un principio corriente y cardinal bien reconocido de interpretación de estatutos. *Rodríguez* v. *Miller*, 23 D.P.R. 594 (1916); *Báiz* v. *Comisión Hípica*, 63 D.P.R. 483 (1944).

Pues bien, el Art. 9 del Código Político entró en vigor el 1 de julio de 1902. En la hipótesis que se tratara real y efectivamente de "terrenos baldíos insulares", don Jorge Bird Arias adquirió por compra los islotes en 5 de octubre de 1901, es decir unos 8 meses antes de entrar en vigor y de aprobarse, tanto el Código Político, con su Art. 9, como el Civil, y casi *un año antes de la aprobación de ambos.* Sus antecesores en título habían poseído, como dueños, tales islotes, sin interrupción, cultivándolos y dedicándolos a fines industriales—fábrica de cal—desde el 12 de febrero del año 1872, con legítimos y justos títulos de amparo, de compraventa y de herencia. Cuando el 12 de febrero de 1902, se cumplieron 30 años de tal posesión, *ni se había aprobado ni mucho menos puesto en vigor el Art. 9, con su última oración, del Código Político.*

Entonces estaban en vigor, la prescripción ordinaria del Art. 1857 del Código Civil antiguo, tal como había sido enmendada por la transcrita orden judicial del 4 de abril de 1899, reduciendo el *término prescriptivo a 6 años* y la prescripción extraordinaria de 30 años establecida por el Art. 1959 del mismo antiguo Código Civil. Al amparo de

ambas prescripciones Bird Arias también había adquirido derecho de propiedad sobre ambos islotes, *mucho antes de la vigencia de ambos códigos.*

En tal caso, aun cuando expresamente se le hubiera dado efecto retroactivo al Art. 9, no podría afectar el pleno derecho de propiedad que ya había adquirido al amparo de la legislación anterior, basado no sólo en dicha prescripción, sino en la fuerza y eficacia jurídica de las obligaciones consignadas y contraídas en un contrato de compraventa y en los efectos de títulos hereditarios.

Es más, los citados Arts. 1867 y 1859 siguieron en vigor respecto a la posesión prescriptiva ejercitada por Bird Arias, después del 1 de julio de 1902, por virtud del Art. 1839 del vigente Código Civil, que dice:

"La prescripción comenzada antes de la publicación de este código—como la de Bird y sus antecesores en título—*se regirá por las leyes anteriores al mismo*; pero si, desde que fuere puesto en observancia, transcurriese todo el tiempo en el exigido por la prescripción, surtirá ésta su efecto, aunque por dichas leyes anteriores se requiriese mayor lapso de tiempo." (Énfasis nuestro.)

La prescripción se rige por la legislación vigente *en la época que empieza a correr.* Este es un principio básico y fundamental en esta materia. *Rivera* v. *Registrador,* 25 D.P.R. 491 (1917); *Subirana* v. *Collazo,* 14 D.P.R. 520 (1908); *Cobián* v. *Registrador,* 11 D.P.R. 91 (1906). No olvidemos que la posesión prescriptiva de Jorge Bird Arias empieza con la compra de los islotes (por escritura pública en lo que se refiere a Hicacos) efectuada el 5 de octubre de 1901—antes de la aprobación y vigencia de los códigos revisados del 1902—sigue con su inscripción registral verificada el 11 de octubre de 1901, y continúa, sin interrupción, hasta que fallece el 3 de julio de 1950, o sea, *poco menos de medio siglo,* pagando como dueño contribuciones territoriales al

propio Pueblo de Puerto Rico, que presta dinero a su titular con garantía hipotecaria sobre los islotes y sus edificios.

## —G—

### Nuestra Legislación Prescriptiva
### Antiprivilegista

En la formación y evolución de nuestro Derecho puertorriqueño en materia de usucapión, sin duda alguna, ha predominado el criterio antiprivilegista señalado por ilustres comentaristas españoles.

1. Así vemos que en el antiguo Código Civil de 1890, que tuvimos hasta el 1 de julio de 1902, en los artículos insertados en las anteriores páginas 708, 711 y 713, se consagró la adquisición por prescripción de bienes patrimoniales y de propiedad privada del Estado y sus municipios.

2. En la Ley Hipotecaria de 1893 y su Reglamento, se dio acceso y protección registral a los actos y contratos afectantes a bienes y derechos reales del Estado, que, por ser patrimoniales o privados, están en el comercio de los hombres y en el tráfico inmobiliario, y sean adquiribles o disponibles en las formas o modos de ley, Arts. 2 (6), Ley Hipotecaria y 24 de su Reglamento. Empero, se niega, especialmente, acceso y protección a los bienes y derechos reales . . . .

". . . que pertenezcan tan sólo al dominio eminente del Estado, y cuyo uso es de todos, como las riberas del mar, las islas, los ríos y sus márgenes; las carreteras y caminos de todas clases, plazas, paseos públicos y ejidos de los pueblos, siempre que no sean terrenos de aprovechamiento común de los vecinos; las murallas de las ciudades y plazas, los puertos y radas y cualesquiera otros bienes, análogos, mientras sean de uso común o general, y salvo las servidumbres establecidas por las leyes en las riberas del mar y en las márgenes de los ríos navegables." Art. 25, Reglamento.

Con arreglo al Art. 26 del mismo Reglamento, esos bienes, si en todo o en parte "cambiaren de destino, entrando en el dominio privado del Estado", podrán ser inscritos del modo prevenido en los Arts. 42 a 49 del propio Reglamento.

Como es obvio, nuestra Ley Hipotecaria le da un trato registral negativo a los bienes inmuebles del Estado que son inalienables, que se encuentran fuera del comercio de los hombres, y que por no ser susceptibles de la apropiación individual, no los alcanza o afecta la prescripción. Son bienes de situación estática, a los que no arrastra la corriente dinámica del constante tráfico inmobiliario. Para ellos el Registro de la Propiedad no tiene sentido, puesto que esta institución no puede convertirse en un mero inventario de bienes o derechos reales del Estado. Otorga trato afirmativo, a los bienes patrimoniales o de propiedad privada, cuando un ciudadano los adquiere por los modos de ley, incluyendo la prescripción acreditada y declarada en derecho.

3. El Código Civil revisado de 1902, que el *Congreso ordena se prepare,* publique y se ponga en vigor, reproduce todos los artículos del antiguo Código de 1890, relativos a la prescripción que afectan a todos los bienes y derechos reales patrimoniales del Estado. En sus ediciones de 1911 y 1930 en nada se altera esa institución, con excepción de un simple cambio en la enumeración del articulado. Considera en su Art. 275 que la prescripción es una forma o modo de enajenar la propiedad.

4. Nuestro Código Político de 1902, sólo establece en la última oración de su Art. 9, una excepción a la prescripción adquisitiva contra el Estado, limitando y restringiendo el ámbito objetivo de tal excepción a los "terrenos baldíos" exclusivamente. Ya hemos dicho que, *a contrario sensu,* aplicada esa excepción y la otra contenida en su Art. 405, se puede afirmar que el Código Político, concordado con el Código Civil, ambos aprobados y puestos en vigor simultáneamente, en materia prescriptiva, autoriza la adquisición por

posesión adversa de títulos sobre todos los terrenos patrimoniales o de propiedad privada del Estado, que no sean: (1) terrenos baldíos insulares y (2) terrenos de carreteras y caminos públicos.

Si el Art. 8 del Código Político faculta al Gobierno de Puerto Rico para adquirir bienes por prescripción de cualquier ciudadano, existe una situación jurídica correlativa, de justicia fundamental, por la cual también debe perderlos del mismo modo.

5. Nuestro Código de Enjuiciamiento Civil de 1904, dedicó su Art. 40 a proteger a los menores de edad, dementes, convictos y mujeres casadas en el ejercicio de sus acciones que no fueran las reivindicatorias de propiedad inmueble, contra los efectos de la prescripción, proveyendo que el tiempo que duran sus respectivas incapacidades "no se considerará parte del tiempo fijado para empezar a ejercitar la acción."

Les reconoció franca inmunidad, en términos generales, contra los estatutos de prescripción. Pero, en términos específicos, les privó de la histórica inmunidad que también tenían durante la incapacidad y respecto a las acciones reivindicatorias de propiedad inmuebles. El Art. 352 del Código de Enjuiciamiento Civil de California, del cual se tomó el Art. 40 nuestro, no excluía de esa protección a las acciones reivindicatorias. Todavía allí se mantiene tal protección absoluta y sin excepción alguna en cuanto al tipo de acción.

También dicho Código de Enjuiciamiento Civil concede inmunidad temporal contra la prescripción, sujeto a ciertas condiciones, a personas ausentes—Art. 39—, a súbditos o ciudadanos de un país en guerra con los Estados Unidos—Art. 42—; en casos en que el principio de una acción es suspendido por prohibición legal o *injunction*—Art. 44. Los Arts. 41 y 43 conceden ciertos privilegios prescriptivos en favor de herederos, en los casos en que sus causantes hubieran fallecido antes o después del comienzo de la acción.

Como en California, estas otras inmunidades se conceden aquí en todas las acciones.

El hecho de que no se ha reconocido en ese código adjetivo inmunidad general contra la usucapión de bienes patrimoniales y privados del Estado, claramente establecida en el Código Civil a pesar de que frecuentemente El Puerto de Puerto Rico, ha sido parte demandante o demandada ante nuestros tribunales en acciones reivindicatorias evidencia, una vez más, el predominio del criterio antiprivilegista y la armónica relación entre los cuerpos fundamentales de nuestro Derecho Civil en materia prescriptiva. Ni en las Reglas de Enjuiciamiento Civil de 1943, ni en las de Procedimiento Civil de 1958 se intentó la resurrección del privilegio antiprescriptivo, reliquia de la era de los derechos divinos.

6. El 13 de abril de 1916 fue aprobada la Ley Núm. 76, "Para Autorizar Demandas contra el Pueblo de Puerto Rico". Entró en vigor el 1 de julio siguiente.

Creemos que fue adoptada para obviar los inconvenientes procesales consecuentes a la decisión de la Corte Suprema de Estados Unidos emitida el 24 de febrero de 1913, en *Porto Rico* v. *Rosaly y Castillo*, 227 U.S. 270, que revocó a *Rosaly* v. *El Pueblo et al.*, 16 D.P.R. 508 (1910).

Habiámos confirmado una sentencia declarando con lugar una acción reivindicatoria de propiedad inmueble, dictada por la entonces Corte de Distrito de Ponce, de la cual apeló El Pueblo de Puerto Rico, parte codemandada, y el único fundamento para sostener su recurso fue "que no pudiendo El Pueblo de Puerto Rico ser demandado sin su consentimiento y no apareciendo que se haya prestado tal consentimiento en este caso, la corte de distrito actuó sin jurisdicción y la sentencia que dictó es nula."

De nuestro fallo se apeló ante la Corte Suprema federal y ésta lo revocó, resolviendo que el gobierno de Puerto Rico establecida por el Acta Foraker de 1900, gozaba del privi-

legio de no ser demandado sin su consentimiento, al igual que el gobierno federal, los estaduales y los de territorios incorporados, ya que tal privilegio era un atributo del poder soberano, no obstante haberse creado por la Sec. 7 de dicha Carta Orgánica un cuerpo político bajo el nombre de El Pueblo de Puerto Rico con facultades gubernamentales y facultad para demandar y ser demandado.

A través de la indicada Ley Núm. 76 de 1916, El Pueblo de Puerto Rico, bajo ciertas condiciones, renunció el privilegio de no ser demandado sin su consentimiento específico, autorizando a las entonces Cortes de Distrito de Puerto Rico para admitir demandas en su contra en las acciones por daños y perjuicios basados sobre contratos celebrados después del 1 de julio de 1916 y en acciones para reivindicar propiedad inmueble o mueble, o derechos sobre la misma, originadas después de su aprobación.

En su Art. 9 dispuso en parte:

"Artículo 9.—Todas las acciones contra El Pueblo de Puerto Rico prescribirán, si el pleito no se principia dentro de un año después de originada la causa de acción; con excepción de las acciones que se refieren a propiedad inmueble, las cuales prescribirán a los dos años."

No puso reparos El Pueblo de Puerto Rico a que se le demandara en reivindicación de inmuebles adquiridos por usucapión contra el Estado. Estableció una prescripción extintiva de dos años para las acciones reivindicatorias de propiedad inmueble, a partir, desde luego, de la fecha en que se originara la causa de acción, es decir, desde el momento en que El Pueblo de Puerto Rico cometiera algún acto contrario, adverso o perturbador del derecho de propiedad del titular, según se resolvió en *Ramos* v. *Pueblo*, 70 D.P.R. 619 (1949).

7. Por la Ley Núm. 104 de 29 de junio de 1955, quedó derogada la Núm. 76 de 1916. En este estatuto de 1955 se extendió ampliamente el ámbito de la renuncia del privilegio

del Estado a no ser demandado sin su consentimiento a casi todas las posibles acciones contra el Estado. Se autorizaron las acciones reivindicatorias contra el Estado por su Art. 8 y se dispuso que para su ejercicio regirían *"los términos prescriptivos fijados en las leyes aplicables."* (Énfasis nuestro.)

Esto significa que, con arreglo al Art. 1863 del Código Civil, se concedió para el ejercicio de "las acciones reales sobre bienes inmuebles . . . 30 años." De modo que aquella prescripción de sólo dos años de la Ley Núm. 76 de 1916, para ejercitar la acción reivindicatoria, se extendió a 30 años, en perjuicio del propio Estado y en beneficio del titular.

Esta situación creada por la Ley de 1955, permite en derecho al ciudadano adquirir de nuevo por prescripción ordinaria de 10 años o por la extraordinaria de 30, contra el Estado, durante el largo período de 30 años que se le concede para el ejercicio de la acción reivindicatoria en caso de apropiación clandestina o violenta de su propiedad. Eso lo ha autorizado el propio Estado, claro está, para las causas de acción que hayan surgido con posterioridad al 29 de junio de 1954 según enmienda que se hizo al Art. 8 de la Ley Núm. 104, por la Núm. 30 de 11 de junio de 1957.

Las surgidas antes, se regían por la prescripción de sólo 2 años. Todas esas acciones *antiguas quedaron extinguidas, a nuestro entender,* el 29 de junio de 1956, según la misma enmienda.

Así el estatuto de prescripción, en cuanto a la prescripción negativa o extintiva de acciones reivindicatorias, quedó adoptado por el Estado por la Ley Núm. 104 de 1955, según enmendada en 1957.

Respecto a la prescripción adquisitiva de inmuebles contra el Estado ya estaba precisa y claramente regulada por los artículos correspondientes del Código Civil revisado, según éste quedó modificado en sus ediciones de 1911 y 1930. Tal

especie de prescripción no tenía que ser reproducida en 1916 y 1955.

La Comisión de lo Jurídico Civil, del Senado de Puerto Rico, al informar el alcance del proyecto P. de la C. 1145, que se convirtió en la Ley Núm. 104 de 1955, se manifestó así:

### "ALCANCE DEL PROYECTO

Este proyecto de ley propone, siguiendo el patrón federal, la autorización de demandas contra el Estado Libre Asociado de Puerto Rico sin la previa autorización legislativa en acciones de daños y perjuicios, en acciones de reivindicación de propiedad mueble e inmueble cuando la cuantía no exceda de 15,000 dólares. El proyecto enmienda también el artículo 1803 del Código Civil en el sentido de que pueda establecerse la acción contra el gobierno aunque la persona causante del daño no haya actuado como agente especial del Estado.

La Comisión cree que una legislación de esta naturaleza es altamente necesaria y deseable en Puerto Rico ya que la vieja idea de que no se podía demandar al Estado sin su previo consentimiento, se ha ido descartando. No se ha querido conceder ilimitadamente autorización para demandar al Pueblo de Puerto Rico y se ha fijado esa autorización en una cuantía que no excederá de 15,000 dólares."

En el Informe de la Cámara, en parte, se expresó lo siguiente:

"La Comisión ha estudiado este proyecto con sumo cuidado por tratarse de una medida legislativa de gran significación para la ciudadanía y el Estado. La Comisión escuchó al Secretario de Justicia, al Sr. Contralor y a un representante del Secretario de Hacienda. *La medida está inspirada en el deseo de que el Estado pueda ser demandado cuando cualquier ciudadano entiende que tiene una buena y justa causa de acción y que sea el poder judicial el que determine la validez y suficiencias que se formulan contra el Estado.*" (Énfasis nuestro.)

De modo que toda la relacionada anterior legislación efectivamente, da o tiende a dar, igual trato de derecho

substantivo, tanto al ciudadano contra el Estado, como al Estado contra el ciudadano.

Ya debe entenderse completa y absolutamente descartado el sistema de privilegios, inmunidades y prerrogativas del Estado contra el ciudadano que lo sostiene con el producto de su trabajo y sacrificios. No debe permitirse por más tiempo el estrangulamiento de los derechos de propiedad privada por la entelequia jurídica que él mismo ha creado.

8. Tanto el Estado, en lo referido a sus bienes patrimoniales, como el ciudadano, en lo tocante a su propiedad privada, deben recibir igual trato de derecho sustantivo cuando son, o pueden ser, sujetos activos o pasivos en el campo de los negocios, transacciones, actos y contratos realizados con fines de lucro. Cuando actúa a ese nivel el Estado deja de ser el llamado "soberano", deja de gobernar, deja de ejercer supremos poderes políticos. Sus bienes patrimoniales son su propiedad privada y, cuando no las dedica a uso público, los puede vender, arrendar, dar en uso o usufructo, o los somete a los actos o contratos que desee, sujeto, desde luego, a las formas, limitaciones y restricciones de ley. El llamado "derecho primitivo y final a todos los bienes inmuebles y muebles, dentro de los límites de Puerto Rico", no es nada más que un derecho preferente a adquirir—no a apropiarse ni a confiscar—la propiedad privada "mediante el pago de una justa compensación y de acuerdo con la forma provista por ley."

Bajo el Art. II, Sec. 7 de nuestra Constitución, se reconoce como derecho fundamental del ser humano—al igual que el derecho de la vida y a la libertad—el derecho al disfrute de la propiedad, *y no se negará a persona alguna en Puerto Rico la igual protección de las leyes.*

El Art. 22 de nuestro Código Civil dispone:

"La ley civil *es igual para todos sin distinción de personas* ni de sexo, exceptuándose los casos en que especialmente se declare lo contrario." (Énfasis nuestro.)

No hay base jurídica alguna para establecer un discrimen intencional contra la ciudadanía y a favor del Estado, en igual situación, en materia de usucapión, frente a los Arts. 256 y 1832 del Código Civil que (volvemos a machacar) dicen:

"Art. 256.—.    .        .        .        .        .        .

.        .        .        .        .        .        .        .

Todos los demás bienes que el Estado Libre Asociado de Puerto Rico o los municipios posean son patrimoniales *y se regirán por las disposiciones de este Código.*

Art. 1832.—Los derechos y acciones se extinguen por la prescripción *en perjuicio de toda clase de personas, inclusas las jurídicas,* en los términos prevenidos por la ley." (Énfasis nuestro.)

¿Por qué puede el Estado adquirir por prescripción mi propiedad y yo no puedo adquirir, también por prescripción, *su propiedad patrimonial,* no comprendida en el término "terrenos baldíos" o terrenos de carreteras?

Lo curioso del presente caso es que, como ya hemos dicho, ni El Pueblo de Puerto Rico ni el Estado Libre Asociado han perdido nada por prescripción. Cuando el Art. 9 del Código Político entró en vigor, el primero no tenía título alguno sobre los islotes. Éstos habían dejado de pertenecer a la Corona de España desde mucho antes del hundimiento del Maine.

—H—

*La Prescripción Contra el Estado*
*en la Jurisprudencia Americana*

Diremos algo respecto a la jurisprudencia americana sobre esta materia.

(a)

Empecemos por la jurisdicción federal, o sea por la adquisición de bienes inmuebles del gobierno de los Estados Unidos

por posesión adversa o prescriptiva. Toda vez que los distintos Estados carecen de poderes para adoptar normas de prescipción contra los bienes inmuebles del gobierno federal y regular la adquisición de la propiedad federal por ese modo, se ha aceptado que no corre la prescripción contra bienes del gobierno federal mientras éste ostente título de dominio sobre ellos.

Pero esta regla tiene una clara excepción. Se refiere a bienes y derechos reales propiedad de los Estados Unidos, sitos en Puerto Rico, *en donde éstos han consentido en estar sujetos al estatuto local de prescripción.*

En la anotación al caso de *Goldman* v. *Quadrato*, 142 Conn. 398, 114 A.2d 687, 55 A.L.R.2d 549—citada por nosotros a la pág. 682 de nuestra opinión—se hace constar, a la pág. 563 del tomo 55 A.L.R.2d, lo siguiente:

"II.   United States
A.   Acquisition of title against, generally

§ 3.   Public lands of United States, generally.

Since the United States is not subject to the jurisdiction of a state, the state is without power to prescribe the time within which the United States shall assert its rights in order to preserve them, and it must be regarded as settled that state statutes of limitation do not apply to the federal government; consequently, no title to public lands of the United States can be acquired by adverse possession or prescription during the time the United States holds title thereto, unless, of course, as is sometimes the case, (²) the United States consents to be bound by a limitation statute."

Esa es la principal razón por la cual, hemos estado insistiendo y dando énfasis al papel o *participación fundamental*

---

"(²) Where the United States, upon the cession of Puerto Rico to it by Spain, continued all laws in force, for a time, which had theretofore been in force in Puerto Rico, including a section of the Spanish Civil Code proving for acquisition of prescriptive title to land by possession for 10 years, the United States sanctioned acquisition of a prescriptive title against it during such period. Porto Rico v. Fortuna Estates (1922, CA1st Puerto Rico) 279 F 500, cert den 259 US 587, 66 L ed 1077, 42 S Ct 590."

*que tuvieron los Estados Unidos, por medio de su Presidente,
de su Gobierno Militar, de su Congreso, de su Comisión Codificadora y de su Consejo Ejecutivo,* en la continuación de la vigencia en Puerto Rico de la legislación fundamental substantiva existente al cambio de soberanía, incluyendo el Código Civil español de 1889, la Ley Hipotecaria de 1893 y su Reglamento. Ello fue consecuencia jurídica de la enmienda hecha al Código Civil en 1899, en la materia de prescripción— Art. 1957—y de las que hizo al mismo Código el propio Congreso por la Carta Orgánica de 1900, y de su intervención en la preparación y aprobación de los Códigos revisados de 1902, que continuaron la vigencia del instituto español de prescripción, de criterio antiprivilegista.

Con arreglo a la Sec. 31 del Acta Foraker y el Art. 34 del Acta Jones, ". . . toda ley decretada por la Asamblea Legislativa de Puerto Rico sería comunicada al Congreso de los Estados Unidos, el cual se reservaba la facultad y autoridad de anularla.

En el mencionado caso de *People of Porto Rico* v. *Fortuna Estates,* 279 Fed. Rep. 500 (1st Cir. 1922), *El Pueblo de Puerto Rico* instó una acción reivindicatoria contra Fortuna Estates. Se alegó por esta corporación que había adquirido la finca objeto del litigio con justo título y buena fe y que tal título fue consolidado por la prescripción ordinaria de 10 años, establecida en el Art. 1957 del antiguo Código, transcurrida del 31 de julio de 1889 al 31 de julio de 1899.

"But the plaintiff contends that [dice la decisión, a la pág. 508] inasmuch as the United States acquired its title by the treaty with Spain, proclaimed April 11, 1899, the prescriptive period was interrupted before the 10 years had elapsed, *as prescription will not run* against the United States. The defendants' answer to this is that the prescriptive period did not cease to run upon the cession by Spain to the United States; that, while Porto Rico was, by order of the President, under military control and occupation, a general order was issued November 4, 1898, continuing all laws in Porto Rico theretofore in force com-

patible with the military government; that by section 8 of the Foraker Act of 1900 (Com. St. § 3755), the laws and ordinances of Porto Rico were further continued in force; and that, as section 1957 was continued in force and unmodified until the Political Code of Porto Rico was adopted March 1, 1902 (section 9), the period of prescription was not broken and the defendants' title became good at the expiration of 10 years from July 31, 1889; that the United States, by continuing section 1957 in force, sanctioned the acquisition of a prescriptive title against it.

The court below instructed the jury upon this question in accordance with the defendants' contention, and we fail to see wherein the instruction was not correct. We do not think that Crespin v. United States, 168 U.S. 208, 18 Sup. Ct. 53, 42 L. Ed. 438, and Hayes v. United States, 170 U.S. 637, 18 Sup. Ct. 735, 42 L. Ed. 1174, cited by plaintiff, are applicable, as in those cases the court, in reaching its conclusion, was limited by the language of the act creating the Court of Private Land Claims, while here we have the adoption of the provision of the Spanish Code continuing the right of prescription." (Énfasis nuestro.)

La sentencia que desestimó la demanda fue confirmada. Vemos como la Corte de Circuito encontró correcta la instrucción al jurado federal de que "the United States, by continuing section 1957 in force, *sanctioned the acquisition of a prescriptive title against it.*" (Énfasis nuestro.)

Además esa Corte dijo: "*. . . here we have the adoption of the provision of the Spanish Code continuing the right of prescription.*" (Énfasis nuestro.)

En *Baldrich* v. *Barbour*, 90 F.2d 867 (1937) la situación era a la inversa. Los Estados Unidos alegaron haber adquirido por prescripción los terrenos conocidos por "Luquillo Forest Reserve", que reclamaban los demandantes. Esta alegación prosperó, y, entre otras cosas, a la pág. 871, dice la opinión:

"In any event, it being admitted that the defendant has been in possession of the property described in the complaint for more than twenty years, we think that, under section 1858 of the

744

Civil Code, the plaintiffs' rights in the land described in the complaint have been prescribed by the possession of the defendant for more than ten years."

Si en Puerto Rico la usucapión establecida por nuestros Códigos Civiles de 1889, 1902, 1911 y 1930, corre en contra o en favor de los Estados Unidos—el soberano del soberano nuestro—no concebimos buena razón para sostener que no corre contra una creación política del propio Congreso Federal, el Pueblo de Puerto Rico, y su sucesor El Estado Libre Asociado de Puerto Rico, en cuyos códigos figura la prescripción establecida desde el año 1889. El primero que no puede ir contra sus propios actos legislativos, que han creado un firme estado de derecho substantivo, que debe respetarlo y acatar su eficacia jurídica, es el propio Pueblo de Puerto Rico, regido por un sistema de derecho civil legislado, que nada tiene que pedirle prestado al derecho angloamericano en materia de prescripción.

(b)

Comentemos ahora, en particular, algunos de los casos de la jurisprudencia de distintos Estados sosteniendo, que, en ellos, la prescripción no corre contra el Estado. Comencemos por los tribunales de Luisiana, casos de Slattery (*1902*); Bright (*1905*) y City of New Orleans, (*1914*). Puede aceptarse que en ellos se sostiene que, *en Luisiana*, no pueden adquirirse por posesión adversa los bienes del Estado de cualquier clase o naturaleza.

Pero la razón de ese estado de derecho se fundamenta en que *en las Constituciones* de 1898, 1913, y 1921, del Estado de Luisiana, expresa y terminantemente, se ha dispuesto, en sus Disposiciones Generales, Arts. 193 y 19 (16), lo siguiente:

*"Prescription shall not run against the State in any civil matter, unless otherwise provided in this Constitution, or expressly by law."* (Énfasis nuestro.)

En los casos citados reiteradamente se hace referencia a esa prohibición constitucional.

Frente a esa disposición constitucional los tribunales de ese Estado, a partir del 12 de mayo de 1898, no han podido resolver que en Luisiana la prescripción corre contra el Estado.

Pero lo que es muy significativo es lo siguiente: La Constitución de Luisiana, del 12 de mayo de 1898, es su séptima constitución. Ha aprobado nueve constituciones hasta hoy, en los años 1812, 1845, 1852, 1864, 1868, 1879, 1898, 1913 y 1921. En sus primeras seis no tenía tal disposición. La Comisión Codificadora de 1900, creada por el Congreso, tomó del Código Civil revisado de Luisiana de 1870, *nada menos que 118 artículos* y los llevó a nuestro Código Civil revisado de 1902. Sin embargo, *no se ocupó de adoptar la prohibición constitucional contra la prescripción de bienes del Estado*, que hacía poco Luisiana había aprobado en su Constitución del 12 de mayo de 1898, y se limitó a adoptar, en el Art. 9 del Código Político una restringida excepción prescriptiva sobre terrenos baldíos y nada más.

Pero sí adoptó y reprodujo textualmente, esa Comisión Codificadora de 1901, en nuestro Código Civil, el instituto completo de prescripcion aquí vigente desde el 1 de enero de 1890 hasta el 1 de julio de 1902, que en términos claros autoriza la usucapión contra el Estado.

No obstante esa categórica disposición constitucional en Luisiana, sus tribunales han resuelto que la prescripción corre contra los municipios y las juntas del gobierno. Véanse: *New Orleans* v. *Salmen Brick*, 135 La. 828, 66 So. 237 y *Board of Comm.* v. *Toyo Kisen Kaisha*, 163 La. 865.

Luisiana, en su Código Civil, dedica 98 artículos—3457 a 3555—a la materia prescriptiva, pero no tiene nada parecido a nuestros Arts. 256 y 1832. La disposición constitucional transcrita se debe, sin duda, a los esfuerzos e influencia del Gobernador Claiborne para poner a Luisiana bajo el

dominio del Common Law, tal como este sistema de derecho inglés se aplicaba en los demás Estados.

*Harris* v. *O'Connor*, 185 S.W.2d 993 (1944) es un caso resuelto por la Corte Suprema de Tejas, que favoreció la adquisición de terrenos bajo la antigua legislación mejicana. Los terrenos se poseían bajo concesiones mejicanas de época anterior a la República de Tejas, y los funcionarios y agentes del Estado de Tejas así lo reconocían. De una simple lectura de la opinión se concluye que por virtud del Art. 5517 de los Estatutos Revisados del Estado de Tejas—Vol. 16, pág. 609, Ed. 1958, Vernon Law Book Co. se dispone, sobre adquisición de bienes del Estado, Condados, Ciudades y Distritos Escolares de Tejas, lo siguiente:

"Art. 5517. [5683] [3351] Right of the state, counties, cities and school districts

The right of the State, all counties, incorporated cities and all school districts shall not be barred by any of the provisions of this Title, nor shall any person ever acquire, by occupancy or adverse possession, any right or title to any part or portion of any road, street, alley, sidewalk, or grounds which belong to any town, city, or county, or which have been donated or dedicated for public use to any such town, city, or county by the owner thereof, or which have been laid out or dedicated in any manner to public use in any town, city, or county in this State. Acts 1841, p. 163; P.D. 4622–4; Acts 1887, p. 28; G.L. vol. 9, p. 826; Acts of 1939, 46th Leg., p. 485, § 1; Acts 1953, 53rd Leg., p. 857, ch. 348, § 1."

Varios Estados como Alabama, Kentucky, Missouri, New York, South Carolina y West Virginia, han aprobado leyes limitando el tiempo para poder el Estado recobrar terrenos poseídos por personas particulares y no usados para fines públicos específicos. Podemos decir que en los demás Estados se perfila ya la misma política legislativa y jurisprudencial.

Los derechos de servidumbres sobre terrenos de los Estados pueden ser adquiridos por prescripción adversa, en California, Montana, Utah.

A la pág. 598 de dicha Anotación, se dice:

"§ 29.  View that property must be reserved for or dedicated to public use.

In California the view has been taken that if land held by the state is neither reserved for nor dedicated to some public use, title as to such land may be wrested from the state by adverse possession. Richert v. San Diego (1930) 109 Cal App 548, 293 P 673; Fresno Irrig. Dist. v. Smith (1943) 58 Cal App2d 48, 136 P2d 382; Ortiz v. Pacific States Properties (1950) 96 Cal App2d 34, 215 P2d 514.

Thus, in Ortiz v. Pacific States Properties (1950) 96 Cal App2d 34, 215 P2d 514, it was held that property sold to the state for nonpayment of taxes could be acquired by adverse possession, where it was neither reserved for nor dedicated to any public use and could be alienated."

*En 1960* el Estado de Nueva York adoptó la anterior regla en *Gottfried* v. *State*, 201 N.Y.S.2d 649.

*En 1964*, el Estado de Oklahoma, en *Sears* v. *Fair*, 397 P.2d 134, también se decidió por la norma de que cuando lo que hay envuelto son derechos privados del Estado, el estatuto de prescripción opera en su contra.

*En 1967*, Hawaii, que tiene la regla de no prescripción contra el Estado, hace una distinción entre meros transgresores que se posesionan de terrenos pertenecientes al Estado y aquellos que no son considerados transgresores y que poseen bajo algún título. Éstos pueden adquirir por posesión adversa. *In re Real Property*, etc., 425 P.2d 83.

Como se dijo en *City of Bisbee* v. *Cochise County*, 52 Ariz. 1, 78 P.2d 982, 984, la máxima *Nullum tempus ocurrit regi*— el tiempo no corre contra el Rey—se refería a éste, exclusivamente en su capacidad como representante o encarnación de la absoluta soberanía nacional, y *no al Rey como individuo*.

Aun en Inglaterra, bajo el *Nullum Tempus Act* (3 Geo. III c. 16), se fijaba un término de 60 años a la Corona para reclamar sus derechos.

La variedad o conjunto de sistemas, filosofías, principios, fuentes u orígenes del Derecho de los 50 Estados de la Unión Americana, respecto a la tesis de la usucapión contra el Estado, no puede ofrecer punto de apoyo firme, seguro y sólido para decidirnos, en 1969, por continuar o restituir aquí un estado, o una era de privilegio, monopolio, gracia, ventajería y excepciones especialísimas en favor del Estado, que como dice Manresa—págs. 37–38—fueron exterminados por el Código Civil español del siglo pasado.

Hace ya mucho tiempo que nuestra Constitución, nuestros códigos, sustituyeron al Rey y a los poderes absolutos. La igualdad en la Ley, su eficacia contra todos, es lo que prevalece.

Contamos con un sistema de derecho legislado, positivo, "mucho más avanzado que los existen en cualquiera de los países de Sud América", como decía la Comisión Codificadora de 1901. ¿Vamos a cambiarlo, este año, por el que impera en Texas, el año que viene por el de California y, en el año de más arriba, por el que impera en Wisconsin, y así, de experimento, acabar pensando, actuando, rigiéndonos, por los criterios esquimales de prescripción del Estado de Alaska? Sabemos que la jurisprudencia continental, como la de cualquier Estado o país, responde genuinamente a la estructuración de la peculiar escala de valoración de cada comunidad. Hay que tener en cuenta la historia y experiencia de cada Estado, de cada sistema de Derecho, antes de acudir a arreglar al Mundo con soluciones abstractas, con términos tan manoseados como "sentido común, lógica y recta razón." Hay que tomar con pinzas, bien largas, el sentido común, la lógica y la recta razón de mucha gente.

Con Holmes, decimos, "La vida de la Ley no ha sido la lógica; ha sido la experiencia; una página de historia equivale a un volumen de lógica."

Nuestra situación, en el asunto que estudiamos, es que aquí tenemos un estatuto que, en términos claros y precisos,

nos dice: "Los derechos y acciones se extinguen por la prescripción en perjuicio de toda clase de personas, *inclusas las jurídicas*, en los términos prevenidos por la Ley." (Énfasis nuestro.) Art. 1832 Código Civil. La forma legal, o autoridad para cambiar este precepto legal, obligatorio para toda clase de personas, "inclusas las jurídicas", está expresa y precisamente fijada por el Congreso de los Estados Unidos, en la Sec. 8 de la Carta Foraker, en cuanto dice que nuestras leyes regirán,

". . . hasta que sean alteradas, enmendadas o revocadas por la autoridad legislativa creada por la presente para Puerto Rico, o por una Ley del Congreso de los Estados Unidos."

Esto se repite en el Art. 57 del Acta Jones de 1917 y se reproduce en la Ley Núm. 600 de Relaciones Federales, Art. 4.

Las leyes, como dice el Art. 5 de nuestro Código Civil, se derogan *por otras leyes posteriores*. Aquí jamás hemos permitido que se deroguen por las máximas del derecho común angloamericano y desechadas. El propio Estado, desde el año 1916, en Puerto Rico, ha dado su consentimiento para que se le demande en acciones reivindicatorias, ha fijado términos de prescripción para ello, adoptando, como ya expusimos, para las acciones que autoriza, por la Ley Núm. 104 de 1955, ". . . los términos prescriptivos fijados en las leyes aplicables."

Los diversos modos de adquirir, disponer y enajenar los bienes inmuebles sitos en Puerto Rico, *son aquellos prescritos por las leyes de Puerto Rico*. Art. 10, Código Civil. Como dijimos en *Colón* v. *Registrador*, 22 D.P.R. 369 (1915) y *Lókpez* v. *Sotelo*, 70 D.P.R. 501 (1949), en relación con este principio cardinal, las doctrinas sobre esta materia de las cortes americanas, no pueden quebrantar su letra ni su espíritu, y nadie puede ganar o perder en Puerto Rico derechos sobre bienes inmuebles sitos aquí sino de acuerdo con las prescripciones de nuestras leyes.

—I—

### Ratio Decidendi en
### Pueblo v. Dimas, 18 D.P.R. 1061 (1912)

La doctrina de esta decisión nuestra debe ser considerada cuidadosamente a la luz de su propio contexto. En ella no se llegó a la conclusión general y absoluta de que, a partir de la vigencia de nuestro Código Político, todos los terrenos del Pueblo de Puerto Rico no pueden adquirirse por prescripción.

Hemos estudiado y analizado paciente y cuidadosamente el viejo expediente civil Núm. 795, de El Pueblo de Puerto Rico, demandante-apelado v. José Dimas Riera, Enrique Calvo Ríos, Wenceslao Bosch y Honorato Andrés García, demandados y apelante el último, año 1912, sobre reivindicación, procedente de la antigua Corte de Distrito de San Juan.

Es un caso típico de aplicación del Art. 9 del Código Político, texto castellano, y una equitativa y humana aplicación del principio de tercero hipotecario. Si se analiza bien esta decisión, a la luz de la naturaleza de los "terrenos baldíos" envueltos en el caso, así se concluirá.

### Nombre del Caso

Como una curiosidad de edición, anotamos que el nombre dado al caso en el vol. 18 es incorrecto. Debió ser El Pueblo v. Riera, et al., ya que "Dimas" es sólo un segundo nombre de José Dimas Riera, no es un apellido. Véase el caso de *El Pueblo v. Riera*, 27 D.P.R. 1 ( 1919) que es otro de reivindicación contra esa misma persona, con el nombre de "José D. Riera."

### Procedimientos ante el Tribunal de Instancia

El legajo de la sentencia revela que el 10 de febrero de 1910, El Pueblo de Puerto Rico, instó ante la Sección Primera

de la entonces Corte de Distrito de San Juan, una acción reivindicatoria contra José Dimas Riera, Enrique Calvo Ríos y Wenceslao Bosch. Alegó en su demanda que le correspondía la propiedad y pleno dominio de una parcela de terreno compuesta de 12,090 metros, situada en el barrio Puerta de Tierra de San Juan, con las siguientes colindancias:

*Norte*, solares de Andrés Calvo y otros,

*Sud*, con *los manglares del caño denominado* San Antonio;

*Este*, calle San Andrés;

*Oeste*, solar de Marcos Caneja.

Adujo además que, con fecha 8 de octubre de 1906, Enrique Calvo Ríos promovió un expediente de dominio ante esa Corte de Distrito, exponiendo que había comprado esa parcela a sus padres Andrés Calvo Hermida y María F. Ríos, *"quienes la habían hecho suya por desecación de manglares que antes la constituían* y la poseían desde el año 1883." Dicha Corte, oída la información ofrecida por el promovente, declaró justificado el dominio de esa parcela a favor de Enrique Calvo Ríos. Se inscribió en el Registro de la Propiedad.

Siguió alegando El Pueblo que respecto a esa parcela se hicieron las siguientes operaciones:

1. Enrique Calvo Ríos vendió el 40% de ella a Mariano Pesquera Goenaga;

2. Pesquera Goenaga vendió a su vez 17% a Wenceslao Bosch y 7% a Martín Bellber;

3. Los señores Calvo Ríos, Pesquera Goenaga y Martín Bellber vendieron a José Dimas Riera las participaciones siguientes: Bellber su 7%; Pesquera su 16%, Calvo Ríos 1/2 de su condominio de 60%, o sea el 30%, en total 53%.

En definitiva, resultaba "que los actuales poseedores de la finca eran, con perjuicio del demandante, los tres demandados en la proporción siguiente:

don José Dimas Riera un 53%
don Enrique Calvo Ríos un 30%
don Wenceslao Bosch un 17%"

Se suplicó por El Pueblo se le declarara dueño en pleno dominio de la finca, se ordenara su entrega y la cancelación en el Registro de los asientos correspondientes.

La demanda la firmaba el Attorney General H. M. Hoyt, 2nd.

El 13 de marzo de 1910, comparecieron José Dimas Riera y Wenceslao Bosch. Por medio de una excepción previa alegaron: (1) Que la demanda no aducía hechos que determinaran una causa de acción y (2) que "tienen el carácter de tercero en el sentido que les reconoce la Ley Hipotecaria."

El 14 de marzo de 1910, compareció el otro demandado Enrique Calvo Ríos y también excepcionó la demanda por "no aducir hechos suficientes para determinar una causa de acción contra este demandado."

Discutidas las excepciones previas ante el Juez Martin E. Gill, éste las declaró sin lugar por medio de una resolución de fecha 9 de junio de 1910 que aparece textualmente transcrita a las págs. 1064 a 1066 del tomo 18 D.P.R.

Llama la atención el énfasis que dio el Juez Gill, en esa resolución a la naturaleza, calidad, tipo y clase de los terrenos en litigio, es decir, los caracteriza y define *"terrenos baldíos"*.

Contestaron la demanda José Dimas Riera y Wenceslao Bosch, exponiendo que al Pueblo de Puerto Rico no le correspondía la propiedad; que eran dueños de sus respectivos condominios con justo título y buena fe y que los tenían inscritos en el Registro de la Propiedad. Aceptaron la tramitación del expediente de dominio; expusieron que en ese expediente se formuló oposición por los Estados Unidos; que los Estados Unidos y El Pueblo de Puerto Rico, después de tal oposición celebraron ciertas transacciones sobre derechos y acciones que los primeros creían tener sobre esos terrenos.

Se enmendó la demanda en junio de 1910, para alegar adicionalmente que en la primera inscripción de la finca aparecía que los causantes de Enrique Calvo Ríos, sus padres don Andrés Calvo Hermida y doña María F. Ríos "la hicieron suya por desecación *de la zona de manglares que antes la constituían* y la poseyeron desde el 1883 ó 1885, teniéndola sembrada de yerba." (Énfasis nuestro.) La suscribió Foster V. Brown, como Attorney General.

Contestaron la demanda enmendada "José D. Riera" y W. Bosch. Interpusieron la defensa de terceros hipotecarios, el fracaso de la oposición en el expediente de dominio y la prescripción por un período de más de 20 años, o sea desde el 1883 hasta el 1906.

La contestó Enrique Calvo Ríos el 1 de julio de 1910; negó los hechos de la demanda enmendada; alegó que compró la finca a sus padres Andrés Calvo y María F. Ríos, que éstos la poseyeron como dueños; que tramitó el expediente de dominio que había aprobado "el Honorable Pedro de Aldrey, Juez de la Corte de Distrito de esta capital en 31 de mayo de 1907;" que sus padres *habían desecado esos terrenos* y los cultivaban; y que en caso de que El Pueblo tuviera derecho a la reivindicación a él debería pagar $7,000.00, "invertidos en la desecación y mejoramiento del inmueble objeto de la acción;" alegó la prescripción a tenor de lo dispuesto en el Art. 1957 del Código Civil Español y la orden judicial del 4 de abril de 1899 del General Henry, y, "aun si se quiere al Real Decreto de 17 de abril de 1884 *relativos a terrenos baldíos,* aprobado por S. M. el Rey de España."

El 22 de diciembre de 1910 compareció en el litigio Honorato Andrés García y solicitó que se le constituyera en parte demandada en el pleito por haber comprado al codemandado Enrique Calvo Ríos el 27 de septiembre anterior, su participación del 30% en la finca. A su moción acompañó una contestación alegando seis defensas, a saber,

que poseía su participación con justo título; la prescripción a tenor del Reglamento de 1884; la prescripción ordinaria; la prescripción extintiva del Art. 1864 del Código Civil de Puerto Rico; la de *res judicata* por virtud de la resolución dada en el expediente de dominio que se había convertido en contencioso; que cuando El Pueblo de Puerto Rico creyó haber adquirido derechos sobre la parcela ya ésta estaba en posesión legal de los demandados. Por enmienda expuso una séptima defensa de tercero hipotecario. En la contestación interpuso reconvención por $5,000.00 por mejoras hechas a la finca "en cuanto a su participación se refiere." Se le admitió como parte codemandada.

Fue el pleito a juicio ante el Juez Martin E. Gill. Dice el legajo de la sentencia:

". . . la susodicha causa fue oportunamente presentada para su vista ante el Hon. Martin E. Gill, Juez de la citada Corte y después de una amplia y detenida discusión de todas las materias que entraña, fue sometida a dicho Martin E. Gill para su resolución."

Poco después, el 14 de junio de 1911, falleció el Juez Gill, sin haber dictado "resolución definitiva sobre las materias en controversia en dicho pleito . . . quedando dichas materias y cuestiones pendientes de resolución."

Por estipulación escrita de las partes, fechada el 23 de junio de 1911, se acordó:

". . . que la causa arriba citada se traspase . . . a la Sección 1, presidida hoy por el Hon. Félix Córdova Dávila, quien queda autorizado para resolver y dictar sentencia sobre las materias y cuestiones contenidas en la misma en vista de los autos de la causa y alegatos en ella presentados, como si originalmente se hubiese incoado ante dicho Sr. Félix Córdova Dávila."

El 2 de agosto de 1911, el Juez Córdova Dávila emitió una extensa opinión y dictó sentencia final en la acción reivindicatoria por la cual decretó:

1ro. Que El Pueblo de Puerto Rico debía ser reintegrado *en el 30% de la finca* que poseía el codemandado original Enrique Calvo Ríos y que éste había traspasado al codemandado Honorato Andrés García;

2do. La desestimación de la demanda enmendada, respecto a los demandados José Dimas Riera y Wenceslao Bosch, por ser terceros hipotecarios y haber adquirido un título superior sobre el 70% remanente y;

3ro. La desestimación de la reconvención de $7,000.00, formulada por dicho Enrique Calvo Ríos.

### Opinión del Tribunal de Instancia

La elaborada opinión del Juez Córdova Dávila es muy extensa. La citaremos textualmente en parte y en parte trataremos de resumirla e intercalando comentarios nuestros.

Trataremos de relacionarla en todos sus aspectos. En primer lugar señalaremos los hechos que, de la prueba practicada ante el Juez Gill, consideró probados el Juez Córdova Dávila:

"[1.] En 6 de setiembre de 1897, Andrés Calvo, antecesor en título de su hijo el demandado Enrique Calvo Ríos, "dirigió una petición al Intendente General de Hacienda, haciendo constar que hacía 14 años había desecado, con sus propios y exclusivos recursos, en el barrio de Puerta de Tierra, una Zona de Mangle, con una cabida de 8,470 metros cuadrados y cincuenta centímetros. Basado en estos hechos y en los cuantiosos gastos realizados para convertir un radio de Mangle improductivo en terreno vegetal, el peticionario, deseando adquirir la propiedad de dicho terreno, en compensación con la Hacienda, solicitó del Intendente que éste dictase las órdenes oportunas, conducentes al indicado fin, significándole que estaba dispuesto a pagar la cantidad que se asignase, al terreno referido, según la práctica establecida y seguida hasta aquella fecha por la Intendencia General de Hacienda. Esta solicitud se presentó acompañada de una certificación expedida en 1883 por el ayudante facultativo de obras públicas, en la cual este funcionario manifiesta que a instancia de don Andrés Calvo, reconoció y midió una

Zona de Mangle, radicada en Puerta de Tierra, y desecada por el propio Calvo, a sus expensas, convirtiéndola en terreno vegetal. La cabida de esta Zona concuerda con la fijada por Calvo al terreno designado en su petición al Intendente.

[2.] En 22 de septiembre de 1897, estos documentos fueron enviados para informe a las autoridades correspondientes, y desde esta fecha, no encontramos en la prueba ningún dato que se relacione con las pretensiones del Sr. Calvo sobre los terrenos en cuestión.

[3.] En 8 de octubre de 1906, Enrique Calvo registró una solicitud en la Corte de Distrito de San Juan para justificar el dominio de 12,095 metros cuadrados de terreno, radicados en Puerta de Tierra, alegando que los había adquirido a título de compra de don Andrés Calvo y su esposa, quienes a su vez los adquirieron, con su trabajo personal, desecando las Zonas de Manglares que antes los constituían, cuyos trabajos efectuaron durante un período de tiempo que alcanza hasta el año de 1883, desde cuya fecha arranca su posesión.

[4.] Aprobado por la Corte el dominio del inmueble aludido, a favor de Enrique Calvo, se inscribió a su nombre en el Registro de la Propiedad, haciéndose constar en dicha inscripción que Andrés Calvo y María Felícita Ríos hicieron suyas la ameritada parcela de terreno por desecación de la Zona de Manglares que antes la constituían.

[5.] Posteriormente Enrique Calvo vendió el 40% del total de la finca a Mariano Pesquera, quien a su vez vendió a Wenceslao Bosch el 17% y el 7% a Martín Bellber, habiendo más tarde Bellber, Pesquera y Calvo vendido participaciones a José D. Riera, en esta forma: Bellber, el 7%, Pesquera el 16% y Calvo el 30%, resultando en definitiva poseedores del inmueble al promoverse este litigio, José D. Riera, en un 53%; Enrique Calvo en un 30%; y Wenceslao Bosch en un 17%. Después de haberse iniciado esta acción Enrique Calvo, vendió su participación a Honorato Andrés, quien se personó en autos, presentando una moción para que se le considerase como parte demandada, cuyo moción fue favorablemente resuelta por la Corte."

Luego de dar por probados los hechos anteriores, expuso el juez sentenciador en su opinión:

"Alegan los demandados que el Pueblo de Puerto Rico carece de título para ejercitar con éxito la acción reivindicatoria que exige necesariamente como requisitos esenciales, la designación de la finca, y la demostración, con pruebas fehacientes, del dominio que por título legítimo corresponda al demandante. La parte que promueve una acción reivindicatoria, debe confiar en la fortaleza de su propio título y en la claridad de su propia prueba, y no en la falta de título o debilidad de prueba del demandado.

En opinión nuestra, El Pueblo de Puerto Rico ha demostrado en este caso la identidad completa de la cosa reclamada y, en parte, el dominio de la misma. Decimos que el dominio ha sido justificado en parte, porque creemos que el demandante ha perdido sus derechos para reivindicar los terrenos adquiridos por los demandados Riera y Bosch, quienes, en nuestro concepto, ostentan hoy un título válido, amparados por los preceptos de la Ley Hipotecaria. Sobre este punto hablaremos más adelante.

El Art. 1ro. del Reglamento para la composición de terrenos realengos, en la Isla de Puerto Rico aprobado en Abril de 1884, dice así: —

'Se considerarán como realengos para los fines de este Reglamento y con arreglo a la Ley 14, título 12, libro 4to. de la Recopilación de Indias, todos los terrenos baldíos, suelos y tierras que no tengan dueños particulares legítimos, o lo que es lo mismo, que no hayan pasado nunca al dominio privado, en virtud de concesión gratuita u onerosa por parte de las autoridades competentes.'

De la prueba practicada en este caso y de las mismas alegaciones, resulta que Andrés Calvo, practicó gestiones para adquirir la propiedad en controversia por composición con el estado. Este hecho plenamente evidenciado, demuestra que en la época en que Andrés Calvo dio los primeros pasos para adquirir los terrenos en litigio, éstos no habían pasado al dominio privado, siendo desde luego, terrenos baldíos, pertenecientes al estado y sujetos a apropiación de acuerdo con el Reglamento anteriormente citado. La petición dirigida por Calvo al Intendente General de Hacienda en 1897, con el fin de adquirir estos terrenos por composición, es una admisión clara y concluyente de que los mismos pertenecían en aquella fecha al estado."

Después se hace referencia al Art. 8 del Tratado de Paz, entre España y Estados Unidos y a la cesión de bienes de aquélla a éstos, incluyendo edificios, muebles, cuarteles, fortalezas, establecimientos, vías públicas y demás bienes inmuebles que "con arreglo a derecho son del dominio público", que pertenecían a la Corona de España.

Se hace una cita de 32 C y c. 651, sobre el significado, en Estados Unidos, de los términos "public property", "terrenos públicos", o "dominio público". Dice la opinión que "Las palabras 'terrenos públicos' o 'dominio público, se usan habitualmente en los Estados Unidos para designar aquellos terrenos de los Estados Unidos o solamente de los Estados que se hallan sujetos a la venta o a cualquier otra disposición bajo las leyes generales, no estando retenidos ni reservados para ningún propósito público, o especial del Gobierno. No hay una definición establecida por los Estatutos de las palabras 'terrenos públicos', y su interpretación puede sufrir alguna variación en las diferentes leyes aprobadas para distintos propósitos, debiendo dárseles aquella interpretación que más se avenga con la intención del Congreso. (32 Cyc., 775–776.)"

La opinión hace referencia al estado de derecho que sigue a la cesión de territorios de un gobierno a otro y que "los terrenos que carezcan de dueños porque nadie se los haya apropiado, pasan a ser propiedad" del gobierno cesionario. Se sostiene que por el Tratado de París, la Ley Orgánica de 1900, una ley del Congreso de primero de julio de 1902, las proclamas presidenciales y un convenio llamado "Lomley Feuille agreement" y cierta escritura de permuta y traspaso otorgada entre el gobierno federal y el insular, los terrenos en litigio pertenecían a El Pueblo de Puerto Rico. También se sostiene que todos los bienes de la propiedad de la Corona de España pasaron, sin excepción alguna al gobierno de los Estados Unidos, además de aquellos que con arreglo a derecho eran de dominio público.

Respecto a las cuestiones a resolver, a continuación de lo antes relacionado, dice el juez sentenciador:

"Sentada por nosotros la afirmación de que, según la evidencia, *los terrenos en litigio,* que no hayan pasado al dominio privado, pertenecen al Pueblo de Puerto Rico, tócanos ahora decir *si estos bienes pueden adquirirse por prescripción, composición o de algún otro modo,* y en caso afirmativo si los demandados, ostentan hoy algún título válido que pueda oponerse con éxito a las pretensiones de la parte demandante." (Énfasis suplido.)

La opinión del Juez Córdova Dávila empieza entonces a resolver la principal cuestión planteada.

En un párrafo dice: ". . . declaramos que los terrenos pertenecientes al Estado, antes de la aprobación definitiva del Tratado de París, estaban sujetos a prescripción de acuerdo con las leyes entonces en vigor . . . ." Expone, citando a Cyc., que según la máxima *nullum tempus ocurrit regi,* aplicada en el derecho inglés, no podía adquirirse bienes de la Corona por posesión adversa y que la doctrina prevalece en Estados Unidos y que la prescripción contra Estados Unidos puede alegarse cuando una ley lo autoriza. Advertimos, a las págs. 742–743, que la situación, conforme al caso de *People* v. *Fortuna,* era distinta cuando se trataba de inmuebles sitos en Puerto Rico, donde el Congreso adoptó el estatuto de usucapión contra el Estado. Y dice el juez sentenciador que "[e]l mismo principio se aplica a favor de los *Estados de la Unión,* en ausencia de una disposición autorizando la prescripción . . . ." (Énfasis suplido.)

A los párrafos anteriores, sigue el que figura en la pág. 1082, tomo 18 D.P.R. de nuestra decisión:

"Aunque la Legislatura del país hubiese permanecido en silencio, el dominio del pueblo sobre los terrenos de su propiedad no podría prescribir hoy [hoy equivale al 2 de agosto de 1911, fecha de la opinión y sentencia] *aplicando la misma regla* que a los Estados se aplica. *La Asamblea Legislativa, sin embargo, ha consignado este precepto en el Código Político, cuyo artículo 9*

*dice de modo claro y terminante, que no puede adquirirse título a terrenos baldíos insulares por la posesión adversa de los mismos."* (Énfasis nuestro.)

En la primera oración de este párrafo se alude a la máxima *nullum tempus ocurrit regi.* En ella obviamente el Juez Córdova Dávila da a entender que si tal máxima del derecho común "que a los Estados Unidos se aplica", se siguiera o aplicara "hoy" (1911) a Puerto Rico, no podrían adquirirse por prescripción adversa los bienes del Estado. Pero, *por la siguiente segunda oración del mismo párrafo,* nos dice el propio juez sentenciador:

". . . La Asamblea Legislativa, sin embargo, *ha consignado este precepto* [no puede ser otro que la máxima inglesa a que se alude en la primera oración precedente] en el Código Político, cuyo artículo 9 dice *de modo claro y terminante,* que no puede adquirirse título *a terrenos baldíos insulares* por la posesión adversa de los mismos." (Énfasis nuestro.)

Lo que así expresó el Juez Córdova Dávila, es lo mismo que, en idénticas palabras, hemos venido sosteniendo: Que la Comisión Codificadora de 1901 y la Asamblea Legislativa, no obstante lo que sobre la materia se ha legislado y resuelto en los Estados de la Unión siguiendo la Ley Común inglesa, jamás optaron por una prohibición plena, absoluta y general de la prescripción contra el Estado, sino que, como dijo allí el juez sentenciador el "precepto" del derecho común, o la esencia del mismo, se consignó *"de modo claro y terminante"* en el Art. 9 del Código Político, limitando y restringiendo la no prescripción *"a títulos baldíos insulares"* solamente. El ámbito inmunizante de la excepción, como vemos, es pequeñísimo.

Seguimos resumiendo la opinión del tribunal de instancia. Continuó el Juez Córdova Dávila, después de citar a Manresa sobre la naturaleza de la prescripción que no se ha consumado, diciendo que se operó un cambio fundamental en las leyes políticas de este país, especialmente aquellas sobre la

disposición y gobierno de la propiedad pública y que "... los terrenos cedidos por la nación Española a los Estados Unidos, deben gobernarse y regularse por las leyes de este país y no por las leyes de la nación cedente."

Esto se decía en el año 1911, vigente la Carta Orgánica y toda la legislación española que puso en vigor el Acta Foraker, y vigentes los códigos de 1902. Claro, es posible que se refiriera, lógicamente, a toda la propiedad cedida que Estados Unidos se reservó, habiendo expresado el Congreso en las Cartas Orgánicas de 1900 y 1917, que la legislación que continuaba en vigor sólo podía ser

"... alterada, enmendada o revocada por la autoridad legislativa creada por la presente para Puerto Rico *o por una ley del Congreso de los Estados Unidos.*" (Énfasis nuestro.)

Hasta donde sepamos la máxima *nullum tempus ocurrit regi* nunca ha sido *"una ley del Congreso de los Estados Unidos,"* ni de Puerto Rico.

Consideró el Juez Córdova Dávila en *Pueblo* v. *Dimas,* que para el 1898 no se había consolidado en los demandados el dominio porque la prueba, a su juicio, "demuestra de modo satisfactorio, que esta posesión data de 1883." Y continúa diciendo en su opinión:

"... Desde esta fecha hasta 1898, únicamente han transcurrido quince años, *período de tiempo que no basta, según queda demostrado, para adquirir por prescripción aquellos terrenos pertenecientes al Estado.* Estos hechos, satisfactoriamente probados, demuestran que el expediente de dominio, tramitado y aprobado en 1906 carece de validez legal." (Énfasis nuestro.)

Bajo el Art. 2do. del Reglamento de 1884 para la composición de terrenos realengos, citado en la opinión, tratándose de "terrenos baldíos o título de autoridad competente", se consideraban propietarios:

"los que careciendo de títulos, acrediten haber poseído sin interrupción los expresados terrenos durante veinte años si se

encuentran en cultivo, y durante treinta años si se hallan incultos. Para que se entienda cultivado un terreno es necesario acreditar que lo ha estado en los tres últimos años."

Recuérdese que en este caso de Hicacos, el título de amparo se concedió el *12 de febrero de 1872;* que, asumiendo que se tratara de terrenos baldíos, los 30 años vencieron el 12 de febrero de 1902, es decir, antes de aprobarse el Código Político, con su Art. 9, referente sólo a terrenos baldíos, y vigente aún el nuevo plazo de 6 años para la prescripción ordinaria del Art. 1957 del Código Civil de 1889.

Respecto a la prescripción ordinaria alegada por los demandados el juez sentenciador se expresó así:

"Alegan también los demandados, acogiéndose a la prescripción ordinaria, la posesión de terreno reclamado, por un período que excede de diez años con buena fe y justo título. Esta alegación no es suficiente para adquirir por prescripción terrenos que pertenecieron y pertenecen al estado. Las disposiciones del Código Civil anterior sobre prescripción, así como las del Código Civil revisado, no son aplicables, cuando se trata de terrenos públicos, porque existen leyes especiales que regulan esta materia, de acuerdo con los Códigos citados, cuyos Arts. 1938 y 1839 respectivamente, en el Capítulo 1, título 18 que trata de la prescripción en general, dicen como sigue:—

'Las disposiciones del presente título se entienden sin perjuicio de lo que en este Código o en leyes especiales se establezca respecto a determinados casos de prescripción.'

La ley aplicable en el presente caso, es el reglamento para la composición de terrenos realengos en la Isla de Puerto Rico, anteriormente citado."

Regresando al presente caso de Hicacos, si tal Reglamento de 1884, fuere aplicable por haberse comenzado la posesión material en 1872, entonces, deberá contarse la posesión prescriptiva desde el 12 de febrero de 1872 en que oficialmente empezó bajo el título de amparo concedido válidamente por la Corona Española, hasta el 14 de enero de 1963, en que, por primera vez, el Estado reclamó como suyos los islotes

valiéndose de un aparente procedimiento de expropiación.

Consideró, finalmente, el Juez Córdova Dávila que no estaban protegidos por la Ley Hipotecaria los demandados Enrique Calvo Ríos y su cesionario Honorato Andrés García. Aquel promovió el expediente de dominio sin la posesión material de los 30 años fijados por el Reglamento de 1884, y sin haber obtenido justo título sobre los terrenos, y éste compró con conocimiento de la existencia del pleito.

Sin embargo, a los codemandados José Dimas Riera y Wenceslao Bosch los consideró terceros hipotecarios.

### Recurso de Apelación

El Pueblo de Puerto Rico no apeló del fallo del Juez Córdova Dávila en cuanto declaró sin lugar la demanda respecto a los codemandados "José D. Riera" y Wenceslao Bosch, por considerarlos terceros hipotecarios.

Pero Honorato Andrés García, el adquirente *pendente lite*, instó recurso de apelación el 6 de setpiembre de 1911.

El recurso fue argumentado ante el Tribunal Supremo el 19 de abril de 1912, representando al apelante el letrado Eugenio Benítez Castaño y a El Pueblo, el Sr. Charles E. Foote, fiscal del Tribunal.

### Decisión del Tribunal Supremo 18 D.P.R. 1061–1086

Fue resuelto el recurso el 21 de diciembre de 1912, confirmándose la sentencia apelada "en la parte en que lo ha sido", por una mayoría de jueces, siendo el ponente el Juez Asociado Señor del Toro, concurriendo con el entonces Presidente Hernández y el Juez Asociado Señor MacLeary.

Disintió el Juez Señor Wolf. No intervino el Juez Señor Aldrey, por haber sido el juez de distrito que en el año 1906 había aprobado el expediente de dominio instado por Calvo Ríos, declarado inválido por el juez sentenciador.

Las primeras ocho páginas de la opinión—1063 a 1070—exponen los antecedentes del caso que hemos relatado. En

la opinión se estudian las cuestiones debatidas en el recurso en el siguiente orden: 1ro. Examen del título del demandante y luego el del demandado Enrique Calvo Ríos; 2do. la prescripción de la acción del demandante; 3ro. si era necesario que antes de la reivindicatoria se ejercitara la acción de nulidad; 4to. si hubo cosa juzgada por la resolución en el expediente de dominio y, 5to. si procedía la reconvención del apelante Honorato Andrés García.

—1—

Manifiesta la opinión de mayoría que "No hay duda alguna con respecto *a la naturaleza de las tierras* que forman la parcela cuya propiedad se discute en este litigio. [pág. 1071] . . . se formó por desecación *de una zona de manglares.* 'Manglar' es un sitio poblado de mangles, y 'mangle' es un árbol que crece con gran abundancia . . . en la América intertropical."—(Énfasis nuestro.) pág. 1071.

A la pág. 1072, se continúa describiendo la naturaleza y clasificación de los terrenos en litigio, diciéndose textualmente:

"Los manglares en Puerto Rico eran considerados como montes del Estado, y, bien se les reconozca ese carácter, ya se les considere como terrenos *realengos o baldíos,* es necesario concluir que eran del dominio público y que sólo podían pasar al privado por los medios claramente establecidos en las leyes.

Atendida, pues, *la naturaleza de las tierras* que forman la parcela en litigio, es necesario concluir que el dominio de dicha parcela correspondía al Estado. Además, como veremos más adelante, Andrés Calvo, la persona de quien alegan que derivan sus derechos los demandados, al dirigirse al Estado Español con el fin de adquirir la propiedad de la parcela por composición, reconoció expresamente el título incuestionable del Estado." (Énfasis nuestro.)

Se dice, además, en la opinión mayoritaria, que los manglares de Puerto Rico, por su propia naturaleza, son "montes inundados por el mar." Y se expone—pág. 1073—

"Y esto sería siempre así aun cuando el lenguaje del Tratado [el de París] hubiere sido menos claro, pues es principio bien establecido, que cuando un gobierno extranjero cede territorio a los Estados Unidos, *las tierras baldías* y sin dueños pasan al dominio de los Estados Unidos." (Énfasis nuestro.)

Se habla en la opinión del Tribunal, y en ello el ponente da mucho énfasis, de que por el Acta Foraker se entregaron a Puerto Rico entre otras propiedades, "todas las *orillas de los puertos*, muelles, embarcaderos y *terrenos saneados*, pero sin incluir la superficie de los puertos y aguas navegables." y que el Presidente, por la autoridad de la Ley de 1 de julio de 1902, no hizo reserva de la "parcela de terreno desecado *procedente de manglares, sobre que versa este pleito.*" (Énfasis nuestro.)—pág. 1074.

—2—

Se resuelve que Enrique Calvo y Honorato Andrés no eran terceros porque sabían que dichas tierras se formaron por desecación de manglares.

Se analiza la evidencia presentada en el expediente de dominio aprobado e inscrito en el Registro de la Propiedad el 25 de setiembre de 1907, y se llega a la conclusión de que la posesión material de los manglares por parte de Andrés Calvo había comenzado en el año 1883, tal como lo había determinado el Juez sentenciador Córdova Dávila, por lo cual, al instarse en 1906 el expediente de dominio la posesión material únicamente se había disfrutado durante 23 años, sin título alguno concedido por la Corona de España, por el gobierno de Estados Unidos o por El Pueblo de Puerto Rico. Por ello la resolución aprobando el expediente carecía de validez.

A fin de que se comparen y contrasten los particulares hechos, eventos y circunstancias, y, también las disposiciones de ley o de reglamentos, concurrentes y aplicadas en el caso de *El Pueblo* v. *Dimas*, con los que concurren y están pre-

sentes en este recurso, vamos a reproducir a continuación aquellos párrafos de la opinión del Juez del Toro, en *Pueblo* v. *Dimas*, referente al fundamental punto de la prescripción:

"Aceptando que los terrenos de que se trata en este pleito puedan considerarse como realengos, veamos si Andrés Calvo había ya adquirido un título cuando se dirigió al Gobierno de acuerdo con la ley especial sobre la materia.

Que él no tenía ninguna concesión de la junta superior de repartimiento de terrenos baldíos, es evidente. Veamos si tenía algún derecho adquirido por prescripción.

La posesión de Andrés Calvo, según su propio escrito y según la conclusión a que llega el juez sentenciador después de analizar las pruebas aportadas en este pleito, data del año de 1883 y es bien claro que desde esa fecha a la del 6 de septiembre de 1897, no habían transcurrido los veinte años que el reglamento fija para adquirir los terrenos si se encontraban en cultivo, ni menos los treinta que señala para el caso de que se hallaran incultos. Luego es necesario concluir que tampoco tenía Andrés Calvo en aquella fecha ningún derecho a la propiedad de las tierras adquirido por prescripción, de acuerdo con el reglamento invocado.

Y si estudiamos el caso en relación con los preceptos generales del derecho en materia de prescripción, tampoco puede concluirse que fundándose en ellos pueda haberse adquirido por los demandados un título por prescripción.

Escriche define la prescripción adquisitiva como el modo de adquirir o hacer suya alguna cosa por tener la posesión de ella todo el tiempo que prefije la ley, y dice, además, que para que tenga lugar esta prescripción, son necesarios, hablando en general, cinco requisitos: 1ro., justo título; 2do., buena fe; 3ro., posesión continuada; 4to., el tiempo tasado por la ley; 5to., la prescriptibilidad de la cosa. (4 Escriche 639.) En estos principios se inspiran tanto las leyes antiguas como el Código Civil Español y el revisado y la Orden Judicial de 4 de abril de 1899.

Calvo sabía que lo que estaba desecando eran terrenos públicos y todo lo más que puede admitirse en su favor es que él lo hacía con la esperanza de que el Estado algún día le otorgaría el título de propiedad sobre los mismos. No puede, pues, concluirse que Calvo poseyera como dueño y con justo título las tierras en cuestión. El mismo consignó por escrito en 1897 que

estaba dispuesto a abonar de contado la cantidad que se asignara por el referido terreno. Por terrenos que nos pertenecen en plena propiedad, no tenemos que abonar cantidad alguna.

Bien se regule, pues, este caso por las Ordenanzas de Montes, bien por el reglamento para la composición de terrenos realengos, *o ya se apliquen los preceptos generales del derecho en materia de prescripción,* es necesario concluir que Andrés Calvo no llegó nunca a adquirir un título legal de propiedad sobre la parcela desecada, ni pudo, por consiguiente, trasmitirlo a Enrique Calvo, y en tal virtud que la sentencia declaratoria de dominio dictada por la Corte de Distrito de San Juan en 1906 a favor de Enrique Calvo, carece de validez legal.

Debe hacerse constar, además, que todas las pruebas relativas a la posesión antigua por parte de Andrés Calvo se refieren a una parcela de 8,470 metros, sin que conste de modo claro y preciso cuándo se desecaron los metros que faltan para llegar a los 12,090 que se acreditaron en el expediente de dominio. La diferencia, que alcanza a más de 3,500 metros, tuvo necesariamente que desecarse después del año de 1883.

Al fijar los derechos del demandado en este caso con referencia a la cuestión de prescripción, sólo podemos considerar los hechos acaecidos hasta el año de 1898 en que cesó la soberanía española en esta Isla y comenzó la americana. A partir de esa fecha, *no era posible adquirir por prescripción los terrenos de que se trata en este pleito . . . .*" (Énfasis nuestro.)

En la opinión de mayoría se dijo que a partir del 1898 (debió decirse: "a partir de 1 de julio de 1902") la prescripción no corría. Pero eso se dijo en relación con *los terrenos de que se trata en este pleito.*—pág. 1081—Es decir los "terrenos baldíos, realengos o montes del estado," de cuya naturaleza participaba la parcela litigada que era parte de *los manglares* del Estado.

Para abundar en ese fundamento jurídico que constituye el *ratio decidendi* de la opinión, es que se inserta, la transcrita oración en que el Juez Córdova Dávila usa la frase "aplicando la misma regla". No se resolvió que tal regla o máxima fuera aquí obligatoria o aplicable sin un estatuto expreso y especial autorizándolo, como la citada disposición

constitucional de Luisiana o la Sec. 5517 de los estatutos revisados de Tejas, que dejamos transcrita.

Pero tal aplicación no era posible, por el fundamento jurídico insoslayable que adoptamos al hacer nuestra la segunda parte del párrafo del juez sentenciador que dice:

". . . La Asamblea Legislativa, sin embargo, ha consignado *este precepto* [el de la máxima de derecho común inglés] en el Código Político, cuyo artículo 9 dice de *modo claro y terminante*, que no puede adquirirse título *a terrenos baldíos insulares* por la posesión adversa de los mismos." (Énfasis nuestro.)

Jamás este Tribunal Supremo dio al Art. 9 del Código Político en el caso de *El Pueblo* v. *Dimas*, un alcance general ni extendió o amplió su ámbito o esfera de aplicación, a terrenos válidamente cedidos por la Corona de España, inscritos en el Registro desde el 1883, dedicados pública y constantemente al cultivo de pastos para la agricultura del país, edificados y a la industria de cal y productos de construcción, durante 26 años bajo la bandera española y 65 años bajo la norteamericana.

Hasta ahora nadie ha intentado demostrar, ni es posible intentarlo racionalmente, que los islotes son terrenos baldíos o realengos.

No haremos referencia a los últimos puntos sobre la cosa juzgada y la reconvención de Calvo porque ningún interés tienen a los fines del presente recurso.

Ni el Juez Gill ni el Juez Córdova Dávila, ni el Juez del Toro, en sus respectivas ponencias, llegaron a la conclusión general e incondicional de que todos "los terrenos del pueblo de Puerto Rico no pueden adquirirse por prescripción." No se arriesgaron a ello porque el estado de las legislaciones envueltas, española, congresional y puertorriqueña, no lo hubiera permitido. Se refirieron, como dijo el Juez del Toro, "*a los terrenos de que se trata en este pleito.*" Y ellos sabían que para enmendar, alterar o revocar nuestro instituto español de prescripción adoptado por el gobierno militar, el

Presidente y el Congreso de los Estados Unidos, y continuado intacto por la Legislatura de 1902, era necesario e indispensable otra ley aprobada válidamente,

". . . por la autoridad legislativa creada por la presente para Puerto Rico, o por una ley del Congreso de los Estados Unidos." (Sec. 8, Carta Orgánica de 1900.)

Y ellos sabían, que no se había adoptado por ley alguna, en términos generales y amplios, el precepto de *nulla temporis ocurrit regi,* sino con alcances, virtud y eficacia restringidísimos, a un espacio superficial de Puerto Rico, que no cubría 1/25 del 1% de su territorio, es decir, a sus *terrenos baldíos,* casi compuestos hoy por los escasos manglares y montes del Estado. Y el Juez Córdova Dávila resolvió que ello era así por imperio del ". . . Código Político, cuyo artículo 9 *dice de modo* claro y terminante, que no puede adquirirse título a *terrenos baldíos insulares* por la posesión adversa de los mismos."

Y precisamente, esa es, y ha sido nuestra posición en este recurso. Que, única y exclusivamente, están fuera del alcance de la prescripción, aquellos terrenos patrimoniales del Estado, que positivamente puedan clasificarse como *terrenos baldíos.* Los demás *bienes patrimoniales o de propiedad particular o privada* del Estado, que se encuentran en el comercio de los hombres, como son los islotes Hicacos y Ratones, sí están cubiertos por o al inmediato alcance de nuestro estatuto prescriptivo.

La decisión de *El Pueblo* v. *Dimas,* antes de ser contraria a la tesis de la usucapión fiscal la apoya, defiende y sostiene. Tomando en cuenta sus particulares hechos y circunstancias, no se puede considerar un precedente apropiado para combatir nuestra posición, sino para sostenerla. El *sin embargo* es la clave del verdadero pensamiento jurídico del Juez Córdova Dávila que hicimos nuestro.

Como parte de la "biografía procesal" del caso de *El Pueblo* v. *Dimas,* agregaremos, que el apelante Honorato

Andrés García interpuso apelación de nuestro fallo para la Corte Suprema de Estados Unidos, el 18 de diciembre de 1914 bajo la firma del ilustre jurista Eugenio Benítez, en ese día. A los fines de ese nuevo recurso, formuló un "Pliego de Errores", alegando la comisión, por la mayoría que decidió, de 17 errores.

No llegó a discutirse el recurso ante la Corte Suprema federal, porque las partes suscribieron "cierto convenio de transacción", el 30 de junio de 1915, suscrito por el Attorney General de Puerto Rico y el Comisionado del Interior, de una parte, y por Luis Sánchez Morales y el apelante Honorato Andrés, de la otra parte, a virtud del cual, por una de sus estipulaciones, éste se comprometió a desistir, y desistió, de su recurso, el 2 de julio de 1915.

### Jurisprudencia Posterior a Pueblo v. Dimas

*Pueblo* v. *Dimas* establece, ratifica o rechaza diversas doctrinas, principios, máximas y postulados, substantivos o procesales, sobre variadas materias de Derecho, tales como: orígenes, fuentes y naturaleza de títulos sobre propiedades del Estado; clasificación y características de las mismas; cesiones y reservas congresionales y presidenciales; título o derecho eminente del Estado; propiedad específica sobre manglares, terrenos baldíos, bienes realengos y montes del Estado; propiedades de uso común, uso público, dominio público, y, patrimoniales del Estado; la previa acción anulatoria del título y la reivindicatoria; prescripción contra el Estado; defensa de tercero hipotecario contra el Estado; eficacia de cosa juzgada de resoluciones en expedientes de dominio; formas y reglamentos anteriores para adquirir bienes inmuebles del Estado, etc.

En los 56 años de jurisprudencia siguiente a esa decisión, es decir, hasta diciembre de 1968, la misma ha sido citada, aplicada o comentada en relación con sus variados pronunciamientos, en los 18 casos siguientes:

(1) *Pueblo* v. *Municipio de San Juan,* 19 D.P.R. 656, 667 (Del Toro) (1913); (2) *Pesquera* v. *Fernández,* 22 D.P.R. 53, 67 (Del Toro) (1915); (3) *Pueblo* v. *Riera,* 27 D.P.R. 1, 4 (Aldrey) (1919); (4) *Pueblo* v. *Sucn. Valdés,* 31 D.P.R. 223, 233 (Hutchison) (1922); (5) *Pueblo* v. *Esteves,* 36 D.P.R. 407, 408 (Del Toro) (1927); (6) *González Rodríguez* v. *Fumero,* 38 D.P.R. 556, 570 (Texidor) (1928); (7) *Miranda* v. *Municipio de Aguadilla,* 39 D.P.R. 467, 470 (Hutchison) (1929); (8) *Fajardo Sugar Growers Ass'n.* v. *Kramer,* 45 D.P.R. 348 (Del Toro) (1933); (9) *González* v. *Colón,* 49 D.P.R. 557, 558 (Córdova Dávila) (1936); (10) *Sucn. Trías* v. *Porto Rico Leaf Tobacco Co.,* 50 D.P.R. 91, 95 (Hutchison) (1936); (11) *Pueblo* v. *Rojas,* 53 D.P.R. 121, 131 (Travieso) (1938); (12) *Rivera* v. *Sucn. Caraballo,* 56 D.P.R. 736, 747 (Del Toro) (1940); (13) *Gobierno de la Capital* v. *Casino Español,* 56 D.P.R. 790, 801 (Del Toro) (1940); (14) *Moore* v. *Corte,* 59 D.P.R. 620 (Del Toro) (1941); (15) *Pueblo* v. *Del Valle,* 60 D.P.R. 184, 191 (Todd, Jr.) (1942); (16) *Jiménez* v. *Municipio,* 70 D.P.R. 517, 519 (Todd, Jr.) (1949); (17) *Mario Mercado e Hijos* v. *Comisión,* 73 D.P.R. 589, 594 (Marrero) (1952); (18) *Sucn. Marrero* v. *Santiago,* 74 D.P.R. 816, 820 (Marrero) (1953).

En muchos de ellos se da al caso de *Dimas* un alcance doctrinal que no puede atribuírsele.

### *Algunos casos posteriores a Dimas*

Digamos algo sobre los casos de *Pueblo* v. *Municipio de San Juan,* 19 D.P.R. 656 (1913); *Miranda* v. *Municipio de Aguadilla,* 39 D.P.R. 467 (1929); *Pueblo* v. *Rojas,* 53 D.P.R. 121 (1938); *Jiménez* v. *Municipio,* 70 D.P.R. 517 (1949).

La naturaleza y características de las propiedades envueltas en estos cuatro casos, con excepción, hasta cierto punto, del caso de *Rojas,* no es la misma que la naturaleza y características de los manglares o terrenos baldíos objeto del litigio en *Pueblo* v. *Dimas.* En ellos no se analiza ni discute

esta decisión, simplemente se hace referencia a ella, a modo de mera advertencia de que ya habíamos resuelto que "no prescriben los bienes del Estado." Estas simples alusiones a esa decisión, desde luego, no implican válidas modificaciones o extensiones de la *ratio decidendi* en el caso de *Dimas*.

Si en ellos hubiéramos aplicado los originales Arts. 328, 329, 1831, 1833, 1837, 1839, 1858, 1860, 1862 y 1864, de nuestro Código Civil de 1902 y el Art. 9 del Código Político tal como fue interpretado en el caso de *Dimas*, jamás hubiéramos dicho en términos absolutos y generales que la prescripción no corre contra el Estado en ningún caso. Comitimos un imperdonable error jurídico en, a la ligera, así afirmarlo en esos casos posteriores.

El Gobierno Militar, establecido el 18 de octubre de 1898, por su Orden General Núm. 1, autorizó la continuación de la vigencia de "las Leyes provinciales y municipales hasta donde afectaran la determinación de derechos privados correspondientes a individuos o propiedades."

La soberanía americana, en su orden político, empieza con el Tratado de Paz, firmado en París el 10 de diciembre de 1898. En su Art. VIII se dispuso que la cesión que España hacía a los Estados Unidos de la Isla de Puerto Rico,

". . . *en nada puede mermar la propiedad, o los derechos que correspondan con arreglo a las leyes, al poseedor pacífico de los bienes de todas clases* de las provincias, municipios, establecimientos públicos o privados, corporaciones civiles o eclesiásticas, o de cualesquiera otras colectividades que tienen personalidad jurídica para adquirir y poseer bienes en los mencionados territorios . . . cedidos y de *los individuos particulares, cualquiera que sea su nacionalidad.*" (Énfasis suplido.)

Y todo esto se estipula y ordena en esos históricos documentos, a sabiendas de que Puerto Rico vive bajo un avanzado sistema de Derecho civil, codificado, desde el 1 de enero de 1890 y de que entre los modos legítimos de adquirir la propiedad patrimonial o privada del Estado estaba la usucapión,

con arreglo al Código Civil de ese año y a los distintos Reglamentos para adquirir los bienes realengos del Estado.

Y el 12 de abril de 1900, el Congreso de los Estados Unidos y su Presidente, en uso de sus poderes constitucionales sobre territorios, adoptan, enmiendan y autorizan la continuación ininterrumpida de la vigencia en el territorio de Puerto Rico, de todas "las leyes y ordenanzas de Puerto Rico actualmente en vigor."

Entre esas leyes está el Código Civil español de 1890, con su instituto de la usucapión, que sólo queda derogado por el Código Civil revisado de 1 de julio de 1902, estatuto en que se vacía, total y literalmente, los preceptos españoles de prescripción contra los bienes patrimoniales y privados del Estado, con la especial excepción de los terrenos baldíos señalada en la final oración del Art. 9 del Código Político que también empieza a regir ese mismo día.

Y siguen aún rigiendo, después del 1 de julio de 1902, los términos prescriptivos del Código Civil español, cuando ha empezado la prescripción a correr antes de esa fecha y bajo su imperio, con arreglo al Art. 1840 del Código Civil Revisado de 1902 que dice:

"Artículo 1840.—La prescripción comenzada antes de la publicación de este Código se regirá por las leyes anteriores al mismo . . . ."

Las disposiciones transitorias del nuevo Código aseguró y protegió todos los derechos substantivos nacidos al amparo de la legislación anterior.

Ya hemos visto cómo el Acta Jones de 1917 protegió tales derechos. Nuestra Constitución le da rango constitucional a el derecho al disfrute de la propiedad y prohíbe su gratuita expropiación o lesión.

En medio de todo, se aprueba la última oración del Art. 9 del Código Político, que confirma nuestro estatuto general de prescripción contra el Estado, excluyendo clara y termi-

nantemente, como dijo el Juez Córdova Dávila, de esa regla general, únicamente a los terrenos baldíos, que comprenden pantanos, manglares, terrenos realengos, terrenos sin dueños en tiempo alguno y montes del Estado.

Después está la Corte de Circuito de Apelaciones, Primer Circuito, fallando el caso de *Fortuna Estates*, que relacionamos en las págs. 742 y 743, en donde se resolvió, ya en el año 1922.

". . . the United States by continuing Section 1957 [prescripción ordinaria] in force *sanctioned the acquisition of a prescriptive title against it.*" (Énfasis nuestro.)

Volvemos a decir, con vista a la legislación relacionada, que si esto se resolvió por un tribunal de jerarquía judicial superior a la nuestra, por jueces americanos, contra su propio gobierno federal, ¿con qué derecho se nos ocurre decir que el estatuto de prescripción de bienes patrimoniales o privados del Estado desapareció con el cambio de soberanía, cuando entonces adquirió mayor pujanza, fuerza y eficacia, al hacerlo suyo, un Tratado de París, un Gobierno Militar, un Congreso federal, una Comisión Codificadora y una Asamblea Legislativa de Puerto Rico?

En fin de cuentas, lo que acertadamente podemos afirmar es que, a partir del 1 de julio de 1902, no podrán ser adquiridas por posesión adversa, *los terrenos baldíos* del Estado y que el transcurso del término prescriptivo *sobre terrenos baldíos* comenzado antes de esa fecha, pero no consumado al 1 de julio de 1902, quedó de derecho interrumpido, al declararse legalmente imprescriptibles *los terrenos baldíos del Estado*.

Volvamos a los cuatro casos antes citados en los que, a veces, se hacen equívocas referencias al caso de *Pueblo* v. *Dimas*.

En *Pueblo* v. *Municipio de San Juan*, 19 D.P.R. 656, 657 (1913), la cuestión fundamental discutida y resuelta fue

si era válida la cesión hecha al Ayuntamiento de San Juan por el Capitán General M. Macías, Gobernador General de la Isla, *el 7 de setiembre de 1898*, de un solar que pertenecía a la reserva del ramo de guerra de la nación española.

Se resolvió que la cesión era inválida por que el Gobernador General carecía de autoridad para hacer tal cesión y "decidir por sí solo este asunto." El pleito de reivindicación fue fallado en contra del Municipio de San Juan, pero reconociéndose al municipio como propietario del edificio construido sobre el solar del Pueblo de Puerto Rico.

La solución final fue:

"Decidiendo el pleito, pues, de acuerdo con la ley, se impone la confirmación de la sentencia apelada, en cuanto a la reivindicación de los terrenos cedidos por el Gobernador General de Puerto Rico al Municipio de San Juan." (pág. 667.)

Citando a *Pueblo* v. *Dimas*, dijimos, que "las cesiones se verificaron en 1898 y en ese mismo año cesó la soberanía española en Puerto Rico," y que después de comenzada la nueva soberanía "dicho medio de adquisición de propiedad no estaba autorizado en contra de los Estados Unidos, ni en contra de Puerto Rico."

Como autoridad para ello sólo descansamos en esa alusión a *Pueblo* v. *Dimas*. Ya sabemos cual fue el tipo de terreno envuelto en el caso de *Dimas* y lo que allí se dijo sobre los terrenos baldíos. También sabemos lo que en 1922 se resolvió en *Fortuna Estates*, por un Tribunal federal con poder entonces para revocar, anular y alterar nuestras decisiones:

". . . the United States by continuing Section 1957 in force sanctioned the acquisition of a prescriptive title against it."

En *Miranda* v. *Municipio de Aguadilla*, 39 D.P.R. 467 (1929), se trataba de "un procedimiento para establecer . . . título sobre cierta casa y solar ubicados en el Municipio de Aguadilla." Éste se opuso alegando que el solar en cuestión formaba parte de un predio mayor suyo que se

le había traspasado por una Ley aprobada el 3 de agosto de 1923.

Se indicó en la opinión, claramente, que no se trataba de terrenos baldíos:

"La ley describe una faja de terreno que linda por el poniente con la zona marítima y por el sur con el 'Cañito'. *Tal descripción no prueba que el terreno quede sumergido bajo el agua cuando la marea está alta, o de que sea un manglar, o de que haya sido saneado.*" (Énfasis nuestro.) (pág. 470.)

También se consignó en la opinión del Juez Hutchison:

"El peticionario estableció un caso *prima facie* de posesión por prescripción durante un término de más de treinta años, y de posesión de buena fe y con justo título durante la mayor parte de ese tiempo. Su título por prescripción, de acuerdo con el artículo 1858 del Código Civil, había sido perfeccionado antes de que el municipio adquiriera interés alguno en la parcela mayor que éste ahora reclama. La ley de la Legislatura autorizando al Comisionado del Interior a traspasar una faja de terreno que no se había demostrado que pertenecía al Pueblo de Puerto Rico al tiempo de esa autorización, no interrumpió el transcurso del período estatutorio que aún no había expirado, ni despojó al peticionario de un título previamente adquirido." (pág. 471.)

El fallo apelado fue revocado. A la página 470, se hace referencia a la *"teoría del juez sentenciador,"* en un párrafo que dice:

"La corte inferior desestimó el procedimiento fundándose en que el título de bienes inmuebles no puede ser adquirido mediante prescripción contra los Estados Unidos o El Pueblo de Puerto Rico. La teoría del juez sentenciador fue que la propiedad en cuestión había pasado de la corona de España a los Estados Unidos de acuerdo con el Tratado de París, y de los Estados Unidos al Pueblo de Puerto Rico por virtud de las distintas leyes del Congreso a que hacen referencia los casos de *El Pueblo* v. *Dimas*, 18 D.P.R. 1061; y *El Pueblo* v. *Municipio de San Juan*, 19 D.P.R. 656. Esta teoría asumió que hasta el momento del cambio de soberanía, la corona de España jamás se había desprendido de su título sobre el predio de terreno ahora en con-

troversia. Pero no hay base satisfactoria alguna para tal conclusión en el presente caso."

*Pueblo* v. *Rojas*, 53 D.P.R. 121 (1938). En este caso se trata de una reivindicación de "ciertos *terrenos baldíos, cubiertos de monte casi en su totalidad,* inventariados con vista de los antecedentes existentes en los archivos de la Secretaría Civil en marzo de 1900." (Énfasis nuestro.) (pág. 125)

La prueba demostró que esos terrenos baldíos figuraban en el Expediente Núm. 10 del Departamento de lo Interior, titulado

"Inventario de los *montes públicos* y *terrenos baldíos* propiedad del Estado existentes en la Isla. (Énfasis nuestro.) [pág. 125.]

. . . y que esos terrenos, con otros, habían sido mensurados y deslindados por la Corona de España por los años de 1879 a 1883, declarados montes del Estado y ocupado y poseído por el Estado en todo momento; que el terreno en litigio también había sido deslindado en 1923 y que estaban comprendidos dentro de los montes "De la Vaca Muerta' y 'La Cuchilla del Prelado.' " (pág. 128.)

El tribunal sentenciador declaró con lugar la reivindicación y confirmamos su fallo. La prescripción alegada encontró un obstáculo legal infranqueable en el Art. 9, última oración, del Código Político, tratándose de terrenos baldíos. En ese aspecto, era de aplicación lo dicho en *Pueblo* v. *Dimas.*

En *Jiménez* v. *Municipio,* 70 D.P.R. 517 (1949), este Tribunal, dejó un poco a un lado la exagerada tendencia americanizante que afloró en las primeras dos décadas de este siglo en nuestras decisiones, con la simple adaptación de máximas y estatutos angloamericanos y fallos de jueces que formaron parte de "las fuerzas para americanizar la isla," a que se refiere la Comisión Codificadora de 1901, en su Informe al Congreso. Véase pág. 27, vol. I, partes I, Il y III.

Como estaba ya resuelto en *Gobierno de la Capital* v. *Casino Español*, 56 D.P.R. 790 (1940), ponencia del Juez Presidente Del Toro, resolvimos en *Jiménez* v. *Municipio*, supra, que los bienes patrimoniales pertenecientes a los municipios, que son bienes de propiedad privada, pueden ser adquiridos por posesión adversa.

También allí dijimos que los derechos de carácter público, la propiedad poseída para uso público o por virtud de fideicomisos, por el contrario, no estaban sujetos a la usucapión.

Hace tiempo que lo mismo debió decirse respecto a los bienes del gobierno de Puerto Rico, al igual que se dijo, nada menos que respecto a los bienes patrimoniales del gobierno de los Estados Unidos, por la Corte de Circuito de Apelaciones del Primer Circuito. No hay razón válida aquí para establecer esa antijurídica distinción.

Como hemos visto la regla de los casos del *Casino Español* y de *Jiménez* es la misma en casi todos los Estados de la Unión, no obstante las disposiciones constitucionales y estatutarias en contrario, como en Luisiana.

El derecho permite la usucapión de bienes patrimoniales del Estado, poniendo en pie de igual, sin privilegios odiosos, al ciudadano con el Estado. No se trata de la usucapión de bienes que no están dentro del comercio de los hombres, como las calles, plazas, parques públicos, hospitales, alcaldías, cárceles y demás bienes destinados al uso público. Se trata de la usucapión de propiedad privada del Estado, adquirida y poseída como los bienes individuales y privados de cualquier ciudadano y que por no ser terrenos baldíos se puede dedicar a fines de utilidad social.

La cosa del Estado apta para la usucapión, sostenemos, es su propiedad privada utilizable, buena para la agricultura, la industria y el tráfico y comercio. Por eso es que el Estado ha excluido de la usucapión, como excepción, aquellos bienes suyos que no tienen gran utilidad social, que puedan estar

comprendidos entre la clasificación de terrenos baldíos, como los pantanos, los manglares, los montes del Estado y bienes realengos o que nunca han tenido dueño privado.

Si se ha poseído como dueño durante el transcurso del término fijado por ley, en las condiciones que ésta señala, ese bien patrimonial, de utilidad social e individual en manos del ciudadano, el buen sentido, aconseja que ese estado posesorio no se perturbe, que se permita reconocerse como transformado, por la absorbente realidad jurídica, en un estado perfecto de derecho.

La opinión pública parece repudiar hasta la limitación sobre terrenos baldíos impuesta al estatuto general prescriptivo. En la pasada sesión de la 5ta. Asamblea Legislativa, se presentó por el Senador Ortiz Toro, ex Procurador General de Puerto Rico, el P. del S. 755, para enmendar el Art. 9 del Código Político "de suerte que las leyes relativas a la prescripción adquisitiva del dominio sobre bienes muebles e inmuebles se apliquen al Estado Libre Asociado en *la misma extensión* [así se eliminaba la no prescripción de terrenos baldíos] que a las personas particulares." (Énfasis nuestro.) Ese proyecto, presentado por un legislador de minoría, no podía tener entonces oportunidad alguna de ser considerado; no podía captar el interés jurídico legislativo en un año saturado de preocupaciones electorales como el de 1968.

Se proponía en el proyecto que se enmendara el Art. 9 del Código Político de Puerto Rico para que se leyera así:

"Artículo 9.—Si alguna persona, so pretexto de algún derecho incompatible con la jurisdicción del Estado Libre Asociado de Puerto Rico, usurpare propiedades o terrenos pertenecientes a Puerto Rico, el Secretario de Justicia adoptará las medidas necesarias para expulsar al usurpador; entendiéndose, sin embargo, que las leyes relativas a la prescripción adquisitiva del dominio sobre bienes muebles e inmuebles se aplicarán al Estado Libre Asociado de Puerto Rico *en la misma extensión* que a las personas particulares." (Énfasis nuestro.)

## Posición Actual del Estado

Pero aún queda algo más por decir. En otro recurso de revisión, Núm. R-65-110, de *José Ángel Rubert Armstrong*, demandantes-recurridos v. *El Estado Libre Asociado de Puerto Rico*,\* sobre reivindicación, resuelto hoy, el demandado-recurrente E.L.A., expuso en su alegato:

"Estos bienes de dominio nacional fueron cedidos por España a virtud del Tratado de París de 1898, Art. VIII. A partir de dicha cesión los bienes del Gobierno no son susceptibles de adquirirse por los particulares mediante prescripción adquisitiva *a menos que estos bienes sean patrimoniales*, lo cual obviamente no sucede en este caso y que la zona marítima-terrestre es de uso público. Siendo esto así, la demandante no pudo haber adquirido dichos bienes por prescripción." (Énfasis nuestro.)

En ese caso de *Rubert*, El Pueblo se acoge a la verdadera y auténtica doctrina del caso de *Dimas*, es decir, que procede la prescripción contra bienes patrimoniales del Estado, excepto cuando se trata de terrenos baldíos, y, desde luego, cuando también se trata de terrenos de uso común o que están fuera del comercio de los hombres.

La falla principal de la jurisprudencia posterior al caso de *El Pueblo* v. *Dimas*, repetimos, con pocas excepciones, es haberle atribuido un alcance jurídico a su doctrina que jamás tuvo, o debió tener, por sus peculiares e individuales hechos y circunstancias. No podemos aprovecharnos de nuestros propios errores ni perpetuarlos conscientemente. Los privilegios ya no pueden ni deben perdurar.

Nuestra Asamblea Legislativa de 1902, *para después del 1 de julio de ese año*—no a partir precisamente del cambio de soberanía—legisló *de un modo especial, categórico, claro y terminante*, sobre la problemática de la usucapión contra el Estado, y lo hizo en forma positiva y general, respecto a sus bienes patrimoniales, a través del Código Civil, en su

---

\* Nota de Compilador: 97 D.P.R. 588 (1969).

instituto prescriptivo y, en forma negativa, limitadísima y excepcional, respecto a terrenos baldíos exclusivamente, por medio de la segunda oración del Art. 9 del Código Político, cuyo texto es:

"No podrá adquirirse títulos a *terrenos baldíos insulares* por posesión adversa, o contraria al título de otra u otras personas." (Énfasis nuestro.)

Así se prescribió la única regla que aquí debe gobernar respecto a la materia. Lo menos que podemos hacer, ante un precepto tan claro y libre de ambigüedad, es respetarlo, acatarlo y aplicarlo "tal como suenan" sus palabras.

### *Advertencia Histórica*

Sería muy saludable, de vez en cuando, recordar que en el famoso caso de *Giménez* v. *Brenes*, 10 D.P.R. 127, 170 (1906), el ilustre Juez MacLeary, al final de su inolvidable disenso, se expresó así:—

"Si para llegar a una correcta decisión de este caso es necesario modificar las opiniones dictadas anteriormente por este Tribunal, *que se modifiquen de cualquier modo,* o que se anulen si fuere necesario. *Al error nunca se le puede convertir en verdad,* por más que se insista en él; si se ha seguido un camino equivocado, volvamos sobre nuestros pasos *antes de que nos perdamos en el laberinto de los engaños, atrevámonos a proceder correctamente."* (Énfasis suplido.)